Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
          armington.jeff@dorsey.com
          thomson.michael@dorsey.com

*Attorneys for Debtor Perseon Corporation*
*and Proposed Attorneys for Debtor in Possession*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 16-24435 |
| PERSEON CORPORATION, | Chapter 11 |
| Debtor. | Chief Judge R. Kimball Mosier |

---

## DECLARATION OF CLINTON E. CARNELL JR. IN SUPPORT OF CHAPTER 11 PETITION, FIRST DAY MOTIONS AND 363 SALE MOTION

I, Clinton E. Carnell Jr., hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I make this Omnibus Declaration (the "Omnibus Declaration") in support of the motions requesting various types of relief (collectively, the "Motions")[1] filed by Person Corporation (the "Debtor" or "Perseon") in the above-captioned case (the "Chapter 11 Case").

---

[1]      All capitalized terms not defined herein shall have the meanings ascribed to them in the applicable Motion.

2.      I am a currently and have been the Chief Executive Officer and President of Perseon since November of 2014.  In such capacity, I am fully cognizant of all facets of Debtor's operations.   As such, except as otherwise indicated, all facts set forth in this Omnibus Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review or relevant documents, and information supplied to me by other members of Debtor's management and Debtor's various business and legal advisors.  If called upon to testify as to the content of this Omnibus Declaration, I could and would do so.

3.      On May 23, 2016, the ("Petition Date"), the Debtor filed a voluntary Chapter 11 petition for relief.  The Debtor has filed its First Day Motions to allow it to operate effectively in the Chapter 11 Case.  The relief sought in the First Day Motions is critical to the Debtor's business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtor is provided the opportunity to reorganize or liquidate successfully.

4.      This Omnibus Declaration is intended to provide the Court with background information regarding the Debtor, as well as the context for the initial relief sought by the Debtor.  Accordingly, the Omnibus Declaration is organized into two parts (a) an overview of the Debtor's business and the events leading up to the Chapter 11 Case, and (b) an explanation of the relief sought in the First Day Motions and the Asset Sale Motion.

### BACKGROUND

5.      On the Petition Date, the Debtor filed its voluntary petition with the Court for relief under chapter 11 of title 11 of the Bankruptcy Code, thereby commencing this "Chapter 11 Case".

6.    The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.    No trustee or examiner has been appointed in this case.

8.    Perseon is a publicly traded medical technology developer and manufacturer that was organized as BSD Medical Corporation under Delaware law in 1986.[2]

9.    Faced with decreasing revenues and Beginning in roughly 2013, Perseon began searching for either a strategic partner or an acquirer of its assets.

10.    On April 1, 2015, Perseon sold the assets associated with its hyperthermia cancer treatment systems to Pyrexar Medical, Inc. ("Pyrexar") in exchange for 19.9% of the Series A Preferred Shares of Pyrexar and a percentage of revenues that Pyrexar would receive from sales of the hyperthermia cancer treatment systems.

11.    Since the sale of its hyperthermia cancer treatment systems to Pyrexar, Perseon has primarily focused on creating and manufacturing thermal ablation technologies for treating cancer.

12.    In July and August of 2015, Perseon completed an offering of common stock and warrants which netted approximately $4.3 million in proceeds to the company.

13.    On October 26, 2015, Perseon and Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned subsidiary of Galil through a tender offer and merger (the "Merger").

---

[2]    Effective February 17, 2015, Perseon amended its certificate of incorporation to change its legal name to "Perseon Corporation" from BSD Medical Corporation.

14. Throughout the Merger process, Perseon advised its shareholders that notwithstanding any cost cutting measures by Perseon, if the Merger was not consummated, Perseon may not be able to continue operations.

15. On December 22, 2015, Galil terminated the Merger Agreement because certain conditions to the tender offer and Merger were not performed.

16. On December 23, 2015, Perseon terminated a substantial number of employees in order to materially reduce expenses.

17. After Galil terminated the Merger Agreement, Perseon renewed its efforts to find either a strategic partner or a purchaser for its assets.

18. With Perseon's financial condition deteriorating rapidly, in an effort to raise cash, on February 22, 2016, Perseon sold the shares it obtained from Pyrexar back to Pyrexar for a $1,000,000 purchase price.

19. Prior to the Petition Date, Perseon attempted to obtain additional financing outside of bankruptcy, but was unable to do so.

