Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
          thomson.michael @dorsey.com
          armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation
    and Proposed Attorneys for Debtor in Possession*

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 16-24435 |
| PERSEON CORPORATION, | Chapter 11 |
| Debtor. | Chief Judge R. Kimball Mosier |

---

**DEBTOR'S MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363, 364, 365, 503, AND 507 AND FED. R. BANKR. P. 6004 AND 6006: (I)(A) AUTHORIZING ENTRY INTO AND ASSUMPTION OF ASSET PURCHASE AGREEMENT, (B) AUTHORIZING BID PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION, AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF; (II) AUTHORIZING SALE OF ASSETS; AND (III) GRANTING RELATED RELIEF**

---

Perseon Corporation ("Perseon" or "Debtor"), the debtor in possession in the above

captioned chapter 11 bankruptcy case hereby submits this motion (the "Motion"), pursuant to

Sections 105(a), 363, 364, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing and approving: (I)(A) the assumption of that certain Asset Purchase Agreement ("APA") attached hereto as **Exhibit A**, with MedLink Technologies, LLC (the "Stalking Horse" or "Buyer"), (B) authorizing bid protections for the Stalking Horse, (C) authorizing the bidding procedures and related auction and (D) scheduling a sale hearing and approving notice thereof (the "Bidding Procedures Order"); (II) authorizing and approving the sale transaction (the "Sale Order"); and (III) granting related relief.  This Motion is supported by the *Declaration of Clinton E. Carnell, Jr. in Support of Chapter 11 Petition, First Day Motions, and Sale Motion* (the "Omnibus Declaration").  In further support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157.

2.      The statutory bases for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 6007, and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Utah (the "Court").

## GENERAL BACKGROUND

3.      On May 23, 2016, the Debtor filed its voluntary petition with the Court for relief under chapter 11 of title 11 of the Bankruptcy Code (the "Petition Date").

4.      The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      No trustee or examiner has been appointed in this case.

6.      Perseon is a publicly traded medical technology developer and manufacturer that is primarily focused on creating and manufacturing ablation technologies for treating cancer.

7.      Perseon was organized as BSD Medical Corporation under Delaware law in 1986.

8.      For an extended period of time commencing in 2013, Perseon or its assets have been offered for sale.

9.      On October 26, 2015, Perseon and Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned subsidiary of Galil through a tender offer and merger (the "Merger").

10.     Throughout the Merger process, Perseon advised its shareholders that notwithstanding any cost cutting measures by Perseon, if the Merger was not consummated, Perseon may not be able to continue operations.

11.     On December 22, 2015, Galil terminated the Merger Agreement asserting that certain conditions to the tender offer and Merger were not performed.

12.     On December 23, 2015, Perseon terminated a substantial number of employees in order to materially reduce expenses.

13.     Additional information about the Debtor's business, the events leading up to the Petition Date and the facts and circumstances surrounding the Debtor's chapter 11 case can be found in the Omnibus Declaration on file in this case.[1]  The Omnibus Declaration is incorporated by reference as if fully set forth herein.

---

[1]      Docket No. 13.

## FACTS SPECIFIC TO THE RELIEF REQUESTED

14.     From May 2013, through the Petition Date, the Debtor and financial advisors retained by the Debtor in 2013, canvased the marketplace for a strategic partner or a potential acquirer.

15.     During the fourth quarter of 2015, Perseon focused its efforts on consummating the Merger with Galil.

16.     The Merger Agreement required Perseon to maintain its operations at a set level, which substantially outstripped the amount of revenue that Perseon was earning at that time.

17.     During this failed attempted merger period, Perseon lost approximately $500,000.00.

18.     Following the termination of the Merger Agreement, and in large part because of the sizable losses that Perseon sustained to unnecessarily maintain operations, the Debtor explored various strategic alternatives to filing for bankruptcy and liquidating its remaining assets, but no other alternatives were available.

19.     Eventually, the Debtor concluded that the best way to maximize the value of its estate for the benefit of all interested parties was to liquidate its remaining assets and distribute the proceeds of such asset sale to the Debtor's constituents.

20.     Accordingly, with the assistance of its financial advisors, the Debtor renewed its efforts and canvassed the marketplace for potential acquirers.   After an exhaustive search, Perseon entered into the APA with the Stalking Horse, which contemplated the filing of a chapter 11 case as the sale vehicle, and conditioned Perseon's entry into the agreement on this Court's approval.

21.     In order to liquidate its business as expeditiously as possible, prevent further deterioration of the Debtor's balance sheet, and preserve value for the Debtor's constituents, the Debtor has filed this Motion seeking authority to sell the "Purchased Assets" as defined in the APA.  The "Purchased Assets" generally consist of, among other things, the Debtor's inventory, accounts receivable, intellectual property assets, approvals and permits, fixtures, furniture and equipment, books and records, the Debtor's rights under the executory contracts identified in the APA, and the Debtor's goodwill.  The Purchased Assets collectively constitute all of the Debtor's assets with the exception of the "Excluded Assets" as defined in the APA.

22.     The Debtor seeks Court approval of the sale transaction in two parts to balance the Debtor's desire to sell its assets expeditiously and to minimize administrative expenses for the benefit of the Debtor's estate with the Debtor's desire to provide meaningful notice of the proposed sale transaction to the Debtor's constituents.  Initially, the Debtor requests that the Court enter the Bidding Procedures Order, which would approve of the Bidding Procedures, the Bid Protections, and Auction process.  Finally, the Debtor will seek Court approval of the Sale of the Purchased Assets at a hearing after the Auction is concluded.

23.     The following chart briefly summarizes certain material provisions of the APA. The chart is qualified by reference to the APA attached hereto as **Exhibit A**, and each capitalized term in the following chart that is not otherwise defined in this Motion has the meaning ascribed to such term in the APA.

| *Purchased Assets:* | **Section 2.01**<br>(a)      all inventory, finished goods, raw materials, work in progress, Quality Systems and all associated records and documentation, packaging, supplies, parts and other inventories of the Business;<br>(b)      all Contracts set forth on Section 2.01(b) of the Disclosure Schedules (the "Executory Contracts"), and the Intellectual Property Agreements set forth on Section 2.01(b) of the Disclosure Schedules (collectively, the "Assigned Contracts"); |
| --- | --- |

| | |
|---|---|
| | (c)    all accounts or notes receivable of the Business together with all prepaid credits, advance payments, security deposits, charges, sums and fees to the extent related to the Business and the Purchased Assets except the cash deposit Seller has paid to secure company credit cards, D&O and commercial insurance prepaids and deposits, rental lease deposits including storage units, tax refunds and retainers and deposits for professionals including attorneys and accountants;<br><br>(d)    Know-How of the Business in Seller's records and possession, and all Intellectual Property Assets, including but not limited to (i) all trade names and styles of Seller including the trade name "Perseon Corporation," (ii) all of Seller's URL's including the internet domain at http://www.perseonmedical.com, and (iii) the Intellectual Property Assets listed on Section 2.01(d) of the Disclosure Schedules;<br><br>(e)    all approvals, permits, licenses and other authorities from the FDA related to the Business;<br><br>(f)    all furniture, fixtures, equipment, supplies and other tangible personal property of the Business listed on Section 2.01(f) of the Disclosure Schedules (the "Tangible Personal Property");<br><br>(g)    all Permits listed on Section 2.01(g) of the Disclosure Schedules;<br><br>(h)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;<br><br>(i)    copies of all (i) books and records, including books of account, ledgers and general, financial and accounting records for the period beginning January 1, 2015 to the date hereof, other than books and records set forth in Section 2.02(c), and (ii) machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Unit), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that primarily relate to the Business or the Purchased Assets; and<br><br>(j)    all goodwill associated with any of the assets described in the foregoing clauses. |
| ***Excluded Assets:*** | **Section 2.02**<br>(a)    all cash and cash equivalents, bank accounts and securities of Seller;<br><br>(b)    all Contracts that are not Assigned Contracts;<br><br>(c)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, and any other books and |

| | |
|---|---|
| | records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;<br>(d)     all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;<br>(e)     all Tax assets (including duty and Tax refunds and prepayments) of Seller;<br>(f)     all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise;<br>(g)     all accounting software and computer systems; and<br>(h)     the rights which accrue or will accrue to Seller under the Transaction Documents. |
| **Assumed Liabilities:** | **Section 2.03**<br>(a)     all liabilities and obligations arising under or relating to the Assigned Contracts;<br>(b)     all liabilities and obligations for Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities prorated for any taxable period (or portion thereof) arising on or after the Closing Date; and<br>(c)     all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing. |
| **Purchase Price:** | **Section 2.05**<br>$4,350,000.00, plus the assumption of the Assumed Liabilities |
| **Buyer's Bid Deposit:** | **Section 2.07**<br>As described in the Bid Procedures Order, Buyer shall be obliged to make payment as a bid deposit to the Seller of $850,000 ("Buyer's Bid Deposit") by wire transfer of immediately available funds to an account designated in writing by the Seller not later than five (5) days after the Signature Date. Upon entry of the Bid Procedures Order, Seller shall be permitted to use Buyer's Bid Deposit to fund its operations during the pendency of the Bankruptcy Case.   Unless Buyer is the winning bidder for the Purchased Assets at the Auction, to the extent this Agreement is terminated in accordance with Section 9.01, Seller shall be obligated to return Buyer's Bid Deposit to Buyer within five (5) days of the termination of this Agreement plus pay five percent (5%) interest on any amounts of Buyer's Bid Deposit used by Seller to fund its operations from the date of the deposit of Buyer's Bid Deposit until the date of termination of this Agreement in accordance with Section 9.01 ("Seller's Repayment Obligation"). Buyer's Bid Deposit shall be secured by a senior secured, super-priority lien in the Collateral.  This security interest shall be perfected upon the entry of the Bid Procedures Order without the need for the Seller or the Buyer to file any UCC-1 financing statements, notices of lien or any similar document to perfect its security interests under the |