20. Accordingly, after continuing to canvas the marketplace to find potential acquirers of the Debtor's assets, the Debtor negotiated and entered into an asset purchase agreement with MedLink Technologies, LLC (the "APA") and determined that the best way to conduct the asset sale, resolve any claims against the Debtor, and to pay the Debtor's creditors would be to file this Chapter 11 Case.

## FIRST DAY MOTIONS AND ASSET SALE MOTION

21. The Debtor has commenced its Chapter 11 Case to maintain its business as a going concern while it efficiently and effectively sell its assets to maximize the value of the

Debtor's estate and pay the Debtor's creditors.  The Debtor's transition into its Chapter 11 proceedings must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy.  Accordingly, it is critical that the Debtor maintains strong relationships with its customers, employees, vendors, creditors, and other governmental entities, and such other parties that enable the Debtor to conduct its business while the Debtor seeks Court-approval to sell its assets as a going concern.  To maintain these relationships, it is important to minimize the distractions to the Debtor's business operations that could result from the Debtor petitioning for Chapter 11 relief.

22.    I have reviewed and am generally familiar with the contents of each of the First Day Motions.  Based on that familiarity and information supplied to me by other members of the Debtor's management and the Debtor's various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in their Chapter 11 Case with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to the successful sale of the Debtor's assets and in the best interests of the Debtor and its creditors.

23.    The First Day Motions include the following pleadings filed by the Debtor in the Chapter 11 Case:

   a. *Emergency Motion for Interim and Final Orders (I) Authorizing but not Directing Payment of Pre-Petition Wages, Salaries, and Related Obligations and Taxes; (II) Directing All Banks to Honor Checks and Transfers for Payment of Pre-Petition Employee Obligations; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "<u>Wages and Employee Obligations Motion</u>").

b. *Emergency Motion for Order Authorizing Debtor to Continue Use of its Existing Bank Accounts and Existing Business Forms* (the "Cash Management Motion").

c. *Motion for Entry of Interim and Final Orders: (I) Authorizing, but not Directing, Debtor to (A) Maintain Existing Insurance Programs and (B) Pay all Obligations in Respect Thereof; (II) Directing Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "Insurance Motion").

d. *Debtor's Motion for Entry of Interim and Final Orders: (I) Authorizing, but not Directing, the Debtor to Pay Certain Pre-Petition Sales, Use, Income, Property, Payroll, and Other Miscellaneous Taxes and Fees; (II) Granting Related Relief; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "Taxes Motion" and collectively with the foregoing motions, the "First Day Motions").

e. *Debtor's Motion for Orders Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 365, 503, and 507 and Fed. R. Bankr. P. 6004 and 6006: (I)(A) Authorizing Entry Into and Assumption of Asset Purchase Agreement; (B) Authorizing Bid Protections; (C) Authorizing Bidding Procedures and Auction, and (D) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing Sale of Assets; and (III) Granting Related Relief* (the "Asset Sale Motion" and together with the First Day Motions, the "Motions").

**B.  The Wages and Employee Obligations Motion**

24.    As of the Petition Date, Perseon employed four (4) individuals, and regularly contracts with at least three (3) individuals as independent contractors (collectively, the "Employees").

25.    Perseon pays its employees twice a month, on the 5th day for a pay period ending on the last day of the previous month, and on the 20th day for a pay period ending on the 15th day of the month.

26.    Perseon last paid its Employees on May 20, 2016 for services rendered by those employees through May 15, 2016.  Perseon's next payroll for its Employees is due to be paid on June 5, 2016 (the "June 5 Payroll").  On that date, the Employees expect to be paid for their services rendered from May 16, 2016, through May 31, 2016.

27.    The continued, uninterrupted service of the Employees is essential to the Debtor's reorganization efforts. The Debtor recognizes that any delay in paying outstanding wages, salaries, and other compensation due to the Employees as of the Petition Date, or failure by the Debtor to continue its practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtor's relationship with its Employees, impair morale at this critical juncture, and disrupt the Debtor's business operations.

28.    The Debtor uses Sure Payroll to process its payroll, calculate paychecks, administer all payroll deductions and tax withholdings, and file related tax returns.  Sure Payroll calculates all Payroll Taxes due for a given pay period and debits that amount from Debtor's operating account in a lump sum prior to each pay date.  Sure Payroll in turn remits the Payroll Taxes to the appropriate taxing authorities and files the related periodic information returns when due.

**Employee Wage and Salary Claims, Deductions, and Payroll Taxes**

29.     As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from Perseon for the portions of the June 5 Payroll attributable to its Employees pre-Petition Date services (the "Employee Wage Claims").