| | |
|---|---|
| | UCC.  Upon the entry of the Bid Procedures Order, the security interests created under this Agreement shall constitute perfected security interests in the Collateral in favor of the Buyer senior and prior to all other liens.  Upon the payment in full in cash of Seller's Repayment Obligation, the security interests granted herein shall automatically terminate with respect to all of the Collateral. Upon any such termination, the Buyer will, at the Seller's sole expense, deliver to the Seller, without any representations, warranties or recourse of any kind whatsoever, all Collateral held by the Buyer hereunder, and execute and deliver to the Seller such documents as the Seller shall reasonably request to evidence such termination. |
| ***Bidding Procedures:*** | **Section 6.01**<br>Promptly upon the filing of the Bankruptcy Case, Seller shall file the Bid Procedures Motion with the Bankruptcy Court, after which the Court will enter the Bid Procedures Order approving the bid procedures proposed in the Bid Procedures Motion.  Buyer has reviewed the Bid Procedures Motion and finds its form and terms acceptable. Seller understands and agrees that Buyer's willingness to enter into the transactions contemplated herein are conditioned upon the prompt filing with and approval by the Bankruptcy Court of the Bid Procedures Motion. |
| ***Bid Protections:*** | **Section 6.02**<br>(a)     Buyer shall be the stalking horse bidder for substantially all of the assets of Seller;<br>(b)     If Buyer is not the successful bidder at the Auction, as approved by the Bankruptcy Court, because of a higher and better offer, then Buyer shall be paid at Closing a break-up fee of $217,500.00 (five percent (5%) of the stalking horse purchase price offered by Buyer);<br>(c)     To be a qualified bidder at the Auction, a bidder must make a $850,000 bid deposit accompanied by a written initial overbid offer (described in subpart (d) below), together with proof of ability to fund the total purchase price and an executed asset purchase agreement in form and substance substantially similar to this Agreement;<br>(d)     The initial overbid, if any, shall be no less than $100,000 higher than Buyer's initial bid plus the break-up fee described in Section 6.02(b); and<br>(e)     Subsequent overbids, if any, shall be in increments of no less than $100,000. |
| ***Assumption of Executory Contracts:*** | **Section 6.03**<br>In connection with Buyer's purchase of the Purchased Assets, Buyer wishes to assume the Executory Contracts.  Seller shall elect to assume the Executory Contracts and assign such assumed Executory Contracts to Buyer in accordance with the procedures set forth in Section 365 of the Bankruptcy Code.  As part of these procedures, Buyer, as assignee of the Executory Contracts, shall provide adequate |

| | |
|---|---|
| | assurance that any defaults under the Executory Contracts will be promptly cured and future obligations will be performed. In order to provide adequate assurance, on or prior to the date Seller assumes and assigns the Executory Contracts, Buyer shall pay directly to counterparties all amounts necessary to cure any defaults under the Executory Contracts, up to an aggregate value not exceeding $50,000 on the Closing Date. Buyer shall then perform all future obligations of Seller under the Executory Contracts in accordance with the terms thereof. |
| ***Sale Approval Order:*** | **Section 6.04** <br> The Sale Approval Order shall be reasonably acceptable in form and substance to Buyer and shall include provisions, among others (i) providing that Buyer shall not incur any liability as a successor to Seller unless such liability is expressly assumed and to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Buyer or the Purchased Assets related thereto, (ii) approving the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, or such higher and better terms and conditions offered by Buyer at the Auction, and authorizing Seller to proceed with this transaction, (iii) stating that any objections timely filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents fair value for the Purchased Assets, (v) finding that the sale is in the best interests of Seller's estate and creditors, (vi) finding that Buyer is a good faith purchaser of the Purchased Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(m) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Buyer shall be free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Buyer and protecting Buyer against any liens, claims, interests, obligations and encumbrances against Seller or the Purchased Assets, and (ix) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing. Seller shall use commercially reasonable efforts to obtain entry of the Sale Approval Order in the form described hereto. To the |

| | |
|---|---|
| | extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern. |
| ***Conditions to Obligations of all Parties:*** | **Section 8.01** |
| | (a)      The Bankruptcy Court shall have entered a final order granting Seller's motion for entry of the Sale Approval Order. |
| | (b)      No Governmental Unit shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof. |
| | (c)      During the course of the Bankruptcy Case until Closing, Seller shall have paid on a current basis all sums due to the vendors and employees listed on Section 8.01(c) of the Disclosure Schedules. |
| | (d)      Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Units referred to in Section 5.03, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked. |
| ***Termination:*** | **Section 9.01** |
| | This Agreement may be terminated at any time prior to the Closing: |
| | (a)      by the mutual written consent of Seller and Buyer; |
| | (b)      by Seller if Buyer is not the Successful Bidder at the Auction; |
| | (c)      by Seller by written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VIII and such breach, inaccuracy or failure cannot be cured by Buyer within 30 days after written notice of such breach; or |
| | (d)      by Buyer or Seller in the event that: |
| | (i)      the Bankruptcy Court denies, without opportunity to cure deficiencies, Seller's Bid Procedures Motion, motion for entry of the Sale Approval Order; |
| | (ii)      the Bankruptcy Case is dismissed by the Bankruptcy Court or converted to a Chapter 7 case; |
| | (iii)      there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or |
| | (iv)      any Governmental Unit shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement. |

24.     The Stalking Horse's bid is subject to overbid.  As part of the consideration for entry into the APA, the Debtor requests authority to pay the Stalking Horse a break-up fee and the reimbursement of expenses incurred in the combined sum of $217,500.00, which the parties believe approximates the costs and expenses incurred by the Buyer and which will be payable to the Buyer if the Buyer is not the successful bidder after the Auction (as defined below).

### The Proposed Bidding Procedures and Auction

25.     In order to maximize value for the estate and the Debtor's creditors, as well as to ensure a fair and transparent opportunity for all potentially interested parties to participate in the Sale process, the Debtor and its advisors will seek to hold an auction (the "Auction"), pursuant to the Bidding Procedures that will be attached to the Bidding Procedures Order as Exhibit 1 ("Bidding Procedures").  The Bidding Procedures will provide that the Debtor may, at any time prior to the conclusion of the Auction, (a) modify the Bidding Procedures and (b) determine the highest and/or best offer.

26.     Subject to the Bankruptcy Court's availability and docket, the Debtor has proposed the following timeline:

     a.  Deadline to object to the Court's entry of the Bidding Procedures Order no later than June 13, 2016;

     b.  A hearing to consider entry of the Bidding Procedures Order on June 21, 2016 at 3:00 p.m.;

     c.  Delivery of the Auction Notice within two days of the Court's entry of the Bidding Procedures Order;

     d.  Deadline to object to the Court's entry of the Sale Order on July 11, 2016;

e. Bid Deadline (as defined below) of 4:00 p.m. prevailing Mountain time on July 21, 2016;

f. The conduct of the Auction and the selection of a winning bid on July 26, 2016; and

g. Conduct of the Sale Hearing, entry by the Bankruptcy Court of the Sale Order on July 26, 2016.

27.     Objections to the Court's entry of the Bidding Procedures Order must be in writing, conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court and served upon (i) proposed counsel to the Debtor, Dorsey & Whitney LLP, 136 South Main Street, Suite 1000, Salt Lake City, Utah 84101 (attn: Steven T. Waterman), proposed counsel to the Debtor; (ii) the Office of the United States Trustee for the District of Utah (the "U.S. Trustee"); (iii) counsel to the Stalking Horse, Troutman Sanders, LLP, 5 Park Plaza, Suite 1400, Irvine, CA 92614, Attn: Penelope Parmes, email: penelope.parmes@troutmansanders.com; and (iv) counsel to any statutory committee established by the U.S. Trustee or the Court by personal service, regular mail, electronic mail or facsimile, received no later than June 13, 2016 at 4:00 p.m. prevailing Mountain Time.