30.     The Employee Wage Claims are comprised of the following forms of compensation: hourly wages or salary, including overtime and commissions; automobile allowances; and reimbursement for expenses incurred by the employees on behalf of the company in the ordinary course of business ("Reimbursement Obligations").

31.     The gross amount of the June 5, 2016 Payroll is approximately $18,415, which includes: (a) net wages and salaries to be paid directly to Perseon's Employees totaling approximately $12,057 (including regular wages, salaries, overtime, and commissions); (b) Reimbursement Obligations totaling approximately $1,807; (c) amounts to be deducted and paid on behalf of Employees, including state and federal payroll taxes, unemployment, Medicare and Social Security deductions in the approximate amount of $3,361; (d) employer taxes in the approximate amount of $1,042 ; and (e) deductions for medical, dental, and vision insurance in the approximate amount of $148.

32.     The June 5 Payroll for the Employees covers a 16-day period ending on May 31, 2016, which includes seven days that occurred before the Petition Date.  Thus, the Debtor estimates that approximately 7/16, or $8,057 of the gross amount of the June 5 Payroll will be attributable to the Employees' pre-petition services.  Thus, as of the Petition Date, the Debtor owes approximately $8,057 in net Employee Wage Claims attributable to the Employees' pre-Petition Date services.

33.     In order to minimize the personal hardship the Employees will suffer if the Debtor's pre-petition Employee payroll obligations are not paid when due, and to maintain Employee morale during this critical time, the Debtor seeks authority to pay all accrued but unpaid pre-petition Employee compensation.

34.     I believe that none of the Employees will receive payments in excess of the $12,475 priority claim amount established pursuant to section 507(a)(4) of the Bankruptcy Code. The highest gross payroll obligation for a single Employee for the June 5 Payroll period is approximately $5,875 with 7/16 of this amount, or $2,570 attributed to pre-Petition Date services for the June 5 Payroll.  Thus, the highest gross total payroll obligation to a single employee is approximately $2,570.

### Payroll Taxes

35.     Perseon is required by law to withhold from Employee paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities. In addition, the Debtor is required to pay from its own funds Social Security and Medicare taxes, and, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").  The Debtor currently uses Sure Payroll as its payroll service provider, and during 2015 used two other payroll provider companies.  Sure Payroll calculates all Payroll Taxes due for a given pay period and debits that amount from Debtor's operating account in a lump sum prior to each pay date.  Sure Payroll in turn remits the Payroll Taxes to the appropriate taxing authorities and files the related periodic information returns when due.

**Health, Welfare and Other Benefits**

36.     In the ordinary course of its business, the Debtor makes the following benefits programs available to its employees (collectively, the "<u>Health and Welfare Benefits</u>"):

| Benefit | Provider |
|---|---|
| Health Insurance | Select Health |
| Dental Insurance | Companion Life |
| Life Insurance | United of Omaha Life Insurance Co. |
| Long Term/Short Term Disability | United of Omaha Life Insurance Co. |
| Supplemental Life Insurance | United of Omaha Life Insurance Co. |

37.     The Debtor's health insurance plan is self-funded by contributions from the Debtor and by withholding from the Employees' payroll, and is administered on behalf of the Debtor by SelectHealth.  The premiums and fees for the other Health and Welfare Benefits are paid for by withholding from the Employees' payroll.

38.     The Employees receiving the Health and Welfare Benefits are required to pay certain amounts toward those benefits as a pre-tax payroll deduction.  The Debtor's monthly cost of providing the Health and Welfare Benefits is approximately $2,500.

39.     As of the Petition Date, the Debtor estimates that approximately $0 in prepetition obligations on account of the Health and Welfare Benefits are accrued and unpaid.  However, there may be additional amounts related to the pre-petition period that will come due post-petition.

**Paid Time Off**

40.     In December of 2015 the Debtor discontinued an employee benefit policy pursuant to which Employees received certain paid time off, encompassing vacation days, sick time, personal days and holiday leave ("PTO").

41.     As of the Petition Date, only three employees have accrued PTO which has not been paid. The total amount of accrued PTO still owing is $15,592.00.

**Workers' Compensation Obligations**

42.     Under applicable state law, the Debtor is required to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for injury claims arising from or related to their employment with the Debtor (the "Workers' Compensation Programs").