28.     Within 2 days of the Court's entry of the Bidding Procedures Order, the Debtor will serve a notice of proposed auction (the "Auction Notice") by personal service, regular mail, electronic mail or facsimile upon: (a) the U.S. Trustee; (b) counsel to the Stalking Horse; (c) the Debtor's equity holders (to the extent known); (d) all applicable federal, state, and local taxing authorities; (e) all other government agencies required to receive notice under the Bankruptcy Rules; (f) the 20 largest unsecured creditors of the Debtor; (g) any other party that files a notice

of opposition in the case and (h) any other party appearing on the Debtor's creditor matrix (collectively, the "Notice Parties").

29.      Objections to the Court's entry of the Sale Order must be in writing, conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court and served upon (i) proposed counsel to the Debtor; (ii) the U.S. Trustee; (iii) counsel to the Stalking Horse; and (iv) counsel to any statutory committee established by the U.S. Trustee or the Court by personal service, regular mail, electronic mail or facsimile, received no later than July 11, 2016 at 4:00 p.m. prevailing Mountain Time.

30.      Any bidder that desires to make a bid will deliver written copies of its Competing Bid to the Debtor, so as to be received by the Debtor not later than 4:00 p.m. prevailing Mountain Time on July 21, 2016 (the "Bid Deadline").

31.      Pursuant to the terms of the Bid Procedures Order, in order for a bid to constitute a "Competing Bid", such bid must (i) be in an amount greater than (x) $4,350,000.00, plus (y) an additional overbid amount equal to not less than $217,500.00; and (ii) include a draft asset purchase agreement that is in form and substance substantially similar to the APA, including a copy of the proposed agreement marked to show all changes from the APA.

32.      Bid increments during the Auction shall be $100,000.00 unless otherwise agreed to by the Debtor.

33.      Each capitalized term in this paragraph that is not otherwise defined in this Motion has the meaning ascribed to such term in the APA.

## RELIEF REQUESTED AND BASIS THEREFOR

34.      By this Motion, the Debtor seeks the entry of two orders:

a.  At the hearing on the Bidding Procedures component of the Motion, the Debtor seeks entry of the Bidding Procedures Order, (a) authorizing entry into and assumption of the Asset Purchase Agreement, (b) authorizing Bid Protections, (c) authorizing Bidding Procedures and setting the time, date and place of the Auction and (d) approving the form of Auction Notice and (ii) setting a hearing (the "Sale Hearing"), to be held on July 26, 2016 at 11:00 a.m. to consider the entry of the Sale Order; and

b.  At the Sale Hearing, the Debtor requests the entry of the Sale Order, approving the APA or any asset purchase agreement with the party submitting the highest and/or otherwise best bid at the Auction, as determined by the Debtor (the "Successful Bidder").

## APPLICABLE AUTHORITY

### A.  The Court Should Authorize the Debtor's Assumption of the APA Pursuant to 11 U.S.C. § 365 and the Assumption of Executory Contracts Contemplated in the APA.

35.    The Debtor and Stalking Horse entered into the APA, which was expressly conditioned on the filing of this Bankruptcy Case, prior to the Petition Date.  Having been previously left at the proverbial altar, the Debtor preferred entry into the APA pre-petition to avoid the prospect of filing for chapter 11 without any assurance of having a Stalking Horse for the Auction.

36.    11 U.S.C. § 365 generally provides that a Debtor may assume an executory contract provided that any defaults are cured at any time prior to the confirmation of a plan. Courts routinely approve motions to assume executory contracts upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that

section 365 is traditionally subject to the "business judgment" standard; *Orion Pictures Corp v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (stating that section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

37.     As described above, entry into, or assumption of the APA is an exercise of the Debtor's sound business judgment.  The APA represents the best current offer that the Debtor has received for its assets and allowing the Debtor to assume the APA will maximize recoveries to the Debtor's constituents.  Thus, to the extent that the APA is a pre-petition executory contract, the Court should allow the Debtor to assume that executory contract.

38.     Further, the APA also requires the Debtor to assume and assign various executory contracts identified on Section 2.01(b) of the Disclosure Schedules attached to the APA (the "Executory Contracts").  Under the APA, the Stalking Horse has agreed to pay any defaults under the executory contracts up to an aggregate amount of $50,000, with the Stalking Horse to assume the Debtor's obligations under such contracts going forward.  Accordingly, the Court should authorize the assumption of the Executory Contracts and their assignment to the Stalking Horse or, alternatively, to a competing bidder at the Auction.

**B.      The Court Should Authorize the Debtor's Sale of Assets pursuant to the APA in Accordance with 11 U.S.C. §§ 363(b).**

39.     Ample authority exists for the approval of the proposed sale of the Debtor's assets.  Section 363 of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides. In relevant part, section 363 of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales

not in the ordinary course of business may be by private sale or by public auction."). Further,

pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §

105(a).

40.    Moreover, if a debtor's proposed use of its assets pursuant to section 363(b) of the

Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use

should be approved. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir.

1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale

of substantially all of the Debtor's assets satisfied the sound business reason test); s*ee also*

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find

from the evidence presented before him at the hearing a good business reason to grant such an

application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-*

*Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a

reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

capriciously), courts will generally not entertain objections to the debtor's conduct.").

41.    The decision to sell assets outside the ordinary course of business is based upon

the business judgment of the debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir.

1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1071

(2d Cir. 1983); *In re Adelphia Communications Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y.

July 31, 2002).  If a debtor's actions satisfy the business judgment rule, then the transaction in

question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when

applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

42.     Here, entry into the APA meets all four parts of the applicable test:

*Sound Business Purpose*.

43.     A "presumption of reasonableness" attaches to the decisions of those controlling a debtor's assets. *Johns-Manville Corp*., 60 B.R. at 615–16. Here, the Debtor, both individually and through its investment advisors, has canvased the marketplace for a potential acquirer or a strategic partner since May 2013, and in the months following the December 2015 termination of the Merger Agreement, the Debtor has focused its efforts on consummating a sale of its assets while preserving the value of its key product. The APA represents the best offer that the Debtor has received for its assets and will maximize recoveries to the Debtor's constituents.

44.     Further, entry into the APA will allow the Debtor to quickly sell its assets and will minimize the operating losses that the Debtor has sustained in the months leading up to the Petition Date.

45.     Assumption of and consummation of the APA will also allow the Debtor to reduce the administrative expenses associated with a lengthy administration of this case. If the APA were not assumed and consummated, then the Debtor and its advisors would have to devote further time, expense, and efforts in securing an alternative purchaser, who then will have to evaluate the Debtor's business and negotiate a purchase agreement.

46.     In sum, the Debtor has determined that assumption and consummation of the APA and selling the Purchased Assets to the Stalking Horse, subject to overbid at Auction is the best way to maximize the value of the Debtor's estate.

### *Notice is Adequate*

47.     Second, notice of the assumption, the auction, the deadline to object to the sale, the assets to be sold, and of the sale hearing will be served on the Debtor's entire creditor matrix and equity holders.

48.     This Motion will be served on all of the parties who have made an appearance in this case including the Notice Parties.

49.     Accordingly, the Debtor submits that the above notice procedures are fair, reasonable, and afford notice as required by the Bankruptcy Code under the circumstances.

### *Fair and Reasonable Price*

50.      The process used to canvas the marketplace was fair, comprehensive, reasonable, and has ensured that the $4.35 million purchase price for the Purchased Assets under the APA is a fair and reasonable sale price that was achieved through extensive arms-length negotiation with the Stalking Horse, and the APA represents the best offer for the Purchased Assets.  In addition, through the proposed Auction, the sale price can only increase – to the benefit of the Debtor's constituents.

### *Good Faith Purchaser*

51.     The Auction process ensures that the Purchased Assets will be sold to a good faith purchaser.

52.     Although the Bankruptcy Code does not define "good faith," the Tenth Circuit has determined, in the context of 11 U.S.C. § 363(m), that a "good faith" purchaser is "one that

buys in good faith, and for value." *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F.2d 301, 304 (10th Cir. 1983).

53.     Here, the proposed sale of the Purchased Assets to the Stalking Horse, subject to higher and better offers has been made in good faith and through arms' length transactions.

54.     Furthermore, the proposed sale to the Stalking Horse is subject to notice, Court approval, and the absence of higher and better offers.  Through the Auction process approved by the Court, the Debtor will obtain the highest and best price for the Purchased Assets that insures that the Purchased Assets are sold at a fair and reasonable price to a good faith purchaser for value.

**C.      Approving the Requested Bid Protections is Reasonable and Justified**

55.     If the Stalking Horse is not the Successful Bidder at the Auction, the Debtor proposes to provide the Stalking Horse with certain Bid Protections.  The Bid Protections are in consideration for the Stalking Horse conducting its due diligence, entering into the APA and agreeing to subject its bid to the Auction. The Bid Protections were negotiated at arm's-length and in good faith and are necessary to secure the Stalking Horse's participation in the Debtor's sale process.  Further, based on discussions with the Stalking Horse, the Debtor believes that the Stalking Horse would not enter into the APA and subject its bid to the Auction process without the Bid Protections.

56.     The Debtor has determined that providing the Bid Protections to the Stalking Horse is an actual, necessary cost of going forward with the sale of its assets. The Bid Protections enable the Debtor to secure an adequate consideration floor for the assets and, thus, ensure that competing bids will be materially higher or better than that contained in the APA. Therefore, the Debtor hereby respectfully requests that the Court approve the Bid Protections.