43.     The Debtor currently insures its workers' compensation liabilities through a policy with Moreton & Company.  The Debtor's total annual cost for providing the Workers' Compensation Programs is approximately $1,072.00. PAID QUARTERLY As of the Petition Date, the Debtor is current on all pre-petition obligations relating to its Workers' Compensation Programs.  However, certain obligations related to the pre-petition period may not yet be due.

**401(k) Plan**

44.     The Debtor maintains a retirement savings plan for the benefit of all eligible Employees meeting the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). Approximately 15 Employees have invested in the 401(k) Plan. The Debtor established a limited matching program to induce eligible Employees to participate in the 401(k)

Plan (the "Matching Obligations"). The Debtor administrates the 401(k) through a third-party administrator and record keeper, Transamerica Retirement ("Transamerica").

45.    The Debtor is in the process of winding down the 401(k) Plan and paying out the proceeds to the Employees according to procedures provided by Transamerica. As of the Petition Date, the Debtor is current on its Matching Obligations. All that remains to wind down the 401(k) Plan and distribute the proceeds to the Employees is for the Debtor to follow Transamerica's procedures and pay a $375 termination fee to Transamerica.

## C.  The Cash Management Motion

46.    On the Petition Date, the Debtor maintained four depository bank accounts (collectively, the "Bank Accounts") with Wells Fargo Bank, N.A. ("Wells Fargo").  Wells Fargo is a financially stable banking institution with FDIC insurance.

47.    The Debtor maintains detailed and accurate records of all disbursements and transfers flowing between the Bank Accounts, including all checks that are written on its accounts.  Wells Fargo allows the Debtor to easily monitor its Bank Accounts' balances and activities, generate reports, hold and release checks, stop payments, transfer funds and send wires.

48.    In the course of its operations, the Debtor maintains a cash management system (the "Cash Management System") to receive and disburse funds.  Below is a description of each of the Debtor's Bank Accounts, identified by the last four digits of the Bank Account number, that form the Debtor's Cash Management System:

  a.  Wells Fargo 7593 – this Bank Account maintains a $25,000 security deposit to protect Wells Fargo from any non-payment of balances on two corporate credit

cards that the Debtor uses during the course of its day-to-day operations.  No funds go into or out of this account.

b.  Wells Fargo 1802 – this is the Debtor's main operating Bank Account.  The Debtor draws on this account to make all payments to its vendors, to pay employee payroll obligations, and initially deposits all amounts received from sales into this Bank Account.

c.  Wells Fargo 8458 – this Bank Account serves as the Debtor's savings account. The Debtor transfers amounts between this Bank Account and its main operating Bank Account as necessary to fund its operations.

d.  Wells Fargo 5217 – this Bank Account maintains and segregates flexible spending account contributions from the Debtor's employees.

49.     During the pendency of its bankruptcy case, the Debtor intends to fund operations from existing cash and post-petition payments, all of which will run through the Bank Accounts.  If the Debtor is required to close all existing Bank Accounts immediately, the Debtor would need to expend resources and time to establish the requisite number of new bank accounts in an expedient manner to fulfill its business requirements.  This disruption to the ordinary financial affairs of the Debtor would be prejudicial to the Debtor's estate.

50.     The Debtor's Bank Accounts are integral to its continued business operations. For example, the Bank Accounts allow the Debtor to: (a) monitor and control all of its receipts and disbursements efficiently; (b) pay vendors; (c) pay its employees; and (d) otherwise fund and operate its business on a daily basis.  If the Debtor is required to close all existing Bank Accounts immediately, the Debtor would need to expend resources and time to

establish the requisite number of new bank, which delay and disruption would be prejudicial to the Debtor's operations and its relationship with creditors, vendors and employees.

### The Debtor's Business Forms

51.    In the ordinary course of business, the Debtor uses several varieties of business forms.  To minimize expense to the estate and to avoid any confusion with user/customers, employees, and third parties, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all business forms, including without limitation, checks, letterhead, customer forms, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as debtor in possession.

52.    Preparing, ordering and purchasing new Business Forms will be an unnecessary cost and burden to the Debtor with no discernible benefit to the estate.

### D.  The Insurance Motion

53.    In connection with the operation of its business, the Debtor maintains comprehensive insurance programs (the "Insurance Programs") that include a variety of policies through several different insurance carriers (the "Insurance Carriers").   A description of the Insurance Programs is given below.