57.     The Bid Protections should be approved and accorded superpriority administrative expense status under section 507 of the Bankruptcy Code, because they provide a clear benefit to the Debtor's estate and the Stalking Horse expressly conditioned its willingness to enter into the APA upon the Debtor's agreement to, and Court approval of, the Bid Protections.

58.     The Debtor submits that the amount of the Break-Up Fee is reasonable in light of the efforts and expenses that the Stalking Horse has undertaken in its due diligence review and negotiating the terms of the APA.

**D.      Entry of the Requested Bidding Procedures is Reasonable and Justified**

59.     The Debtor believes that the solicitation of bids for its assets is the best way to maximize the value of those assets, and an Auction for those assets with the Stalking Horse in place will result in the most beneficial arrangement for the Debtor and its estate.  Based on the Auction results, the Debtor will consummate the APA or another asset purchase agreement with the Successful Bidder.  Accordingly, the Debtor respectfully requests that the Court approve the Bidding Procedures, as set forth in the Bidding Procedures Order.

60.     The APA, upon which the initial bids, as well as bids at the Auction will be based, enables the Debtor and other parties-in-interest to easily compare and contrast any differing terms of the bids made by the qualified bidders at the Auction.  The Debtor reserves the right to amend or otherwise change the terms of the APA in such manner as the Debtor deems to be in its best interests.

61.     Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify its creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the date, time, and place of the Sale Hearing, and the deadline for filing any objections

to the relief requested herein.  Within two days of the Court's entry of the Bidding Procedures

Order, the Debtor will serve the Auction Notice by personal service, regular mail, electronic mail

or facsimile upon the Notice Parties.

62.     The Debtor will submit a form of Auction Notice reasonably calculated to provide

timely and adequate notice of the Bidding Procedures, the Auction and the Sale Hearing to the

Debtor's creditors and all other parties-in-interest that are entitled to notice.  Accordingly, the

Debtor requests that the Court approve the notice procedures set forth in this Motion, including

the form and manner of service of the Auction Notice, and that no other or further notice of the

Bidding Procedures or the Auction is required.

**E.      Scheduling Sale Hearing**

63.     The Debtor requests that the Court hold the Sale Hearing on July 26, 2016 at

11:00 a.m.  The Debtor has also requested that the Court establish July 11, 2016 at 4:00 p.m.

(Mountain) as the deadline for objections to the Court's entry of the Sale Order.

64.     The Debtor believes that it is crucial that it commence the sale transaction

contemplated by the APA on its proposed timeline to maximize value for the Debtor's estate

while minimizing administrative expenses.

**F.      The Sale Of Assets Should Be Free And Clear Of Liens, Claims And
        Encumbrances**

65.     To facilitate the sale of the Purchased Assets and in the interest of attracting the

best offers, the Debtor requests authority to sell the Purchased Assets on a final, "as is" basis,

free and clear of all liens, claims, encumbrances, mortgages, security interests, conditional sales,

or title retention agreements, pledges, hypothecations, judgments or claims of any kind or nature

and other interests (including, without limitation, all "claims" within the meaning of section

101(5) of the Bankruptcy Code) (collectively, the "Liens") in accordance with section 363(f) of

the Bankruptcy Code, with any such Liens in the Purchased Assets attaching to the Purchase Price in the same order or priority and with the same force, validity and effect with respect to such Purchased Assets prior to the transaction.

66.    Section 363 of the Bankruptcy Code provides in relevant part that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."    Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

    a.   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    b.   the party asserting the lien, claim, or interest consents;

    c.   the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d.   the interest is subject to a bona fide dispute; or

    e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

       11 .S.C. § 363(f)(1)–(5).

67.    The Debtor is not aware of any Liens that attach to the Purchased Assets. However, in the event that any lienholders emerge, such lienholders could be compelled to accept a money satisfaction of such interest.  Specifically, the Debtor proposes that any Liens asserted against the Purchased Assets attach to any proceeds realized from the sale of such Purchased Assets, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

## REQUEST OF WAIVER OF STAY

68.     The Debtor requests that the Court waive the stay imposed by Bankruptcy Rule

6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than

cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." As set forth above, time is of the essence and it is imperative that the Debtor

be able to enter into the APA on the timeline proposed. In order to maximize the value of the

Assets and minimize the estate's unnecessary administrative expenses, the Debtor believes a

waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that

they apply, is in the best interest of the Debtor's estate and stakeholders.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter orders granting the

relief requested in this Motion and such other and further relief as may be just and proper.

DATED this 24th day of May, 2016.

**DORSEY & WHITNEY LLP**

*/s/ Steven T. Waterman*
Steven T. Waterman
Michael F. Thomson
Jeffrey M. Armington
*Attorneys for Debtor Perseon Corporation
and Proposed Attorneys for Debtor in
Possession*

# **EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

between

**PERSEON CORPORATION**

and

**MEDLINK TECHNOLOGIES, LLC**

dated as of

May 17, 2016

# TABLE OF CONTENTS

## CONTENTS

Article I. Definitions ............................................................................................................... 1

Article II. Purchase and Sale ................................................................................................... 5

    Section 2.01    Purchase and Sale of Assets ............................................................... 5

    Section 2.02    Excluded Assets .................................................................................. 7

    Section 2.03    Assumed Liabilities ............................................................................ 7

    Section 2.04    Excluded Liabilities ............................................................................ 8

    Section 2.05    Purchase Price ..................................................................................... 8

    Section 2.06    Allocation of Purchase Price ............................................................... 8

    Section 2.07    Buyer's Bid Deposit ............................................................................ 8

Article III. Closing .................................................................................................................. 9

    Section 3.01    Closing ................................................................................................. 9

    Section 3.02    Closing Deliverables ........................................................................... 9

Article IV. Representations and Warranties of Seller ............................................................ 10

    Section 4.01    Organization and Qualification of Seller ........................................... 10

    Section 4.02    Authority of Seller ............................................................................ 10

    Section 4.03    Title to Purchased Assets .................................................................. 10

    Section 4.04    No Other Representations and Warranties .......................................... 10

Article V. Representations and Warranties of Buyer ............................................................ 11

    Section 5.01    Organization and Authority of Buyer ................................................ 11

    Section 5.02    Authority of Buyer ............................................................................ 11

    Section 5.03    No Conflicts; Consents ...................................................................... 11

Section 5.04    Sufficiency of Funds ........................................................................................ 12

Section 5.05    Solvency ........................................................................................................... 12

Section 5.06    Independent Investigation ................................................................................ 12

Article VI. Bankruptcy Court Proceedings ............................................................................... 12

Section 6.01    Bidding Procedures ........................................................................................... 12

Section 6.02    Bid Protections ................................................................................................. 13

Section 6.03    Assumption of Executory Contracts ................................................................ 13

Section 6.04    Sale Approval Order ......................................................................................... 13

Article VII. Covenants ............................................................................................................... 14

Section 7.01    Conduct of Business Prior to the Closing ........................................................ 14

Section 7.02    Other Bankruptcy Covenants .......................................................................... 14

Section 7.03    Closing Conditions .......................................................................................... 15

Section 7.04    Notices ............................................................................................................. 15

Article VIII. Conditions to Closing ........................................................................................... 15

Section 8.01    Conditions to Obligations of All Parties .......................................................... 15

Section 8.02    Conditions to Obligations of Buyer ................................................................. 16

Section 8.03    Conditions to Obligations of Seller .................................................................. 16

Article IX. Termination .............................................................................................................. 16

Section 9.01    Termination ...................................................................................................... 16

Section 9.02    Effect of Termination ....................................................................................... 17

Article X. Miscellaneous ............................................................................................................ 17

Section 10.01    Survival .......................................................................................................... 17

Section 10.02    Expenses ........................................................................................................ 17

Section 10.03    Timing ............................................................................................................ 17

Section 10.04   Notices ........................................................................................................... 18

Section 10.05   Interpretation.................................................................................................. 19

Section 10.06   Headings ......................................................................................................... 19

Section 10.07   Severability..................................................................................................... 19

Section 10.08   Entire Agreement........................................................................................... 19

Section 10.09   Successors and Assigns ................................................................................. 19

Section 10.10   No Third Party Beneficiaries ........................................................................ 20

Section 10.11   Amendment and Modification; Waiver ......................................................... 20

Section 10.12   Governing Law; Submission to Jurisdiction................................................. 20

Section 10.13   Counterparts.................................................................................................... 20

Section 10.14   Non-recourse................................................................................................... 20

## Asset Purchase Agreement

This Asset Purchase Agreement (this "**Agreement**"), dated as of May 17, 2016, is entered into between Perseon Corporation, a Delaware corporation ("**Seller**") and MedLink Technologies, LLC, a North Carolina limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged in the business of developing, manufacturing, marketing and servicing systems to treat cancer and benign diseases using its flagship product, MicroThermX (the "**Business**");

WHEREAS, Seller intends to file a voluntary petition under Chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**"), which Bankruptcy Court will then commence a case to administer the bankruptcy of Seller (the "**Bankruptcy Case**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, substantially all the assets of the Business as defined herein, free and clear of liens, claims, encumbrances and interests pursuant to Section 363 of the Bankruptcy Code, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**363 Sale Motion**" means a motion to be filed by Seller with the Bankruptcy Court seeking approval of the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code

"**Affiliate**" has the meaning set forth in Section 101 of the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in **Section 2.06**.