54.    Debtor maintains the Insurance Programs to protect its company against risks that may arise in the course of its business.  The Insurance Programs include the following types of coverage:

   a.   General Commercial Liability Package – This policy provides $2,000,000 of general liability coverage, including property coverage, and has a premium

amount of $8,063.00 per year, payable with 25% down and 9 subsequent equal monthly installments.

b. <u>Products/Completed Operations</u> - This policy provides $5,000,000.00 of coverage for the Debtor's products and operations.  The premium amount for this policy is $23,791.00 per year, payable with 25% down and 9 subsequent equal monthly installments.

c. <u>Auto</u> – This policy provides $1,000,000 of coverage which includes liability protection, personal injury protection, uninsured/underinsured motorist protection, comprehensive, and collision coverage.  The premium amount for this policy is $2,590.00 per year, payable with 25% down and 9 equal monthly installments.

d. <u>Umbrella</u> – This policy provides $4,000,000 of coverage.  The premium amount for this policy is $1,765.00 per year, payable with 25% down and 9 subsequent equal monthly installments.

e. <u>D&O</u> – The Debtor has four D&O policies that it purchased through its insurance broker, Moreton & Company, with effective dates of March 21, 2015 and expiration dates of March 21, 2017 that are described as follows:

   i. D&O liability policy through National Union Fire Insurance Co. – AIG with a policy limit of $5,000,000 and an annual premium of $84,668;

   ii. D&O Side A policy through Liberty Mutual Insurance Co. with a policy limit of $2,500,000 and an annual premium of $25,470;

   iii. D&O Excess Side A Policy through Old Republic Insurance Company with a policy limit of $2,500,000 and an annual premium of $21,934;

iv.  D&O Excess Side A Policy through National Union Fire Insurance Co. –

AIG with a policy limit of $5,000,000 and an annual premium of $26,532.

55.    Debtor has incurred and continues to incur certain obligations relating to the

Insurance Programs (such obligations, including those which accrued prior to the Petition Date,

are referred to herein as the "Insurance Obligations").  The different categories of Insurance

Obligations include the following: (i) fixed-rate premiums based on a rate established by each

Insurance Carrier, which are generally payable in fixed monthly installments; (ii) deductibles and

other fees related to the Insurance Programs; and (iii) payments to insurance agents and brokers,

who assist Debtor with the procurement and negotiation of the Insurance Programs.

56.    As of the Petition Date, the Debtor is current on all premium payments for current

and previous policy periods.

57.    The Debtor expects to make further payments that are the direct obligations of the

Debtor during the anticipated timeframe of the Chapter 11 Case.  Most of the insurance policies

have premium payments remaining for the current policy period, which are payable on an

installment basis. The Debtor expects such premiums to come due prior to the conclusion of this

Chapter 11 Case.

58.    Continuation of the Insurance Programs is imperative to the Debtor's continued

operation, and payment of the Insurance Obligations is essential to ensure that the value of the

Debtor's estate is maintained.  The Debtor needs to minimize the risks associated with operating

its business.  Even a brief delay or suspension in the Debtor's ability to pay the Insurance

Obligations could create significant risk that the Debtor would void or otherwise lose the benefits

of the Insurance Programs.

59. Risks to the Debtor posed by any disruption of its insurance coverage include, among other things: (i) possible incurrence of direct liability for payment of claims that would otherwise have been payable by the Insurance Carriers under the Insurance Programs; (ii) possible incurrence of material costs or losses that would otherwise have been reimbursed by the Insurance Carriers under the Insurance Programs; (iii) consequences to the Debtor's ability to conduct business in jurisdictions that require the Debtor to maintain certain insurance coverage; (iv) the possible inability to obtain equivalent coverage from alternative sources; and (v) possible incurrence of higher costs in order to re-establish lapsed insurance policies or obtain new insurance coverage.

**E.  The Taxes Motion**

60. In connection with the operation of its business, the Debtor (i) incurs and/or collects taxes, including sales, use, income, property and other miscellaneous taxes (collectively, the "Taxes"); (ii) incurs business license fees, miscellaneous fees, and other similar assessments (collectively, the "Fees"); and (iii) remits such Taxes and Fees to various taxing, licensing, and other regulatory authorities (collectively, the "Taxing Authorities"; each a "Taxing Authority") as they become due.

61. Paying the Taxes and Fees will benefit the Debtor's estate and its creditors by allowing the Debtor's operations to continue without interruption, and paying the taxes will not harm the Debtor's estate or stakeholders.  Absent the relief requested in the Taxes Motion, the Debtor's business could be significantly disrupted.  Granting the relief requested in the Taxes Motion will enhance the likelihood of the Debtor's successful rehabilitation, and maximize the value of the estate assets for the benefit of the Debtor's creditors.