"**Assigned Contracts**" has the meaning set forth in **Section 2.01(b)**.

1

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 3.02(a)(ii)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" means the Auction for the sale of substantially all of the assets used by Seller in its operation of the Business, as to be scheduled by the Bankruptcy Court in the Bid Procedures Order.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Procedures Motion**" means that certain motion to be filed by Seller seeking Bankruptcy Court approval of certain bidding procedures to be used in the Auction.

"**Bid Procedures Order**" means that certain order to be entered by the Bankruptcy Court approving the bidding procedures set forth in the Bid Procedures Motion.

"**Bill of Sale**" has the meaning set forth in **Section 3.02(a)(i)**.

"**Business**" has the meaning set forth in the recitals.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer's Bid Date**" has the meaning set forth in **Section 2.07**.

"**Buyer's Bid Deposit**" has the meaning set forth in **Section 2.07**.

"**Buyer Closing Certificate**" has the meaning set forth in **Section 8.03(c)**.

"**Closing**" has the meaning set forth in **Section 3.01**.

"**Closing Date**" has the meaning set forth in **Section 3.01**.

"**Collateral**" means all property and interests in property and proceeds thereof now owned or hereafter acquired by Buyer including: (a) Accounts; (b) Chattel Paper; (c) Deposit Accounts; (d) Documents; (e) General Intangibles (other than as excluded below); (f) Goods; (g) Instruments; (h) Intellectual Property; (i) Inventory; (j) Investment Property; (k) Letter-of-Credit Rights; (l) all of Seller's corporate and trade names and styles; (m) Supporting Obligations; and (n) all Proceeds of the foregoing, each as defined herein or in Article 5, Article 8 or Article 9, as applicable, of the Uniform Commercial Code as in effect in the State of Utah.  Notwithstanding

2

the foregoing, and unless authorized by the Bankruptcy Court, Collateral shall not include: (i) Seller's real property interests (including fee real estate, leasehold interests and fixtures); (ii) any General Intangibles or other rights arising under any contracts, instruments, licenses, leases or other documents (each, a "**Contract**") or any asset or property that is subject to any Contract thereof as to which the grant of a security interest would (A) constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of Seller under such Contracts, (B) constitute a violation of a valid and enforceable restriction in favor of a third party on such grant, unless and until any required consents shall have been obtained, (C) give any other party to such Contract the right to terminate its obligations thereunder or the Seller's use of such asset would result in a breach or violation of, or constitute a default under any such Contract, or (D) would result in the loss of use of such asset subject to any such Contract; (iii) any asset, the granting of a security interest in which would be void or illegal under any applicable governmental law, rule or regulation, or pursuant thereto would result in, or permit the termination of such asset or Seller's rights in such asset; or (iv) any claim or cause of action arising under sections 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a) of the Bankruptcy Code, other than avoidance actions under Section 549 of the Bankruptcy Code to the extent any portion of the Collateral is transferred in a manner not authorized by the Bankruptcy Court or the Bankruptcy Code.

"**Contracts**" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Liabilities**" means all liabilities of Seller other than the Assumed Liabilities.

"**Executory Contracts**" has the meaning set forth in **Section 2.01(b)**.

"**FDA**" means the U.S. Food and Drug Administration.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Unit.

"**Governmental Unit**" has the meaning set forth in Section 101 of the Bankruptcy Code.

3

"**Intellectual Property**" has the meaning set forth in Section 101 of the Bankruptcy Code and also includes Know-How of the Business and Perseon's U.S. patent applications and letters patents, including (a) all divisionals, continuations and continuation-in-part applications that claim priority to any of the applications; (b) any  foreign application corresponding to any application identified in (a) or other application, as well as any utility models and future reissues, re-examinations, extensions, continuations, continuations-in-part, divisions or substitute patent applications of the inventions as described in the patents and applications; and (c) each patent that issues or reissues from any application or patent.

"**Intellectual Property Agreements**" means all licenses, sublicenses and other agreements by or through which other Persons grant Seller or Seller grants any other Persons any exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used primarily in connection with the Business.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and primarily used in connection with the Business.

"**Intellectual Property Assignment**" has the meaning set forth in **Section 3.02(a)(iii)**.

"**Know-How"** means the technical information and other knowledge in Seller's records and possession associated with the Business (including trade secrets), drawings and other material relevant to manufacture, develop, improve, enhance, modify, or reformulate the Intellectual Property Assets or derivative works therefrom, and market the business associated with the Intellectual Property Assets.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Unit.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Units, including but not limited to the FDA.

"**Person**" has the meaning set forth in Section 101 of the Bankruptcy Code.

"**Purchase Price**" has the meaning set forth in **Section 2.05**.

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Quality Systems**" means the documentation, records, training materials and procedures maintained by Seller to govern the methods used in, and the facilities and controls used for, the design, manufacture, packagin, labeling, storage, installation, and servicing of all finished medical devices intended for human use.

4

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Approval Order**" means an order entered by the Bankruptcy Court approving the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in **Section 8.02(c)**.

"**Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of Clinton E. Carnell Jr. or David Green.

"**Signature Date**" means the date of signature of this Agreement by the party last signing it.

"**Successful Bidder**" has the meaning set forth in the Bid Procedures Motion.

"**Tangible Personal Property**" has the meaning set forth in **Section 2.01(e)**.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the 363 Sale Motion, the Bid Procedures Motion, and the other agreements, instruments and documents required to be delivered at the Closing.

## ARTICLE II.
### PURCHASE AND SALE

Section 2.01    **Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, all of Seller's right, title and interest in, to all of the assets, properties and rights of Seller, to the extent that such assets,

5

properties and rights exist as of the Closing Date and primarily relate to the Business (collectively, the "**Purchased Assets**"):

(a)      all inventory, finished goods, raw materials, work in progress, Quality Systems and all associated records and documentation, packaging, supplies, parts and other inventories of the Business;

(b)      all Contracts set forth on **Section 2.01(b)** of the Disclosure Schedules (the "**Executory Contracts**"), and the Intellectual Property Agreements set forth on **Section 2.01(b)** of the Disclosure Schedules (collectively, the "**Assigned Contracts**");

(c)      all accounts or notes receivable of the Business together with all prepaid credits, advance payments, security deposits, charges, sums and fees to the extent related to the Business and the Purchased Assets <u>except</u> the cash deposit Seller has paid to secure company credit cards, D&O and commercial insurance prepaids and deposits, rental lease deposits including storage units, tax refunds and retainers and deposits for professionals including attorneys and accountants;

(d)      Know-How of the Business in Seller's records and possession, and all Intellectual Property Assets, including but not limited to (i) all trade names and styles of Seller including the trade name "Perseon Corporation," (ii) all of Seller's URL's including the internet domain at http://www.perseonmedical.com, and (iii) the Intellectual Property Assets listed on **Section 2.01(d)** of the Disclosure Schedules;

(e)      all approvals, permits, licenses and other authorities from the FDA related to the Business;

(f)      all furniture, fixtures, equipment, supplies and other tangible personal property of the Business listed on **Section 2.01(f)** of the Disclosure Schedules (the "**Tangible Personal Property**");

(g)      all Permits listed on **Section 2.01(g)** of the Disclosure Schedules;

(h)      all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(i)      copies of all (i) books and records, including books of account, ledgers and general, financial and accounting records for the period beginning January 1, 2015 to the date hereof, other than books and records set forth in **Section 2.02(c)**, and (ii) machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all

6

correspondence with any Governmental Unit), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that primarily relate to the Business or the Purchased Assets; and

(j)      all goodwill associated with any of the assets described in the foregoing clauses.

Section 2.02    **Excluded Assets.** Other than the Purchased Assets subject to **Section 2.01**, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "**Excluded Assets**"). Excluded Assets include the following assets and properties of Seller:

(a)      all cash and cash equivalents, bank accounts and securities of Seller;

(b)      all Contracts that are not Assigned Contracts;

(c)      the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(d)      all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

(e)      all Tax assets (including duty and Tax refunds and prepayments) of Seller;

(f)      all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise;

(g)      all accounting software and computer systems; and

(h)      the rights which accrue or will accrue to Seller under the Transaction Documents.

Section 2.03    **Assumed Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all liabilities and obligations of Seller arising out of or relating to the Business or the Purchased Assets on or after the Closing, other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

7

(a)      all liabilities and obligations arising under or relating to the Assigned Contracts;

(b)      all liabilities and obligations for Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities prorated for any taxable period (or portion thereof) arising on or after the Closing Date; and

(c)      all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing.

Section 2.04   **Excluded Liabilities**.  Buyer shall not assume and shall not be responsible to pay, perform or discharge the Excluded Liabilities.