62.     With the exception of its state and federal income tax returns for tax year 2015, the Debtor is current on substantially all of the Taxes and Fees that have become due as of the Petition Date.  However, because certain of the Taxes and Fees are paid on a periodic basis (and in arrears), there is, in many instances, a delay between the time when the Debtor incurs an obligation to pay the Taxes and Fees and the date such Taxes and Fees become due.  Various Taxing Authorities may, therefore, have claims against the Debtor for Taxes and Fees that have accrued but remain unpaid as of the Petition Date or that will come due during the pendency of this Chapter 11 Case.  The Debtor's obligations on account of these Taxes and Fees are discussed in greater detail below.

63.     The payments proposed in the Taxes Motion are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.

**Sales and Use Taxes**

64.     The Debtor sells its products to distributors, who in turn sell the products to end users such as hospitals.  The Debtor is responsible for paying a quarterly sales and use tax (the "Sales and Use Taxes") to several Taxing Authorities where the Debtor's products are sold.

65.     In particular, as of the Petition Date, the Debtor is obligated to pay Sales and Use Taxes to the Utah State Tax Commission, however the exact amounts owed to these Taxing Authorities is uncertain because the Debtor has not filed Sales and Use Tax returns for Q4 of 2015 and Q1 of 2016.  The Utah State Tax Commission has sent the Debtor a bill in the amount of $6,732.14 based on the amounts that Perseon paid in Sales and Use Taxes in prior periods.  However, Perseon's sales declined significantly in Q4 of 2015 and Q1 of 2016 so the Debtor

estimates that once its liabilities are calculated and its returns are filed the Debtor will owe the Utah State Tax Commission roughly $250.

### Personal Property Taxes

66.    Salt Lake County levies taxes against the Debtor's personal property each calendar year (the "Personal Property Taxes").  The Debtor filed its Personal Property Tax return with the Salt Lake County Assessor on May 5, 2016, paid its outstanding obligations, and is current on its Personal Property Taxes.

### Income Taxes

67.    Under applicable law, the Debtor is required to pay state income taxes each year in California, Arizona, and Utah ("State Income Taxes"). As of the petition date, the Debtor has paid extension amounts in each of these jurisdictions and obtained an extension through September 15, 2016 to file its State Income Tax returns.  Because of the Debtor's net operating losses, the Debtor does not anticipate having any unpaid pre-petition State Income Tax obligations.

68.    The Debtor is also required to pay federal income taxes each year ("Federal Income Taxes").  As of the Petition Date, the Debtor has not paid its Federal Income Taxes for the tax year 2015, but has obtained an extension from the federal government through September 15, 2016 to file its returns.  Because of the Debtor's net operating losses, the Debtor does not anticipate having any unpaid pre-petition Federal Income Tax obligations.

69.    Prior to the Petition Date, the Debtor retained and prepaid fees for Tanner, LLC ("Tanner") to assist with preparing the Debtor's State and Federal Income Tax returns,[3] and with

---

[3]    The Debtor will file an application to retain Tanner, LLC as a professional in this case.

Tanner's assistance, the Debtor will file its State and Federal Income Tax returns by September 15, 2016.

### Payroll Taxes

70.     The Debtor is required to pay from its own funds Social Security and Medicare taxes, and, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").

71.     Up until May 31, 2015, the Debtor used Payroll Perfect, Inc. as its payroll processor.  Payroll Perfect, Inc. would directly debit the Debtor's main operating count two times per month to meet the Debtor's Payroll Tax obligations and would escrow all amounts required to meet such obligations.

72.     On June 1, 2015, the Debtor transitioned all of its employees from working directly for the Debtor to working for Stratus HR and the Debtor terminated its relationship with Payroll Perfect, Inc.  From June 1, 2015 through December 31, 2015, the "employees" who worked for the Debtor were technically employees of Stratus HR, but were leased by Stratus HR to the Debtor.[4]  Stratus HR handled paying its employees who worked for the Debtor and filed Payroll Taxes related to the employees it leased to the Debtor for Q3 and Q4 of 2015.[5]

---

[4]     As of December 31, 2015, Stratus HR terminated its employee leasing relationship with the Debtor and the Stratus HR employees who continued to work for the Debtor became employees of the Debtor.