Section 2.05   **Purchase Price**.  The aggregate purchase price for the Purchased Assets shall be $4,350,000.00 (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities. The Purchase Price shall include the amount of Buyer's Bid Deposit. The Purchase Price shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer no later than two (2) days prior to the Closing Date.

Section 2.06   **Allocation of Purchase Price.** The Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) shall be allocated among the Purchased Assets as proposed in writing by Buyer and approved by Seller prior to the Closing Date (the "**Allocation Schedule**"). Seller and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax Returns in accordance with the Allocation Schedule.

Section 2.07   **Buyer's Bid Deposit.** As described in the Bid Procedures Order, Buyer shall be obliged to make payment as a bid deposit to the Seller of $850,000 ("**Buyer's Bid Deposi**t") by wire transfer of immediately available funds to an account designated in writing by the Seller not later than five (5) days after the Signature Date. Upon entry of the Bid Procedures Order, Seller shall be permitted to use Buyer's Bid Deposit to fund its operations during the pendency of the Bankruptcy Case.  Unless Buyer is the winning bidder for the Purchased Assets at the Auction, to the extent this Agreement is terminated in accordance with **Section 9.01**, Seller shall be obligated to return Buyer's Bid Deposit to Buyer within five (5) days of the termination of this Agreement plus pay five percent (5%) interest on any amounts of Buyer's Bid Deposit used by Seller to fund its operations from the date of the deposit of Buyer's Bid Deposit until the date of termination of this Agreement in accordance with **Section 9.01** ("**Seller's Repayment Obligation**").  Buyer's Bid Deposit shall be secured by a senior secured, super-priority lien in the Collateral.  This security interest shall be perfected upon the entry of the Bid Procedures Order without the need for the Seller or the Buyer to file any UCC-1 financing statements, notices of lien or any similar document to perfect its security interests under the UCC.  Upon the entry of the Bid Procedures Order, the security interests created under this Agreement shall

8

constitute perfected security interests in the Collateral in favor of the Buyer senior and prior to all other liens.  Upon the payment in full in cash of Seller's Repayment Obligation, the security interests granted herein shall automatically terminate with respect to all of the Collateral. Upon any such termination, the Buyer will, at the Seller's sole expense, deliver to the Seller, without any representations, warranties or recourse of any kind whatsoever, all Collateral held by the Buyer hereunder, and execute and deliver to the Seller such documents as the Seller shall reasonably request to evidence such termination.

## ARTICLE III.
### CLOSING

Section 3.01    **Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Dorsey & Whitney LLP, 136 S. Main St, Suite 1000, Salt Lake City, UT 84101 on the day after all of the conditions to Closing set forth in **Article VIII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

Section 3.02    **Closing Deliverables**.

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale in a form mutually acceptable to Buyer and Seller (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in a form mutually acceptable to Buyer and Seller (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)    an assignment agreement in a form mutually acceptable to Buyer and Seller, and duly executed by Seller, effecting the assignment of the Intellectual Property Assignments to Buyer (the "**Intellectual Property Assignment**").

(iv)    the Seller Closing Certificate; and

(v)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may reasonably be required to give effect to this Agreement.

9

(b)      At the Closing, Buyer shall deliver to Seller the following:

(i)      the Purchase Price;

(ii)      the Assignment and Assumption Agreement duly executed by Buyer; and

(iii)      the Buyer Closing Certificate.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the date hereof.

Section 4.01    **Organization and Qualification of Seller.** Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.

Section 4.02    **Authority of Seller.** Subject to approval of the Bankruptcy Court, Seller has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.03    **Title to Purchased Assets**.  Subject to approval of the Bankruptcy Court pursuant to the Sale Approval Order and upon satisfaction of Seller's Repayment Obligation, Seller has the legal right and authority to sell, convey and transfer the Purchased Assets, free and clear of Encumbrances.

Section 4.04    **No Other Representations and Warranties.** Seller conveys the Purchased Assets as-is, where-is and if-is, and disclaims any representation or warranty arising

10

from statute or otherwise in Law, including any warranty of merchantability or fitness for a particular purpose.  Except for statements contained in this **Article IV** (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Purchased Assets furnished or made available to Buyer and its Representatives (including any information, documents or material made available to Buyer in any form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business or the Purchased Assets.

## ARTICLE V.
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the date hereof.

Section 5.01   **Organization and Authority of Buyer**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of North Carolina.

Section 5.02   **Authority of Buyer**.  Buyer has all necessary limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.03   **No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of formation, by-laws, or other similar organizational documents of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other

11

action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Unit is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

Section 5.04    **Sufficiency of Funds.**  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

Section 5.05    **Solvency**.  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 5.06    **Independent Investigation.**  Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in **Article IV** of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in **Article IV** of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE VI.
## BANKRUPTCY COURT PROCEEDINGS

Section 6.01    **Bidding Procedures**.  Promptly upon the filing of the Bankruptcy Case, Seller shall file the Bid Procedures Motion with the Bankruptcy Court, after which the Court will enter the Bid Procedures Order approving the bid procedures proposed in the Bid Procedures

12

28506165v1

Motion.  Buyer has reviewed the Bid Procedures Motion and finds its form and terms acceptable.
Seller understands and agrees that Buyer's willingness to enter into the transactions
contemplated herein are conditioned upon the prompt filing with and approval by the Bankruptcy
Court of the Bid Procedures Motion.

Section 6.02    **Bid Protections**.  The Bid Procedures Motion shall provide, among other
things:

(a)    Buyer shall be the stalking horse bidder for substantially all of the assets
of Seller;

(b)    If Buyer is not the successful bidder at the Auction, as approved by the
Bankruptcy Court, because of a higher and better offer, then Buyer shall be paid at Closing a
break-up fee of $217,500.00 (five percent (5%) of the stalking horse purchase price offered by
Buyer);

(c)    To be a qualified bidder at the Auction, a bidder must make a $850,000
bid deposit accompanied by a written initial overbid offer (described in subpart (d) below),
together with proof of ability to fund the total purchase price and an executed asset purchase
agreement in form and substance substantially similar to this Agreement;

(d)    The initial overbid, if any, shall be no less than $100,000 higher than
Buyer's initial bid plus the break-up fee described in Section 6.02(b); and

(e)    Subsequent overbids, if any, shall be in increments of no less than
$100,000.

Section 6.03    **Assumption of Executory Contracts**.  In connection with Buyer's
purchase of the Purchased Assets, Buyer wishes to assume the Executory Contracts.  Seller shall
elect to assume the Executory Contracts and assign such assumed Executory Contracts to Buyer
in accordance with the procedures set forth in Section 365 of the Bankruptcy Code.  As part of
these procedures, Buyer, as assignee of the Executory Contracts, shall provide adequate
assurance that any defaults under the Executory Contracts will be promptly cured and future
obligations will be performed.  In order to provide adequate assurance, on or prior to the date
Seller assumes and assigns the Executory Contracts, Buyer shall pay directly to counterparties all
amounts necessary to cure any defaults under the Executory Contracts, up to an aggregate value
not exceeding $50,000 on the Closing Date.  Buyer shall then perform all future obligations of
Seller under the Executory Contracts in accordance with the terms thereof.

Section 6.04    **Sale Approval Order**.  The Sale Approval Order shall be reasonably
acceptable in form and substance to Buyer and shall include provisions, among others (i)
providing that Buyer shall not incur any liability as a successor to Seller unless such liability is

13

expressly assumed and to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Buyer or the Purchased Assets related thereto, (ii) approving the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, or such higher and better terms and conditions offered by Buyer at the Auction, and authorizing Seller to proceed with this transaction, (iii) stating that any objections timely filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents fair value for the Purchased Assets, (v) finding that the sale is in the best interests of Seller's estate and creditors, (vi) finding that Buyer is a good faith purchaser of the Purchased Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(m) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Buyer shall be free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Buyer and protecting Buyer against any liens, claims, interests, obligations and encumbrances against Seller or the Purchased Assets, and (ix) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing.  Seller shall use commercially reasonable efforts to obtain entry of the Sale Approval Order in the form described hereto.  To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

## ARTICLE VII.
### COVENANTS

Section 7.01    **Conduct of Business Prior to the Closing**.  To the extent permitted by orders and directives of the Bankruptcy Court and applicable provisions of the Bankruptcy Code, between the date of this Agreement and the Closing, Seller shall use its commercially reasonable efforts to preserve and maintain the Purchased Assets.  Seller shall consult with Buyer prior to implementing any decisions reasonably anticipated to materially and adversely affect any of the Purchased Assets.

Section 7.02    **Other Bankruptcy Covenants**.  Seller shall promptly make all filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets consistent with the terms of this Agreement.  In the event that any third party appeals, or requests a stay pending appeal, from any order relating to the transaction, Seller shall promptly notify

14

Buyer of such appeal or stay request.  Seller shall also provide Buyer with written notice of any motion, application, brief or other pleading filed in connection with any appeal relating to the transactions contemplated hereunder.  Neither party shall willfully take any action that could reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any authorizations, orders and approvals of the Bankruptcy Court.

Section 7.03    **Closing Conditions**.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the conditions to closing set forth in **Article VIII** hereof.