[5]     Since January 1, 2016, the Debtor has used Sure Payroll as its payroll processor.  As discussed in the Debtor's "Wages" motion, Sure Payroll withholds amounts to meet the Debtor's Payroll Tax obligations. Sure Payroll has filed and paid the Debtor's Payroll Tax obligations for Q1 of 2016.  Through this Motion, the Debtor seeks authority to pay its Q2 – 2015 Payroll Tax liabilities, and through its "Wages" motion, the Debtor seeks authority to pay other accrued and unpaid pre-petition Payroll Taxes as they accrue and become due during the Chapter 11 Case.

73.    Because the transition from Payroll Perfect, Inc. to Stratus HR occurred during Q2 of 2015, the Debtor's Payroll Tax returns for Q2 of 2015 were not timely filed.  The Debtor learned of the missing returns only recently and has been working diligently to file all Q2 of 2015 delinquent Payroll Tax returns in the applicable jurisdictions.  As of the Petition Date, the Debtor has filed its federal Q2 – 2015 Payroll Tax return and Q2 – 2015 Payroll Tax returns for California and New York, and the Debtor continues to work diligently to complete and file returns in Oregon, Ohio, Arizona, Illinois, and Utah.  The Debtor does not believe that it has any additional liability on account of outstanding Payroll Taxes in the jurisdictions where it has not yet filed returns, but through this Motion the Debtor requests authority to pay any Payroll Tax liability that the Debtor incurred during Q2 of 2015 as such amounts are determined.

**Business License/Permit Fees, Annual Report Fees, and Other Miscellaneous Taxes and Fees**

74.    The Debtor has obtained business licenses from both Salt Lake City and the Utah Division of Corporations which it must renew on an annual basis to remain in good standing for purposes of conducting business within the state. These renewal fees were last paid in November, 2015 and October, 2015, respectively. As of the Petition Date, the Debtor has current business licenses.

75.    As a Delaware corporation, the Debtor is required to file and pay a Delaware Franchise Tax Return each February for the previous calendar year. As of the Petition Date, the Debtor is current on its Delaware Franchise Tax Return.

76.    Finally, as a medical device manufacturer, the Debtor is required to file and pay a quarterly Federal Excise Tax Return on certain sales of medical devices.  The required return for the Q4 2015 was filed and paid late.  The Debtor does not believe that it has any additional

liability, but may be assessed a penalty or interest expense for the late payment of this return. Through this Motion the Debtor requests authority to pay any excise tax liability that the Debtor incurred during Q4 of 2015 as such amounts are determined.  Beginning January 1, 2016, Congress implemented a two year moratorium on the medical device excise tax imposed and therefore the Debtor does not believe that it will have any additional liability for 2016 or 2017.

## G.  The 363 Sale Motion

77.     From May 2013, through the Petition Date, the Debtor and financial advisors retained by the Debtor in 2013, canvased the marketplace for a strategic partner or a potential acquirer.

78.     During the fourth quarter of 2015, Perseon focused its efforts on consummating the Merger with Galil.

79.     The Merger Agreement required Perseon to maintain its operations at a set level, which substantially outstripped the amount of revenue that Perseon was earning at that time.

80.     During this failed attempted merger period, Perseon lost approximately $500,000.00.

81.     Following the termination of the Merger Agreement, and in large part because of the sizable losses that Perseon sustained to unnecessarily maintain operations, the Debtor explored various strategic alternatives to filing for bankruptcy and liquidating its remaining assets, but no other alternatives were available.

82.     Eventually, the Debtor concluded that the best way to maximize the value of its estate for the benefit of all interested parties was to liquidate its remaining assets and distribute the proceeds of such asset sale to the Debtor's constituents.

83.     Accordingly, with the assistance of its financial advisors, the Debtor renewed its efforts and canvassed the marketplace for potential acquirers.  After an exhaustive search, Perseon entered into the APA with the Stalking Horse, which contemplated the filing of the Chapter 11 Case as the sale vehicle, and conditioned Perseon's entry into the agreement on this Court's approval.

84.     In order to liquidate its business as expeditiously as possible, prevent further deterioration of the Debtor's balance sheet, and preserve value for the Debtor's constituents, the Debtor has filed the Asset Sale Motion seeking authority to sell the "Purchased Assets" as defined in the APA.  The "Purchased Assets" generally consist of, among other things, the Debtor's inventory, accounts receivable, intellectual property assets, approvals and permits, fixtures, furniture and equipment, books and records, the Debtor's rights under the executory contracts identified in the APA, and the Debtor's goodwill.  The Purchased Assets collectively constitute all of the Debtor's assets with the exception of the "Excluded Assets" as defined in the APA.