Section 7.04    **Notices**.  Seller shall provide all notices required under the Bankruptcy Code to all parties in interest to the Bankruptcy Case, including notices of the pendency of and all hearings before the Bankruptcy Court regarding the motions for entry of the Sale Approval Order and to assume the Executory Contracts.

## ARTICLE VIII.
### CONDITIONS TO CLOSING

Section 8.01    **Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered a final order granting Seller's motion for entry of the Sale Approval Order.

(b)    No Governmental Unit shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(c)    During the course of the Bankruptcy Case until Closing, Seller shall have paid on a current basis all sums due to the vendors and employees listed on **Section 8.01(c)** of the Disclosure Schedules.

(d)    Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Units referred to in **Section 5.03**, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

15

Section 8.02 **Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a) Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(b) Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(a)**.

(c) Seller shall have delivered a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in **Section 8.02(a)** and **Section 8.02(b)** have been satisfied (the "**Seller Closing Certificate**").

Section 8.03 **Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a) Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(b) Buyer shall have delivered to Seller the Purchase Price, duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(b)**.

(c) Buyer shall have delivered a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 8.03(a)** and **Section 8.03(b)** have been satisfied (the "**Buyer Closing Certificate**").

## ARTICLE IX.
### TERMINATION

Section 9.01 **Termination.** This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of Seller and Buyer;

(b) by Seller if Buyer is not the Successful Bidder at the Auction;

16

28506165v1

(c)    by Seller by written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VIII** and such breach, inaccuracy or failure cannot be cured by Buyer within 30 days after written notice of such breach; or

(d)    by Buyer or Seller in the event that:

(i)    the Bankruptcy Court denies, without opportunity to cure deficiencies, Seller's Bid Procedures Motion, motion for entry of the Sale Approval Order;

(ii)    the Bankruptcy Case is dismissed by the Bankruptcy Court or converted to a Chapter 7 case;

(iii)    there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(iv)    any Governmental Unit shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement.

Section 9.02    **Effect of Termination.** Other than the parties' obligations under **Section 2.07** and **Section 10.02**, the provisions of this Agreement shall not survive termination of this Agreement.

## ARTICLE X.
### MISCELLANEOUS

Section 10.01    **Survival.**  Seller's statements, covenants and agreements contained in this Agreement shall not survive the Closing Date.

Section 10.02    **Expenses**.  Except as otherwise expressly provided, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred. For the avoidance of doubt, Buyer shall not be liable for any costs or expenses in relation to the Bankruptcy Case.

Section 10.03    **Timing**.  All references to "days" or other timing methods or procedures in this Agreement shall be subject to Rule 9006 of the Federal Rules of Bankruptcy Procedure.

17

Section 10.04  **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 10.04**):

| | |
|---|---|
| If to Seller: | Perseon Corporation |
| | 391 Chipeta Way |
| | Salt Lake City, UT 84108 |
| | E-mail:     ccarnell@perseonmedical.com |
| | dgreen@perseonmedical.com |
| | Attention: Clinton E. Carnell Jr. |
| | David Green |
| with a copy to: | Dorsey & Whitney LLP |
| | 136 S. Main St., Suite 1000 |
| | Salt Lake City, UT 84101 |
| | Facsimile: (801) 933-7373 |
| | E-mail: taylor.nolan@dorsey.com |
| | Attention: Nolan S. Taylor |
| If to Buyer: | MedLink Technologies, LLC |
| | 16 Portofino Place |
| | Durham, NC 27707 |
| | E-mail: David@medlinktechnologies.com |
| | Attention: David Chen |
| with a copy to: | Troutman Sanders LLP |
| | 5 Park Plaza, Suite 1400 |
| | Irvine, CA 92614 |
| | Facsimile:  949-622-2739 |
| | Email:  penelope.parmes@troutmansanders.com |

18

Attention:  Penelope Parmes

Section 10.05  **Interpretation**.  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Disclosure Schedules mean the Articles and Sections of, and Disclosure Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 10.06  **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 10.07  **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 10.08  **Entire Agreement**.  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 10.09  **Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

19

Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 10.10  **No Third Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.11  **Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto and, as necessary, approved by the Bankruptcy Court. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.12  **Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Utah and the Bankruptcy Code without giving effect to any choice or conflict of law provision or rule (whether of the State of Utah or any other jurisdiction). Any dispute regarding the interpretation or enforcement of this Agreement shall be heard by the Bankruptcy Court, applying the laws of the State of Utah, and the parties hereby irrevocably consent to the jurisdiction of the Bankruptcy Court for all such matters.

Section 10.13  **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 10.14  **Non-recourse.** This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future

20

director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

*[Signature Page Follows]*

21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

PERSEON CORPORATION

By: _____

Name: CLINT CARNELL

Title: CEO + PRESIDENT

MEDLINK TECHNOLOGIES, LLC

By: _____

Name: David Chen

Title: Director

*[Signature Page to Asset Purchase Agreement]*

28506165v1

# DISCLOSURE SCHEDULES

## TO

## ASSET PURCHASE AGREEMENT

### DATED [___], 2016

These Disclosure Schedules constitute an integral part of the Asset Purchase Agreement and are subject to all of the applicable terms thereof. Capitalized terms shall have the same meaning as defined in the Asset Purchase Agreement. The headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of these Disclosure Schedules.

1

2850616v1

### Section 2.01(b)

Exclusive Distribution Agreement between Terumo Europe, NV and BSD Medical Corporation dated March 29, 2013, including all amendments, restatements and supplements thereto.

Sales Agent Agreement by and between Perseon Corporation and Appleton Medical Services, Inc. dated April 1, 2015.

Exclusive Distribution Agreement by and between Comed Medical Specialties, LLC and BSD Medical Corporation dated June 23, 2014.

First Amendment to Exclusive Distribution Agreement between Comed Medical Specialities, LLC and Perseon Corporation dated April 1, 2015.

Exclusive Distribution Agreement by and between KOL Bio-Medical Instruments, Inc. and Perseon Corporation dated April 1, 2015.

Manufacturing Agreement by and between BSD Medical Corporation and CEA Technologies, Inc. dated April 11, 2011.

First Amendment to Manufacturing Agreement by and between BSD Medical Corporation and CEA Technologies, Inc. dated January 22, 2014.

Contract bewteen BSD Medical Corporation and VA Eastern Colorado Health Care System dated April 8, 2015.

Service Order between Perseon Corporation and MegaPath dated March 3, 2015.

Sales Order between Perseon Corporation and De Laige Landen dated April 10, 2015.

Maintenance Service Agreement between Perseon Corporation and Les Olsen Company dated April 10, 2015.

Sub Lease by and between KAX CO LLC and Perseon Corporation.

License Agreement between Perseon Corporation and MedLink Technologies, LLC.

2

**Section 2.01(e)**

## Patents

| Application No. | Country | Filing Date | Patent No. | Title | Status |
|---|---|---|---|---|---|
| 12/620,002 | US | 11/17/2009 | 8,414,570 | Microwave Coagulation Applicator and System | Granted |
| 12/689,195 | US | 1/18/2010 | 8,551,083 | Microwave Coagulation Applicator and System | Granted |
| 14/049,064 | US | 10/8/2013 | | Microwave Coagulation Applicator and System | Pending |
| 12/794,667 | US | 6/4/2010 | | Microwave Coagulation Applicator and System with Fluid Injection | Pending |
| PCT/US10/57127 | WO | 11/17/2010 | | Microwave Coagulation Applicator and System | Nat. Phase |
| 10832144.9 | EP | 11/17/2010 | | Microwave Coagulation Applicator and System | Pending |
| 201080061511.4 | CN | 11/17/2010 | | Microwave Coagulation Applicator and System | Pending |
| 2012-540035 | JP | 11/17/2010 | | Microwave Coagulation Applicator and System | Pending |
| 2012125022 | RU | 11/17/2010 | 2562287 | Microwave Coagulation Applicator and System | Granted |
| 13/020,483 | US | 2/3/2011 | | Multiple Frequency Energy Supply and Coagulation System | Abandoned |
| 13/615,017 | US | 9/13/2012 | | Ablation Antenna | Pending |
| PCT/US12/56418 | WO | 9/20/2012 | | Ablation Antenna | Nat. Phase |
| 12833617.9 | EP | 9/20/2012 | | Ablation Antenna | Pending |
| 201280045847.0 | CN | 9/20/2012 | | Ablation Antenna | Pending |
| 2014-531978 | JP | 9/20/2012 | | Ablation Antenna | Pending |
| 2014115808 | RU | 9/20/2012 | | Ablation Antenna | Pending |
| 10-2014-7010042 | KR | 9/20/2012 | | Ablation Antenna | Pending |
| 1120140067007 | BR | 9/20/2012 | | Ablation Antenna | Pending |
| 2496/DELNP/2014 | IN | 9/20/2012 | | Ablation Antenna | Converted |
| 61/536,680 | US | 9/20/2011 | | Ablation Antenna | Pending |
| 14/310,951 | US | 6/20/2014 | | Ablation Emitter Assembly | Pending |
| 14/310,975 | US | 6/20/2014 | | Ablation Probe with Metalized Ceramic Component | Pending |
| 62/121,236 | US | 2/26/2015 | | Microwave Sheath/Introducer with Accessibility Port | Pending |