85.     The Debtor and Stalking Horse entered into the APA, which was expressly conditioned on the filing of this Bankruptcy Case, prior to the Petition Date.  Having been previously left at the proverbial altar, the Debtor preferred entry into the APA pre-petition to avoid the prospect of filing for chapter 11 without any assurance of having a Stalking Horse for the Auction.

86.     Entry into, or assumption of the APA is an exercise of the Debtor's sound business judgment.  The APA represents the best current offer that the Debtor has received for its

assets and allowing the Debtor to assume the APA will maximize recoveries to the Debtor's constituents.

87.    Under the APA, the Stalking Horse has agreed to pay any defaults under the executory contracts up to an aggregate amount of $50,000, with the Stalking Horse to assume the Debtor's obligations under such contracts going forward.

88.    The Debtor, both individually and through its investment advisors, has canvased the marketplace for a potential acquirer or a strategic partner since May 2013, and in the months following the December 2015 termination of the Merger Agreement, the Debtor has focused its efforts on consummating a sale of its assets while preserving the value of its key product.  In my business judgment, the APA represents the best offer that the Debtor has received for its assets and will maximize recoveries to the Debtor's constituents.

89.    Further, entry into the APA will allow the Debtor to quickly sell its assets and will minimize the operating losses that the Debtor has sustained in the months leading up to the Petition Date.

90.    Assumption of and consummation of the APA will also allow the Debtor to reduce the administrative expenses associated with a lengthy administration of this case.  If the APA were not assumed and consummated, then the Debtor and its advisors would have to devote further time, expense, and efforts in securing an alternative purchaser, who then will have to evaluate the Debtor's business and negotiate a purchase agreement.

91.    In sum, I have determined determined that assumption and consummation of the APA and selling the Purchased Assets to the Stalking Horse, subject to overbid at Auction is the best way to maximize the value of the Debtor's estate.

92.     The process used by the Debtor to canvas the marketplace was fair, comprehensive, reasonable, and in my business judgment has ensured that the $4.35 million purchase price for the Purchased Assets under the APA is a fair and reasonable sale price that was achieved through extensive arms-length negotiation with the Stalking Horse, and the APA represents the best offer for the Purchased Assets.  In addition, through the proposed Auction, the sale price can only increase – to the benefit of the Debtor's constituents.

93.     The proposed sale of the Purchased Assets to the Stalking Horse, subject to higher and better offers has been made in good faith and through arms' length transactions.

94.     If the Stalking Horse is not the Successful Bidder at the Auction, the Debtor proposes to provide the Stalking Horse with certain Bid Protections.  The Bid Protections are in consideration for the Stalking Horse conducting its due diligence, entering into the APA and agreeing to subject its bid to the Auction.  The Bid Protections were negotiated at arm's-length and in good faith and are necessary to secure the Stalking Horse's participation in the Debtor's sale process.  Further, based on discussions with the Stalking Horse, I believe that the Stalking Horse would not enter into the APA and subject its bid to the Auction process without the Bid Protections.

95.     The Debtor has determined that providing the Bid Protections to the Stalking Horse is an actual, necessary cost of going forward with the sale of its assets. The Bid Protections enable the Debtor to secure an adequate consideration floor for the assets and, thus, ensure that competing bids will be materially higher or better than that contained in the APA.

96.     In my business judgment the amount of the Break-Up Fee is reasonable in light of the efforts and expenses that the Stalking Horse has undertaken in its due diligence review and negotiating the terms of the APA.

97.     I believe that the solicitation of bids for the Debtor's assets is the best way to maximize the value of those assets, and an Auction for those assets with the Stalking Horse in place will result in the most beneficial arrangement for the Debtor and its estate.

98.     The Debtor believes that it is crucial that it commence the sale transaction contemplated by the APA on its proposed timeline to maximize value for the Debtor's estate while minimizing administrative expenses.

99.     I am not aware of any Liens that attach to the Purchased Assets.

100.    Time is of the essence and it is imperative that the Debtor be able to enter into the APA on the timeline proposed. In order to maximize the value of the Assets and minimize the estate's unnecessary administrative expenses, I believe a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the Debtor's estate and stakeholders.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

*/s/ Clinton E. Carnell, Jr.*
Clinton E. Carnell, Jr.