## Trademarks/Service Marks

| Application No. | Country | Filing Date | Reg. No. | MARK | Status |
|---|---|---|---|---|---|
| 77/095618 | US TM | 1/31/2007 | 3384164 | MICROTHERMX | Registered |

3

| 86/559,628 | US TM | 3/10/2015 |           | PERSEON                       | Pending    |
| 86/559,650 | US TM | 3/10/2015 |           | SYNCHRONOUS WAVE ALIGNMENT    | Pending    |
| 011893732  | EU    | 12/6/2013 | 011893732 | MICROTHERMX                   | Registered |

4

2850616Sv1

Section 2.01(f)

| Equip P/N / Asset # | Equipment Type | Manufacturer | Model | S/N | Repair and Maintenance Remarks |
|---|---|---|---|---|---|
| 11-16842-002 | Oscilloscope | Tektronix | TDS 2024C | TDS2024C C014513 | New, put into use 06/01/12. |
| 11-16843-005 | Frequency Counter | EZ Digital Co. | FC-7150 | R11040020 | New, put into service 8/23/13 |
| 11-16844-007 | Safety Testers Function Checker | Compliance West | HTT-1 | 433087 | New, put into service on 9/29/15, Does Not Get Calibrated |
| 11-16846-017 | Power Meter | | | | Storage |
| 11-16846-018 | Power Meter | Agilent Technologies | N1913A | MY5409000 2 | New, put into service on 03/28/14 |
| 11-16848-004 | Network / Spectrum Analyzer | Anritsu | MS2024A | 0815111 | New, 04/15/08.  Sent to Anritsu for repair on 06/04/08. |

5

2850616Sv1

| | | | | | New, 07/26/11. Repaired 10/14/14. |
|---|---|---|---|---|---|
| 11-16848-006 | Network Analyzer | Agilent Technologies | E5061B | MY49201903 | |
| 11-16849-001 | Spectrum Analyzer | Rhode & Schwarz | FS300 | 101020 | |
| 11-16850-001 | Multimeter, True RMS | Fluke | 26-3 | 78870224 | |
| 11-16850-005 | Multimeter, True RMS | Fluke | 26-3 | 78870228 | |
| 11-16850-014 | Multimeter | Fluke | 177 | 92070417 | |
| 11-16850-015 | Multimeter, True RMS | Fluke | 87-5 | 95830123 | |
| 11-16856-007 | Dial Caliper, 12" | Mitutoyo | 505-645 | 9M6008 | |
| 11-16856-008 | Dial Caliper 6" | Fowler | N/A / 6" ± 0.001 | 4-92617 | |

6

| ID | Item | Manufacturer | Model | Serial | Notes |
|---|---|---|---|---|---|
| 11-16857-006 | Digital Caliper | Fowler | None | NA | New, 05/12, was John Henrie's |
| 11-16857-010 | Digital Caliper 12" | Mitutoyo | 500-173 | 1091293 | New, 08/02/13 |
| 11-16858-002 | Micrometer | | | | Storage |
| 11-16858-003 | Micrometer | | | | Storage |
| 11-16859-003 | Digimatic Micrometer | Mitutoyo | MDC-1"MX | 45096117 | New, 11/7/14 |
| 11-16867-005 | Power Supply | Instek | GPS-3303 | EI920247 | Does Not Get Calibrated |
| 11-16868-002 | Hipot Tester | Quadtech | Sentry 30 Plus | S00300001196 | New, put into use on 11/01/11. |
| 11-16869-003 | Coaxial Attenuator | Bird | 8325 | 5164 | Does Not Get Calibrated |

7

2850616v1

| | | | | | Does Not Get Calibrated |
|---|---|---|---|---|---|
| 11-16870-006 | Coaxial Resistor | | 8401 | 1887 | Does Not Get Calibrated |
| 11-16873-004 | Signal Generator | Agilent Technologies | 8648A | 3847M01668 | Does Not Get Calibrated, Reference Only |
| 11-16882-024 | Power Sensor | Agilent Technologies | N8482A | MY55120010 | New, put into service on 9/23/15 |
| 11-16895-002 | Digital Force Gauge | Omega | DFG55-100 | 3548139 | |
| 11-16895-003 | Chatillon Tensile Tester | Chatillon | LTCM-100 | 03 25 15 01 | |
| 11-16895-004 | Force Tester | Chatillon | LTCM-100 | 03 25 15 01 | New, 04/07/15 |
| 11-16895-005 | Load Cell Sensor | Chatillon | SLC-0100 | V07149 | New, 04/07/15 |
| 11-16895-006 | Load Cell Sensor | Chatillon | TLC-0002 | TLC2594 | New, 08/26/15 |

8

| 11-16895-007 | Load Cell Sensor | Chatillon | TLC-0010 | TLC2595 | New, 08/26/15 |
|---|---|---|---|---|---|
| 11-16898-001 | Isaac Multi-Function Leak Tester | Zaxis Inc. | Isaac-PF | 489-10i1 | New 01/2010, modified from PD to PF on 3/26/10. Clamp valve added to pneumatic circuit, 1/2/13. Recalibrated 9/11/14. |
| 11-16899-004 | Chroma Ground Bond Tester | Chroma ATE | 19572 | 1957200008 68 | Storage |
| 11-16902-002 | Torque Screwdriver | Utica | TS-30 | NA | New on 6/23/14, was Thong's |
| 11-16908-005 | RF LAMBDA Termination (Load) | RF LAMBDA | RFST200G02 NF | 11091503 | New, 12/14/11, Reference only. |
| 11-16909-005 | ThermoHygrometer | Control Company / Cole Parmer | 90080-03 | 140717005 | This item will be replaced rather than recalibrated when due. |
| 11-16912-001 | Plus Gage Blocks .011/.250 | Meyer Gage Co. Inc. | N/A | N/A | New, 02/20/12, Reference Only |
| 11-16912-002 | Minus Gage Blocks .011/.250 | Meyer Gage Co. Inc. | N/A | N/A | New, 02/20/12, Reference Only |

9

2850616541

| 11-16914-001 | Airflow Meter | Fluke | 922 | 18630409 | New, 06/12 |
|---|---|---|---|---|---|
| 11-16914-002 | Airflow Meter | Fluke | 922 | 24620439 | |
| 11-16919-001 | Scale, 1500g x 0.05g | Adam Equipment, Inc. | HCB1502 | AE76001527 | New on 02/21/13 |
| 11-16925-001 | Synthesizer | Mini Circuits | SSG-4000LH | 11304020001 | Put into use on 4/15/14. |
| 11-16927-001 | Isaac Leak Standard | Zaxis Inc. | L-STD-6-C | T285-14s1 | New 04/29/14 |
| 11-16930-001 | Contact Tachometer | Extech | 461720 | 960122 | New, 1/5/15. This item will be replaced rather than recalibrated when due. |

10

2850616Sv1

**Section 2.01(g)**

510(k) Clearances

510(k) Clearances for Microwave Ablation system and accessories, listing numbers D110278 and D240185.

Other Permits

EC Certificate number 349980 MR2 from DQS Medizinprodukte GmbH for fulfillment of the requirements of CE Annex II – excluding Section 4 of Council Directive 93/42/EEC concerning medical devices with respect to "Heat therapy including hyperthermia and thermotherapy, and microwave ablation equipment including steril accessories, as listed in the annex [to the certificate]" dated January 11, 2013.

EC Certificate number 349980 MR2 from DQS Medizinprodukte GmbH for fulfillment of the requirements of CE Annex II – excluding Section 4 of Council Directive 93/42/EEC concerning medical devices with respect to "Heat therapy including hyperthermia and thermotherapy, and microwave ablation equipment including steril accessories, as listed in the annex [to the certificate]" dated March 20, 2015.

Certificate number 349980 MP29 from DQS Medizinprodukte GmbH to the effect that the Company has implemented and maintains a Quality Management System dated June 17, 2011.

Certificate number 349980 MP2012 from DQS Medizinprodukte GmbH to the effect that the Company has implemented and maintains a Quality Management System dated March 20, 2015.

Certificate of product registration in Serbia issued February 2, 2016.

Certificate of product registration in Turkey issued November 12, 2015.

System of Award Management for Veterans Administration Approval.

TUV NRTL CU and cTUVus Mark - 60601-1 Certificate

*[Signature Page to Asset Purchase Agreement]*

**Section 8.01(c)**

<u>Vendors</u>

Vernay Laboratories, Inc.
Merit Medical
CEA
Sterigenics
Nelson Lab
Richard Manufacturing
PCB Solutions Inc.
Metal Fab
Diamond System
Arrow Electronics, Inc.
Sierra Circuits
Metroplois Design
CDW
MODO
Interpower Corp
Thermofisher Scientific
SynQor Incorp

<u>Employees</u>

Michael Houskeeper

Michael Dachman

Doug Wilkes

Ariel Duke

2