Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation*
*and Proposed Attorneys for Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 16-24435 |
| PERSEON CORPORATION, | Chapter 11 |
| Debtor. | The Honorable R. Kimball Mosier |

**APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105, 327, 328, 363 AND 365 AND FED. R. BANK. P. 2014(a), (I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF SUNTRUST ROBINSON HUMPHREY, INC. AS INVESTMENT BANKER TO THE DEBTOR *NUNC PRO TUNC TO THE PETITION DATE*; (II) AUTHORIZING THE ASSUMPTION OF THE AGREEMENT WITH SUNTRUST ROBINSON HUMPHREY TO PROVIDE SERVICES RELATED THERETO; AND (III) APPROVING THE AGREEMENT WITH SUNTRUST ROBINSON HUMPHREY**

Perseon Corporation ("Perseon" or "Debtor"), the debtor in possession in the above captioned bankruptcy case, by and through its counsel, submits this application   (the "Application") for entry of an order substantially in the form submitted herewith (the "Order")

pursuant to sections 105(a), 327(a), 328, 363(b) and 365(a) of title 11 of the United States Code,

11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), (I) authorizing the retention and employment

of SunTrust Robinson Humphrey ("STRH") as investment banker to the Debtor *nunc pro tunc* to

the Petition Date, (II) authorizing the assumption of Perseon's agreement with STRH dated

February 27, 2015 (as amended, the "Engagement Agreement"), a copy of which with the

amendment thereto is attached hereto as **Exhibit A**, pursuant to 11 U.S.C. § 365(a), and (III)

approving the Engagement Agreement. This Application is supported by the *Declaration of*

*Stephen Blumenreich* (the "Blumenreich Declaration") a copy of which is attached hereto as

**Exhibit B**.  In further support of the Application, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 327, 328,

363(b), and 365(a) of the Bankruptcy Code.

## BACKGROUND

3.      On May 23, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Utah (the "Court") thereby commencing the above-captioned case (the "Chapter 11

Case").

4.     No trustee or examiner has been appointed in this case.  The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     Perseon is a publicly traded medical technology developer and manufacturer that is primarily focused on creating and manufacturing ablation technologies for treating cancer.

6.     For an extended period of time commencing in 2013, Perseon or its assets have been offered for sale.

7.     In February 2015, Perseon retained STRH as its investment banker, to assist in the marketing of its business and assets for sale or merger. STRH subsequently ran a process in the March-May 2015 timeframe, reaching out to 20 potential parties. However, this did not result in a successful sale transaction.

8.     On October 26, 2015, with STRH's assistance, Perseon and Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned subsidiary of Galil through a tender offer and merger (the "Merger").

9.     Throughout the Merger process, Perseon advised its shareholders that notwithstanding any cost cutting measures by Perseon, if the Merger was not consummated, Perseon may not be able to continue operations.

10.     On December 22, 2015, Galil terminated the Merger Agreement.

11.     On December 23, 2015, Perseon terminated a substantial number of employees in order to materially reduce expenses.

12.     Additional information about the Debtor's business, the events leading up to the Petition Date and the facts and circumstances surrounding the Debtor's Chapter 11 Case can be found in the First Day Declaration on file in this case. The First Day Declaration is incorporated by reference as if fully set forth herein.

13.     Since the failure of the Merger, the Debtor has continued exploring its options to sell its business and related assets (collectively, the "Assets") with the assistance of STRH.

14.     STRH's provision of investment banking services to Perseon was governed prepetition, and will be governed postpetition, by the Engagement Agreement.

15.     . Prior to the Petition Date, in addition to a fully earned $75,000 retainer, STRH received payments from the Debtor totaling $255,330, representing the reimbursement of expenses incurred by STRH and compensation for a fairness opinion provided by STRH to the Debtor.  As of the Petition Date, there are no amounts currently outstanding from the Debtor to STRH.

## RELIEF REQUESTED

16.     By this Application, the Debtor requests entry of an Order, pursuant to sections 105(a), 327(a), 328, 363 and 365(a) of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules, authorizing the retention and employment of STRH as the Debtor's investment banker in accordance with the Engagement Agreement, *nunc pro tunc* to the Petition Date, and the assumption of the Engagement Agreement pursuant to § 365(a) of the Bankruptcy Code.

## QUALIFICATIONS AND RETENTION OF SUNTRUST

17.     STRH is an investment bank engaged in a variety of financial services, including, among other things, debt and equity underwriting, equity and fixed income sales and trading and

providing financial advisory services in connection with mergers and acquisitions (the "Investment Banking Services").  STRH's Investment Banking Services clients include public and private companies in a variety of industries, including, among others, healthcare, technology, manufacturing, life sciences, financial services and energy.

18.    Mr. Stephen Blumenreich has more than 20 years of experience providing Investment Banking Services.  A copy of Mr. Blumenreich's biographical information is attached hereto as **Exhibit C**.

19.    The Debtor requires knowledgeable marketing professionals in order to obtain the greatest value for its Assets.  As outlined above, based on his experience and knowledge, Mr. Blumenreich is well suited to serve as the Debtor's investment banker.  Other personnel of STRH are also experienced in providing services relating to the marketing and sale of the Assets in the Chapter 11 Case.  Accordingly, the Debtor submits that the employment of STRH and the performance of related services should be approved.

### STRH IS DISINTERESTED AND HOLDS NO ADVERSE INTEREST

20.    STRH has stated its desire and willingness to act in this case and render the necessary professional services as the Debtor's investment banker.  The Blumenreich Declaration details all presently known connections of STRH to the Debtor and its creditors and shareholders.  To the best of the Debtor's knowledge, STRH does not have any connection with the Debtor, its creditors or other parties in interest or their respective attorneys, except as set forth in the Blumenreich  Declaration and is a disinterested person as that term is used in section 101(14) of the Bankruptcy Code.  Therefore, STRH's retention by the Debtor under section 327(a) of the Bankruptcy Code is proper and appropriate.

## SCOPE OF SERVICES

21.     STRH has assigned Stephen Blumenreich and other personnel of STRH to perform services related to the marketing and sale of the Debtor's assets.

## COMPENSATION

22.     As disclosed in more detail in the Engagement Agreement, if the Debtor consummates a sale for substantially all of its assets for a purchase price of $5,500,000 or less, then STRH will be entitled to a fee of $700,000 upon the closing of such sale.  However, if the Debtor consummates a sale for substantially all of its assets for a purchase price of more than $5,500,000, then STRH will be entitled to a fee of $925,000 upon the closing of such sale.  Per the terms of the Engagement Agreement, the Debtor will also reimburse STRH for out-of-pocket expenses.

23.     STRH understands that all of its fees and expenses are subject to Court approval. STRH will abide by the Bankruptcy Code and its provisions and any order this Court may enter in relation to fee application procedures.  STRH will also apply to the Court for allowance of any compensation and reimbursement in this case and understands that its compensation in this case is subject to the prior approval of this Court, after notice and a hearing, in accordance with 11 U.S.C. §§ 327, 328 and 331, Rule 2016 of the Bankruptcy Rules, applicable guidelines issued by the Office of the United States Trustee, and any other applicable order of the Court.

## BASIS FOR RELIEF REQUESTED

24.     Section 327(a) of the Bankruptcy Code authorizes a debtor in possession to employ one or more professional persons to represent or assist the debtor in possession in carrying out its duties so long as those professional persons do not represent or hold any interest

adverse to the debtor or to the estate with respect to the matter on which they are to be employed. *See* 11 U.S.C. § 327(a).  Moreover, section 1107(b) of the Bankruptcy Code provides that "a person is not disqualified for employment under section 327 . . . solely because of such person's employment by or representation of the debtor before the commencement of the case." *See* 11 U.S.C. § 1107(b).  For the reasons set forth in this Application and the Blumenreich Declaration, the Debtor submits that STRH's retention and employment satisfies section 327(a) and the Application should be approved.

25.    The Court should further authorize the Debtor's assumption of the Engagement Agreement pursuant to 11 U.S.C. § 365(a).  Section 365(a) permits a debtor-in-possession to assume any executory contract, subject to bankruptcy court approval.  11 U.S.C. § 365(a).  The Court of Appeals for the Tenth Circuit has held that an executory contract "is a contract that has not as yet been fully completed or performed and in which future obligations remain."  *Myers v. Myers* (*In re Myers*), 362 F.3d 667, 673 (10th Cir. 2004).  The Engagement Agreement is an executory contract because both parties have significant future obligations to be performed under the contract, namely (1) STRH is obligated to market and sell the Assets and provide related investment banking services in connection with the sale of the Assets, and (2) the Debtor is obligated to pay STRH for its services in the manner described above.  Additionally, the Debtor is fully current on its obligations under the Engagement Agreement, so no cure is required under § 365(b)(1).

26.    Courts apply the "business judgment test" to determine whether assumption of an executory contract is appropriate, *see In re TS Industries, Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990) (quoting *In re Tilco, Inc.*, 558 F.2d 1369, 1372–73 (10th Cir. 1977)), and a debtor-in-

possession's "business judgment is to be given great judicial deference." *In re C.W. Min. Co.*, No. 08-2338, 2010 WL 841395, *10 (Bankr. D. Utah 2010). Here, the completion of the parties' obligations under the Engagement Agreement is integral to the Debtor's efforts to maximize the value of the Assets in a sale pursuant to 11 U.S.C. § 363. Thus, the assumption of the Engagement Agreement is a sound exercise of the Debtor's business judgment, and the Court should approve the Debtor's decision to assume the Engagement Agreement.

27.    Further, section 363(b) of the Bankruptcy Code provides in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts interpreting section 363(b) have held that transactions should be approved pursuant to this provision when, as here, they are supported by management's sound business judgment. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (outlining requirements for sale of assets pursuant to section 363); *In re Phoenix Steel Corp.*, 82 B.R. 334, 336-36 (Bankr. D. Del. 1987).

28.    The proposed use, sale, or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification. *See In re Montgomery Ward*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"). Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations. *See, e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property). Moreover, pursuant to section 105 of the

Bankruptcy Code, a court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of a debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986).

29.     Once a debtor articulates a valid business justification, the "business judgment" standard "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id., In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("The Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

30.     The Debtor believes that it is necessary and in the best interest of its estate to assume the Engagement Agreement and employ STRH during the Chapter 11 Case.  STRH is experienced in pursuing and effectuating transactions like the one contemplated by the Debtor in this Chapter 11 Case and the employment of STRH is necessary to maximize the value of the Debtor's assets through a sale process.

31.     Courts recognize the applicability of section 363(b) of the Bankruptcy Code to the use of estate property to compensate individuals employed outside the ordinary course of business. *See, e.g., In re Spheris Inc, et al.*, Case No. 10-10352 (KG) (Bankr. D. Del. Mar. 2, 2010); *In re Flying J, Inc.*, Case No. 08-13384 (MFW) (Bankr. D. Del. 2008); *In re Eddie Bauer Holdings, Inc.*, Case No. 09-12099 (MFW) (Bankr. D. Del. 2009); *In re Indalex Holdings*

*Finance, Inc.*, Case No. 09-10982 (PJW) (Bankr. D. Del. 2009); *In re Fluid Routing Solutions*

*Intermediate Holding Corp.*, Case No. 09-10384 (CSS) (Bankr. D. Del. 2009); *In re SemCrude,*

*L.P.*, Case No. 08-11525 (BLS) (Bankr. D. Del. 2008).

## CONCLUSION

WHEREFORE, pursuant to 11 U.S.C. §§ 105(a), 327(a), 363(b) and 365(a), and Fed. R.

Bankr. P. 2014, the Debtor respectfully requests the entry of an Order authorizing the retention

and employment of STRH as the Debtor's investment banker, *nunc pro tunc* to the Petition Date,

and authorizing and approving the terms of the Engagement Agreement.  The Debtor also

requests such other relief as is just and proper.

DATED this 22nd day of June, 2016.

**DORSEY & WHITNEY LLP**

*/s/ Steven T. Waterman*
Steven T. Waterman
Michael F. Thomson
Jeffrey M. Armington

*Proposed Attorneys for Debtor Perseon*
*Corporation*

# EXHIBIT A

**SUNTRUST**
**ROBINSON HUMPHREY**

**CONFIDENTIAL**

February 27, 2015

Clint Carnell
President and Chief Executive Officer
Perseon Corporation
2188 West 2200 South
Valley City, UT  84119

Dear Mr. Carnell:

The purpose of this letter is to confirm the engagement of SunTrust Robinson Humphrey, Inc. ("STRH" or "us") by Perseon Corporation (the "Company") as its exclusive external investment banking advisor to provide investment banking advisory assistance to the Board of Directors of the Company (solely in its capacity as such, the "Board") in its evaluation of strategic alternatives relating to the possible sale of all or substantially all of the assets of the Company, , the acquisition of all or a material portion of the assets or securities of, or the merger or other business combination of the Company with various  third parties (each a "Transaction").  For the avoidance of doubt, this letter agreement does not relate to the sale of the hyperthermia assets of the Company or the sale of securities of the Company and the Company will have no obligation to pay any fees to STRH relating to the sale of the hyperthermia assets of the Company or relating to the sale of securities of the Company (except as set forth in 2(e).  This letter agreement (this "Agreement") will outline the terms of our engagement to provide certain investment banking advisory services that may be requested.

1. **INVESTMENT BANKING ADVISORY SERVICES**

   As the Company's exclusive external investment banking advisor relating to a Transaction, STRH will provide the following services to the extent requested by the Company:

   (a) Assist the Company in the evaluation of the Company on a stand-alone and a pro forma consolidated basis, if applicable, it being understood that STRH shall, in the course of such evaluation, rely entirely upon the information supplied by the Company and the prospective parties to a Transaction ("Prospects"), without independent investigation;

   (b) Assist in the identification and evaluation of Transaction alternatives, strategies and structures, including a list of Prospects if requested;

   (c) Assist the Company in the evaluation of descriptive information and other relevant analyses regarding the Prospects;

   (d) Assist in preparing descriptive information and other relevant analyses regarding the Company for dissemination to Prospects;

(e) Assist the Company in negotiating with the Prospects and in evaluating and qualifying Prospects and any acquisition or merger offers, including the estimated valuation of any securities or other assets that may be part of a Transaction;

(f) Assist the Company and its counsel in negotiating certain agreements ancillary to a Transaction to the extent requested by the Company; and

(g) If requested, and to the extent STRH is able, consistent with its policies and practices, STRH will deliver a written opinion ("Fairness Opinion") to the Board of Directors of the Company relating to the fairness, from a financial point of view, of the consideration to be paid or received by the Company or its shareholders in a Transaction. The Company may include the full text of its written Fairness Opinion in any proxy statement/registration statement required to be filed by the Company in connection with the Transaction and a description thereof, which description is approved in writing by STRH. In connection with rendering such Fairness Opinion, STRH may, among other examinations, review:

   (i) The financial terms and conditions of any Transaction, including an analysis of the consideration to be paid or received;

   (ii) All documents to be filed with the SEC, particularly as they relate to the analyses performed, and opinion delivered, by STRH;

   (iii) The Company's and the Prospect's (if applicable) audited and unaudited financial statements;

   (iv) The Company's and the Prospect's (if applicable) publicly-filed reports and schedules;

   (v) Certain internal financial analyses and forecasts for the Company and the Prospect as prepared by the management of the Company and the Prospect, respectively;

   (vi) The business plan and prospects for the Company and the Prospect, as provided by the management of the Company and the Prospect, respectively;

   (vii) Certain publicly available information regarding actual and proposed business combinations involving companies deemed comparable to the Company and the Prospect, including valuations for such companies; and

   (viii) Such other analyses and information as STRH may deem relevant for the purposes of the Fairness Opinion.

## 2. Compensation

Our compensation for providing the investment banking advisory services to the Company set forth in Section 1 above will consist of the following:

Perseon Corporation
February 27, 2015
Page 3

(a)  STRH will be paid a non-refundable cash retainer of $75,000.00, upon execution of this Agreement.   The non-refundable cash retainer shall be applied toward payment of any Transaction Consideration (as defined below).

(b)  At the close of a Transaction, the Company will pay STRH a cash advisory fee (the "Advisory Fee") equal to the greater of (i) 3.0% of any Transaction Consideration (as defined below) paid, payable or received in connection with any Transaction, or (ii) $1,000,000 (the "Minimum Advisory Fee").

For purposes of this Agreement, "Transaction Consideration" shall mean the fair market value of all cash, securities, and other property or other assets paid, payable, or received, including funded debt and other long-term liabilities and obligations (excluding normal working capital liabilities) which are assumed or transferred in connection with the Transaction, including, without limitation (a) any distributions made to the Company or its shareholders in anticipation of the closing; (b) any payments in connection with any separate but related transaction or transactions affecting another business entity or any of its assets or securities (e.g., purchase or lease of any real estate or other assets, but in the case of a lease, Transaction Consideration shall include only sums in excess of current rentals paid to unrelated or unaffiliated third parties); and (c) any indebtedness for monies borrowed, including guarantees, which are assumed.  For purposes of determining Transaction Consideration, the value of any securities (whether debt or equity) shall be equal to the average closing market price for the ten trading days prior to closing of the Transaction; provided, however, that the value of securities that are not freely tradable or have no established public market shall be the fair market value as reasonably agreed upon by the parties.  The Advisory Fee paid on Transaction Consideration, including any amounts placed or held in escrow, shall be payable at close of a Transaction. If any part of the Transaction Consideration shall be contingent upon future earnings or other future performance or events (the "Additional Transaction Consideration"), then STRH shall be entitled to a cash Advisory Fee on such Additional Transaction Consideration if and when such Additional Transaction Consideration is paid.  Any such Advisory Fee arising from payment of Additional Transaction Consideration (if applicable) shall be calculated by adding the Additional Transaction Consideration to all other Transaction Consideration previously paid using the formula set forth in this Section 2(b).

In the event that a majority, but less than 100%, of the assets or securities of the Company are sold in the Transaction, the Advisory Fee shall be calculated based upon the total implied value of the Transaction Consideration as if all of the assets or securities of the Company had been acquired or sold.

(c)  In addition to the Advisory Fee, if the Company requests that STRH deliver a Fairness Opinion in connection with the Transaction, STRH shall be paid a cash fee in the amount of $250,000.00 upon delivery of the Fairness Opinion or at such time as STRH delivers to the Company written notice that it will be unable to deliver that Fairness Opinion consistent with its policies and practices. If the Company requests a bring-down or any subsequent opinions, the Company and STRH shall execute an amendment to this Agreement providing for the fee to be paid for such additional work.

Perseon Corporation
February 27, 2015
Page 4

(d)  Additionally, in the event the Company enters into an agreement with respect to a Transaction that is subsequently terminated, and the Company receives a "break-up", "termination", "topping" or similar fee or payment (including, without limitation, any judgment for damages or amount in settlement of any dispute as a result of such termination), including any profit on any stock acquired or stock option granted by the Company or any of its affiliates (but in all cases excluding any amount paid or payable for reimbursement of expenses), STRH shall be entitled to a fee payable in cash of fifteen percent (15%) of all such amounts after expenses required to collect such amounts are paid,(the "Break-up Fee") payable promptly upon receipt by the Company; provided, however, that in no event shall the Break-up Fee be greater than the Advisory Fee applicable to the Transaction had it been consummated. The value of any securities (whether debt or equity) shall be equal to the average closing market price for the ten trading days prior to closing of the Transaction.

(e)  If, during the term of STRH's engagement hereunder or during the Tail Period (as defined below),  the Company receives an investment or payment from one of the Prospects   in connection with the pursuit of a Transaction or an investment by an independent third party to fund a proposed Transaction (a "Strategic Financing"), where in either case STRH is asked to assist with the negotiations, STRH will be paid upon closing of such Strategic Financing an advisory fee equal to 7.0% of the total financing commitment by the investors STRH assisted (the "Financing Advisory Fee").   If any part of the financing commitment is deferred or contingent upon the achievement of future milestones, the Financing Advisory Fee shall be paid when such proceeds are actually received.  Additionally, STRH and the Company agree that no Financing Advisory Fee will be due on funds received by the Company pursuant to the Company's ongoing efforts to secure capital outside of a Transaction. If the Company is contractually obligated to pay another advisor a fee as a result of the above Strategic Financing, STRH and the Company will work in good faith to determine a mutually agreeable split of the above Financing Advisory Fee between STRH and such other advisor, but under no circumstances shall STRH's split be less than 50% of the above Financing Advisory Fee. The obligation to pay any such fee to any third-party advisor shall be solely that of the Company and shall be subject to the indemnification provisions of Section 5 and Addendum A.  In the event of a Strategic Financing that takes the form of an offering of securities, the Company and STRH will enter into an amendment to this Agreement providing for customary representations, warranties and covenants relating to compliance with securities laws and related regulations.

(f)  In addition to any compensation that may be payable to STRH and regardless of whether a Transaction is proposed or consummated, the Company agrees to STRH monthly for all reasonable travel and other out-of-pocket expenses incurred by STRH and for all reasonable legal fees that may be incurred by STRH, each in connection with any actual or proposed Transaction or otherwise arising out of this engagement.

## 3.  TERM OF AGREEMENT

This Agreement may be terminated by either the Company or STRH at any time, with or without cause, upon thirty (30) days' written notice to that effect to the other party.  Notwithstanding any termination of this Agreement:

(a)  Sections 2, 4, and 5, and Addendum A shall survive any termination of this Agreement along with any other provisions which expressly or by implication survive termination (collectively the "Surviving Provisions"); and

(b)  STRH shall be compensated as outlined in Section 2 above if a Transaction is agreed upon or consummated during the term of this Agreement or within twelve (18) months after any termination of this Agreement (the "Tail Period").

## 4.  INDEMNIFICATION

In consideration of the engagement of STRH hereunder, the Company agrees to the terms and provisions set forth in Addendum A hereto, which is incorporated by reference into this Agreement and constitutes a part hereof.   The terms and provisions of Addendum A shall survive any termination or expiration of this Agreement.

## 5.  GENERAL TERMS

(a)  STRH shall have the right, subsequent to the closing of any Transaction, to place advertisements (and to use the Company's and the Prospect's logos in such advertisements) at its own cost in financial and other newspapers and journals describing its services hereunder.

(b)  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns The benefits of and liabilities and obligations under this Agreement shall inure to and be binding upon the respective successors and permitted assigns.  The benefits of Addendum A shall inure to the Indemnified Parties (as defined in Addendum A) hereunder and their successors, assigns, heirs and personal representatives.

(c)  The Company is a sophisticated business enterprise with competent internal financial advisors and legal counsel, and the Company has retained STRH for the limited purposes set forth in this Agreement.  The parties acknowledge and agree (i) that STRH has been engaged solely as an advisor to the Company and (ii) that the Company's engagement of STRH is as an independent contractor and that their respective rights and obligations as set forth herein are contractual in nature.  Accordingly, the Company disclaims any intention to impose any fiduciary or agency obligations on STRH by virtue of the engagement contemplated by this Agreement, and STRH shall not be deemed to have any fiduciary or agency duties or obligations to any Prospects, other business entities or the Company, or their respective officers, directors, shareholders, affiliates or creditors, as a result of this Agreement or the services to be provided pursuant hereto.  The Company agrees that any agreement documenting a Transaction as contemplated by this Agreement shall include provisions reasonably acceptable to STRH in which the other parties to the Transaction disclaim and disavow any reliance upon STRH in connection with the contemplated Transaction.  Any such agreement shall also contain language in a form reasonably acceptable to STRH that reflects

Perseon Corporation
February 27, 2015
Page 6

that the other parties to the Transaction relied solely upon their own independent investigation and counsel before deciding to enter into the contemplated Transaction.

(d)  This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which shall together constitute one instrument.  This Agreement may also be executed by signatures on facsimiles hereof.

(e)  All claims arising out of the interpretation, application or enforcement of this Agreement, including, without limitation, any breach hereof, shall be settled by final and binding arbitration in New York, New York, in accordance with the commercial rules then prevailing of the American Arbitration Association by a panel of three (3) arbitrators appointed by the American Arbitration Association.  The decision of the arbitrators shall be binding on STRH and the Company and may be entered and enforced in any court of competent jurisdiction by either party.  The arbitration shall be pursued and brought to conclusion as rapidly as is possible.  EACH OF STRH AND THE COMPANY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF STRH PURSUANT TO, OR THE PERFORMANCE BY STRH OF, THE SERVICES CONTEMPLATED BY THIS AGREEMENT.

(f)  This Agreement and Addendum A constitute the entire agreement and understanding between STRH and the Company regarding the subject matter hereof and supersede any and all prior, contrary agreements and understandings, whether oral or written, relating to the subject matter hereof.  This Agreement cannot be modified or changed nor can any of its provisions be waived, except by a writing signed by the parties.

(g)  In conjunction with the engagement outlined herein, the Company agrees to provide the necessary assistance and information required at all steps and to have management reasonably available as may be required by STRH.  In connection with STRH's services, the Company will furnish to STRH such information and data relating to the Company as STRH may reasonably request.  The Company recognizes and confirms that STRH, in the performance of its services hereunder:  (i) may rely upon such information received from the Company, its advisors or Prospects, without independent verification by STRH; and (ii) does not assume responsibility for the accuracy or completeness of such information received from the Company, its advisors or Prospects whether or not STRH makes an independent verification of such information.  STRH's role in reviewing any information is limited solely to such review as it deems necessary for purposes of its analysis and advice and shall not be on behalf of the Company.

(h)  In connection with this Agreement, the term "Confidential Information" means (i) confidential business or technical information or data of the Company that is competitively and commercially valuable to Company and not generally known, or available by legal means, to the competitors of the Company or (ii) materially non-public information about the Company. STRH agrees that during the term of its engagement hereunder, unless the Company has consented, or unless required by law, regulation or a court or agency of the government, STRH will not reveal or disclose any such Confidential Information to any third party, except to utilize such Confidential Information in a manner consistent with customary industry practices

in connection with the provision of services under this Agreement.  For the avoidance of doubt, doubt STRH may share the Confidential Information with its affiliates and its and their officers, directors, managers, employees, independent accountants, legal counsel and other agents, consultants and advisors ("Representatives"), in each case who have a reasonable need to know such information in connection with the services contemplated by this Agreement and who are directed to keep such information confidential. STRH shall be responsible for any breach of the terms of this Section 5(h) by its Representatives. Following the termination of STRH's engagement hereunder, all such non-public Confidential Information in STRH's possession will be promptly returned to the Company at the Company's written request.  Provided, however, that STRH can retain for its records such information as is required in order for STRH to be in compliance with laws, securities industry regulations, or any bona fide internal compliance policy.

Neither the previous paragraph nor any restriction, non-disclosure or use limitation or other obligation contained in this Agreement shall apply to any information, data or item of any kind that is: (i) in the public domain, through no action of STRH in breach of this Section 5(h); (ii) already known by STRH; (iii) disclosed to STRH by any person or entity not known by STRH to be under an obligation of confidentiality to the Company; or (iv) independently developed or derived by STRH.

(i)    Except as described in Section 1(g), The Company may not publish, refer to, describe or characterize STRH's engagement hereunder, or the advice provided to the Company by STRH, without the prior written approval of STRH in each instance. Any written or oral advice or material provided by STRH is intended solely for the benefit of the Board in its analysis and consideration of a Transaction and shall not be used by the Board for any other purpose or relied upon by any other person or entity for any purpose without the prior written consent of STRH.  It is the mutual intent of the Company and STRH that the tax structure and tax treatment of any transaction contemplated by this Agreement are not confidential. Accordingly, notwithstanding anything herein to the contrary, the Company and its respective Representatives may disclose to any and all persons, without limitation of any kind, the tax structure and tax treatment of any transaction contemplated herein, such that the transaction will be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended (the "Code"), and any comparable provision in the law of any other jurisdiction.

(j)    The services provided by STRH hereunder are solely for the benefit of the Company and are not intended to confer any rights upon any persons or entities not a party hereto (including, without limitation, the Prospect, or the respective security holders, employees, or creditors of the Company or the Prospect) as against STRH or its affiliates or their respective directors, officers, agents, and employees.

(k)    The Company acknowledges that STRH is not an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and STRH shall have no

responsibility or liability to the Company with respect thereto. Furthermore, STRH hereby informs the Company that any discussion of federal tax issues contained or referred to in any materials prepared by STRH in connection with its engagement hereunder is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed therein.

(l)    The Company acknowledges that STRH and its affiliates are engaged in securities trading and brokerage activities and providing investment banking, commercial banking, lending and financial advisory services. In the ordinary course of business, STRH and its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for its own account or the accounts of customers, in debt or equity securities or other financial instruments (including derivatives and bank loans) of the Company, its affiliates or other entities that may be involved in the transactions contemplated hereby. In addition, STRH and its affiliates may from time to time perform various investment banking, commercial banking, lending and financial advisory services for other clients and customers who may have conflicting interests with respect to the Company or the transactions contemplated hereby. The Company acknowledges that STRH and its affiliates have no obligation to use in connection with this engagement, or to furnish to the Company, confidential information obtained from other customers or counterparts in other transactions. Furthermore, the Company acknowledges that STRH and its affiliates may have fiduciary or other relationships whereby STRH and its affiliates may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company, Prospects, or others with interests in respect of the transactions contemplated hereby. The Company acknowledges that STRH and its affiliates may exercise such powers and otherwise perform their functions in connection with such fiduciary or other relationships without regard to STRH's relationship to the Company hereunder. Consistent with applicable legal and regulatory requirements, STRH has adopted policies and procedures to establish and maintain the independence of STRH's research departments and personnel. As a result, STRH's research analysts may hold views, make statements or investment recommendations or publish research reports with respect to the Company, Prospects, other transaction participants or a Transaction that differ from the views of STRH's investment banking personnel. STRH is an affiliate of SunTrust Bank. STRH is not a bank. SunTrust Bank and STRH, although affiliated, are each separate entities and have their own contractual rights and obligations. SunTrust Bank may act in accordance with its contractual rights and obligations, if any, regarding the Company and Prospects, regardless of this engagement of STRH.

(m)    In accordance with the requirements of the USA PATRIOT Act, STRH is required to obtain, verify and record information that identifies its clients, including the Company, which information may include the name and address of its clients, as well as other information that will allow STRH to properly identify its clients. To permit compliance with these requirements, upon request, the Company will provide STRH with information or documents sufficient to verify the Company's identity. The Company represents and warrants to STRH that, to the best of its knowledge, none of (i) the Company, (ii) any person controlling or controlled by the Company, (iii) any person having a beneficial ownership interest in the Company and (iv) any person for whom the Company acts as an agent or nominee is (A) a country, territory,

Perseon Corporation
February 27, 2015
Page 9

individual or entity named on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") list, (B) a person or entity prohibited under the programs administered by OFAC ("OFAC Programs"), or (C) a country, territory, individual or entity named on another international sanctions list.  The Company further represents and warrants to STRH that, to the best of its knowledge, none of the proceeds of a Transaction shall be derived from or used for any purpose prohibited under the OFAC Programs or other international sanctions programs.

Perseon Corporation
February 27, 2015
Page 10

If this Agreement conforms to your understanding of our agreed upon terms of engagement, please execute the acknowledgement below and return an executed copy of the Agreement to us.  We look forward to working with you on this assignment.

Very truly yours,

SUNTRUST ROBINSON HUMPHREY, INC.

_____
Stephen Blumenreich
Managing Director
Healthcare Investment Banking

AGREED AND ACCEPTED:

PERSEON CORPORATION

_____
William S. Barth
Chief Financial Officer

Attachment

Perseon Corporation
February 27, 2015
Page 11

## ADDENDUM A

## INDEMNIFICATION AGREEMENT

The Company agrees to indemnify and hold harmless STRH and each of its affiliates and its and their directors, officers, employees, agents, advisors, controlling persons and other representatives (each, an "Indemnified Party") from and against (and to reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities (joint or several) and reasonable expenses (including the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, (i) related to or arising out of the Company's actions or failures to act (including statements or omissions made or information provided by the Company or its Representatives) or actions or failures to act by an Indemnified Party with the Company's consent or at the request of the Company or in reliance on the Company's actions or failures to act, or (ii) otherwise related to or arising out of any matter contemplated by this Agreement, such Indemnified Party's performance thereof or any aspect of a Transaction or any of the other transactions contemplated thereby (including all reasonable legal and other expenses incurred in giving testimony, furnishing documents in response to subpoenas or otherwise providing evidence in claims or actions related to or arising out of this Agreement or the Transaction or in enforcing this Agreement), except in the case of this clause (ii) to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct in performing the services that are the subject of this Agreement. In the case of an investigation, claim, action or proceeding to which this indemnity applies, such indemnity shall be effective whether or not such investigation, claim, action or proceeding is brought by the Company, its equity holders, affiliates or creditors or any Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated.

The Company shall not be liable under this Agreement for any settlement made by any Indemnified Party without the Company's prior written consent (which shall not be unreasonably withheld, conditioned or delayed), and the Company agrees to indemnify and hold harmless each Indemnified Party from and against any loss or liability by reason of the settlement of any claim or action with the Company's consent. The Company shall not settle, compromise or consent to the entry of any judgment in (or permit, participate in or otherwise facilitate the settlement, compromise or consent to the entry of any judgment by any director, executive officer or other affiliate of the Company with respect to) any claim, suit, proceeding, investigation, inquiry or action (including any shareholder or derivative action) for which indemnity may be sought hereunder, whether or not STRH or any Indemnified Party is an actual or potential party thereto, without the prior written consent of the Indemnified Parties (which shall not be unreasonably withheld, conditioned or delayed), unless such settlement, compromise or consent (i) provides for a full and unconditional release of the Indemnified Parties from all liabilities arising out of such claim or action, (ii) does not include any statement or admission of fault, culpability or failure to act by or on behalf of any Indemnified Party, and (iii) imposes no obligation on any Indemnified Party other than the payment of monetary damages that are to be satisfied solely by the Company.

If for any reason the foregoing indemnification is unavailable to an Indemnified Party or insufficient to fully indemnify and hold an Indemnified Party harmless, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such claims, damages, losses, liabilities and expenses (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and STRH, on the other hand, from the engagement hereunder and the other transactions contemplated by this Agreement or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the Company's relative fault, on the one hand, and the relative fault of STRH, on the other hand, in connection with the actions that resulted in such claims, damages, losses, liabilities or expenses, as well as any other relevant equitable considerations. The benefits received by the Company shall be deemed to be equal to the aggregate Consideration payable, issuable, exchangeable or transferable in such transaction or proposed transaction, and the benefits received by STRH shall be deemed to be equal to the compensation paid by the Company to STRH in connection with this Agreement (exclusive of amounts paid for reimbursement of expenses or paid under this Addendum A). To the extent permitted by applicable law, in no event shall an Indemnified Party be required to contribute an aggregate amount in excess of the aggregate fees actually paid to such Indemnified Party under this Agreement (exclusive of amounts paid for reimbursement of expenses or paid under this Addendum A). No investigation or failure to investigate by any Indemnified Party shall impair the Company's indemnification and contribution obligations herein or any right of an Indemnified Party.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or any of its equity holders, subsidiaries, affiliates or creditors or any other person or entity asserting claims on behalf of or in right of the Company related to or arising out of this Agreement or the performance by STRH of the services contemplated herein or in connection with a Transaction, except only for direct (as opposed to special, indirect, consequential, incidental or punitive) damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct in performing the services that are the subject of this Agreement. The Company further

Perseon Corporation
February 27, 2015
Page 12

agrees that the Indemnified Parties shall have no responsibility for any act or omission of the Board or the Company's Representatives.

Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities, in any such case that does not directly, indirectly or by operation of law provide for the assumption of the obligations of the Company set forth herein, the Company will promptly notify STRH in writing thereof and, if requested by STRH, shall arrange alternative means of providing for the obligations of the Company set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and on terms and conditions reasonably satisfactory to STRH.

The obligations of the Company set forth in this Addendum A shall be in addition to any other liability or obligation that the Company may have at common law or otherwise and shall survive the expiration or termination of STRH's engagement under this Agreement.

June 14, 2016

Perseon Corporation
2188 West 2200 South
Valley City, UT 84119
Attn: Clint Carnell, President and Chief Executive Officer

     RE:     Amendment to Engagement Letter

Dear Mr. Carnell:

Reference is hereby made to the letter agreement (the "Engagement Letter"), dated February 27, 2015, between SunTrust Robinson Humphrey, Inc. ("SunTrust Robinson Humphrey") and Perseon Corporation (the "Company") pursuant to which the Company has retained SunTrust Robinson Humphrey as its exclusive external investment banking advisor. Each capitalized term used and not otherwise defined in this letter (this "Agreement") shall have the meaning ascribed to it in the Engagement Letter. This Agreement confirms our understanding as follows:

1. The second sentence of the first paragraph of the Engagement Letter is amended and restated to read as follows: "For the avoidance of doubt, this letter agreement shall include, without limitation, any sale of the Company or a material portion of its assets, or any similar transaction, in connection with or arising from the bankruptcy case captioned *In re Perseon Corporation*, Case No. 16-24435 (Bankr. Utah).

2. The Company acknowledges that SunTrust Robinson Humphrey previously provided a Fairness Opinion to its board of directors in accordance with the Engagement Letter and that SunTrust Robinson Humphrey will have no obligation to render another Fairness Opinion or to update, revise, reaffirm, withdraw, amend or supplement the Fairness Opinion previously provided to the board.

3. The Company acknowledges that the non-refundable cash retainer of $75,000 referenced in Section 2.2(a) of the Engagement Letter has been fully earned by SunTrust Robinson Humphrey.

4. Section 2.2(b) of the Engagement Letter is hereby amended and restated as follows:

(b) At the close of a Transaction, the Company will pay us a cash advisory fee (the "Advisory Fee") as follows: (i) if the Company consummates a Transaction with Transaction Consideration of $5,500,000 or less, then we will be entitled to a fee of $700,000 upon the closing of such Transaction, and (ii) if the Company consummates a Transaction involving Transaction Consideration in excess of $5,500,000, then we will be entitled to a fee of $925,000 upon the closing of such Transaction.

Except as expressly set forth in this Agreement, the parties make no other amendment, alteration or modification of the Engagement Letter. In the event of any conflict between the terms of the Engagement Letter and the terms of this Agreement, the terms of this Agreement shall control.

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. A signature delivered by facsimile or other electronic transmission will be considered an original signature.

This Agreement shall be governed by and construed in accordance with the Laws of the State of New York. However, this Agreement shall be subject to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Utah.

This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Very truly yours,

SUNTRUST ROBINSON HUMPHREY, INC.

By: _____
Name: Stephen Blumenreich
Title: Managing Director, Healthcare Investment Banking

ACCEPTED AND AGREED, as of this 14th day of June, 2016:

PERSEON CORPORATION

By: _____
Name: Clint Carnell
Title: President and Chief Executive Officer

# **EXHIBIT B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 16-24435 |
| PERSEON CORPORATION,<br>Debtor. | Chapter 11 |
| | The Honorable R. Kimball Mosier |

**DECLARATION OF STEPHEN BLUMENREICH IN SUPPORT OF THE APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105, 327, 328, 363 AND 365 AND FED. R. BANK. P. 2014(a), (I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF SUNTRUST ROBINSON HUMPHREY, INC. AS INVESTMENT BANKER TO THE DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE; (II) AUTHORIZING THE ASSUMPTION OF THE AGREEMENT WITH SUNTRUST ROBINSON HUMPHREY TO PROVIDE SERVICES RELATED THERETO; AND (III) APPROVING THE AGREEMENT WITH SUNTRUST ROBINSON HUMPHREY**

I, Stephen Blumenreich, hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I make this Declaration (the "Declaration") in support of the *Application of the Debtor for Entry of an Order, Pursuant to 11 U.S.C. §§ 105, 327, 328, 363 and 365 and Fed. R. Bank. P. 2014(a), (I) Authorizing the Retention and Employment of SunTrust Robinson Humphrey, Inc. as Investment Banker to the Debtor Nunc Pro Tunc to the Petition Date; (II) Authorizing the Assumption of the Agreement with SunTrust Robinson Humphrey to Provide Services Related Thereto; and (III) Approving the Agreement with SunTrust Robinson Humphrey* (the "Application").[1]

---

[1]      Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Application.

1

2.      I am a currently a Managing Director of Healthcare Investment Banking at SunTrust Robinson Humphrey, Inc. ("STRH").   I am authorized by STRH to make this Declaration, and I have personal knowledge of the facts stated in this Declaration.  If called as a witness, I could and would testify competently to these facts, except where matters are stated on information and belief.   As to those facts, I am informed and believe that they are true and correct.

3.      STRH is an investment bank engaged in a variety of financial services, including, among other things, debt and equity underwriting, equity and fixed income sales and trading and providing financial advisory services in connection with mergers and acquisitions (the "Investment Banking Services").  STRH's Investment Banking Services clients include public and private companies in a variety of industries, including, among others, healthcare, technology, manufacturing, life sciences, financial services and energy.

4.      I have more than 20 years of experience providing Investment Banking Services. A copy of my biographical information is attached to the Application as Exhibit B.

5.      STRH was retained by the Debtor in February 2015 to provide investment banking services and has continuously represented and advised the Debtor with respect to the marketing of its business and assets for merger or sale since that time.  As disclosed in more detail in the amended Engagement Agreement attached to the Application as Exhibit A, if the Debtor consummates a sale for substantially all of its assets for a purchase price of $5,500,000 or less, then STRH will be entitled to a fee of $700,000 upon the closing of such sale.  However, if the Debtor consummates a sale for substantially all of its assets for a purchase price of more than

2

$5,500,000, then STRH will be entitled to a fee of $925,000 upon the closing of such sale. STRH is also entitled to reimbursement by the Debtor for STRH's out-of-pocket expenses.

6.      Prior to the Petition Date, STRH received payments from the Debtor totaling $255,330, representing the reimbursement of expenses incurred by STRH and compensation for a fairness opinion provided by STRH to the Debtor.  Prior to the Petition Date, STRH also received a non-refundable $75,000 retainer from the Debtor, which retainer was fully earned by STRH prepetition.  As of the Petition Date, there are no amounts currently outstanding from the Debtor to STRH.

7.      STRH understands that all of its fees and expenses are subject to Court approval. STRH will abide by the Bankruptcy Code and its provisions and any order this Court may enter in relation to fee application procedures.  STRH will also apply to the Court for allowance of any compensation and reimbursement in this case and understands that its compensation in this case is subject to the prior approval of this Court, after notice and a hearing, in accordance with 11 U.S.C. §§ 327, 328 and 331, Rule 2016 of the Bankruptcy Rules, applicable guidelines issued by the Office of the United States Trustee, and any other applicable order of the Court.

8.      In order to determine all connections of STRH and its professionals for purposes of determining STRH's eligibility to serve as Investment Banker to the Debtor under 11 U.S.C. §§ 327 and 328, STRH conducted the following investigation: STRH was provided a list of the Debtor's creditors and stockholders by Debtor's counsel.  STRH is an institutional broker-dealer; accordingly, none of STRH's clients are natural persons.  On that basis, STRH identified the entities contained in the lists provided by Debtor's counsel (the "Covered Entities") and searched for the Covered Entities in STRH's customer relationship management system.  In addition,

STRH compared the list of Covered Entities to a list of completed Investment Banking Services engagements and active Investment Banking Services engagements. Finally, STRH's operations group determined that STRH does not hold any equity securities in the Debtor, either for its own account or for the account of it clients.

9.    To the best of my knowledge, based on the information that I have as of this date, including my personal knowledge, my review of STRH's customer relationship management system, and information provided to me by other employees of STRH in connection with the investigation described in Paragraph 7 above, I believe that neither I nor STRH, including its employees, has any connections to or conflicts of interest with, the Debtor, insiders of the Debtor, equity holders of the Debtor, creditors of the Debtor, or any other known party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee, except as set forth immediately below.

a.    As a result of the investigation described in Paragraph 7 above, STRH has determined that it has connections to certain of the Covered Entities. Specifically, STRH provides services to or receives services from the following Covered Entities, or their affiliates, on matters unrelated to the Debtor or this bankruptcy case: ADT Security Services; American Shredding; Aramark Refreshment Services; Arrow Electronics, Inc.; Cognizant Technology Solutions US Corp.; Comcast; Converge; De Lage Landen; Eclipse Product Development, Inc.; Federal Express; Healthstar Public Relations; Hogan Lovells US LLP; Home Depot Credit Services; Iron Mountain; Mastercraft Machine; McMaster-Carr Supply Co.; MegaPath; Merit Medical; Merrill Communications LLC; Morgan

4

Stanley Smith; NASDAQ Stock Market; Nixon Peabody; North American Logistics Service; Republic Services; Salt Lake County Assessor; Standard Parking; State of Michigan; Tailfin Marketing, LLC; Technology Assessment & Transfer, Inc.; Verizon Wireless; Vernay Laboratories, Inc.; W.W. Grainger Inc.; Wasatch Employee Benefit Services; and Worldwide Express.  STRH does not believe that these connections create a conflict of interest regarding the Debtor or this chapter 11 case.

10.     In addition to the foregoing, some of STRH's more than 1,000 professionals may have had some personal or professional relationships with the Covered Entities or attorneys, accountants, employees, or officers of the Covered Entities.  The undersigned neither has knowledge of any such relationship that is material nor does he know of any way in which all such relationships could be discovered.  To the extent that it is determined that any additional matters should be disclosed, the undersigned will supplement this Declaration.

11.     Because of the magnitude of the entire creditor and stockholder list in this case, it is possible that STRH may have business relationships with other parties in interest or creditors of the Debtor, but STRH does not and will not represent any such parties in interest or creditors in connection with the Debtor or this case.  STRH may presently or in the past have served as a professional in other matters, wholly unrelated to the Debtor or this case, in which other attorneys, accountants or other professionals of the Debtor, creditors, or other parties in interest may have also served or serve as professional persons.  In my opinion, these current and future representations, if any, do not and will not constitute materially adverse interests.

12.    To the best of my knowledge, neither I nor STRH has any connections with the Bankruptcy Court or the Office of the United States Trustee that would prohibit employment under Rule 5002 of the Federal Rules of Bankruptcy Procedure.

13.    I understand that STRH has a continuing obligation to supplement this Declaration in event that it discovers additional connections related to this case not disclosed herein.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Name: Stephen Blumenreich
Its:  Managing Director, Healthcare Investment Banking
SunTrust Robinson Humphrey, Inc.

# EXHIBIT C

# Stephen Blumenreich: Bios Summary

## Managing Director and Head of Medical Technology & Devices Investment Banking

### Background

> Joined STRH in 2015 as a Managing Director in the Healthcare Group

> Has approximately 20 years of experience advising middle market companies, focusing on the medical device sector and has completed capital raising and M&A transactions in the aesthetics, cardiovascular, diabetes, diagnostics, general surgery, orthopedics, and spine subsectors

> Began career in the M&A group at Salomon Brothers before joining Alex. Brown & Sons in the Healthcare Group

> Co-head of the Medical Device Group at Thomas Weisel Partners, helping build one of the leading medical device underwriters on Wall Street

> Education: M.B.A. from the Wharton School at The University of Pennsylvania; B.A. from Dartmouth College

### Selected Transaction Experience ($ in millions)

| | Transaction Value |
|---|---|
| **Selected M&A Transactions** | |
| > **Halma** / CenTrak | $140 |
| > Philips / **Sentinelle Medical (Hologic)** | N/A |
| > **Laborie** / Mediwatch | $16 |
| > Capsugel / **Bend Research** | N/A |
| > **Solta Medical** / Sound Surgical Technologies | $40 |
| > Samsung / **NeuroLogica** | N/A |
| > Merit Medical / **Thomas Medical Products (GE Healthcare)** | N/A |
| > Covidien / **Poly Touch Medical** | $40 |
| > **Solta Medical** / Liposonix | $35 |
| > Aton / **OrthoScan** | N/A |
| > **Roper** / NDI (Audax) | $205 |
| **Selected Equity Transactions** | |
| > Catalent - IPO | $1,002 |
| > CareDx - IPO | $42 |
| > TransEnterix – Follow-on | $56 |
| > Solta Medical - Block Sale of Solta Common Stock | $6 |
| > Solta Medical – PIPE | $17 |
| **Selected Debt Transactions** | |
| > Alere – Senior Subordinated Notes Offering | $425 |



# STEPHEN BLUMENREICH

50 Summit Ave, Bronxville, NY, Ph: (917) 923-8086, sblumenreich@gmail.com

## Experience:

**RAYMOND JAMES & ASSOCIATES, INC.**                                                                 New York, NY
*Managing Director, Head of Medical Device Investment Banking*                                  2009 – Present
- Started and developed medical device calling effort into one of Raymond James's highest revenue producing franchises
- Pipeline of over $15 mil in fees most of which are high quality, publicly traded or private equity backed clients
- Initiated active dialogue with leading medical device private equity investors, venture capitalists, strategic acquirers and key opinion leaders
- Extensive deal experience encompassing multiple private placements, initial public offerings, follow-on offerings, registered directs, PIPEs, convertible offerings, high yield, bank debt, and M&A transactions
- Selected to head the for-profit healthcare investment banking effort at Morgan Keegan prior to acquisition by Raymond James

**STANFORD GROUP COMPANY**                                                                           New York, NY
*Managing Director, Head of Medical Device Investment Banking and Principal Investing*              2008 – 2009
- Completed three transactions within seven months of creating a new investment banking platform at Stanford
- Responsible for principal investments in medical device companies

**THOMAS WEISEL PARTNERS**                                                                           New York, NY
*Managing Director, Co-Head of Medical Device Investment Banking Group*                             2005 – 2008
- Served as one of two Managing Directors responsible for all marketing and deal execution in the medical device sector
- Built the medical device franchise into one of Wall Street's top three equity underwriters
- One of Thomas Weisel Partner's leading revenue producers in 2008

**DEUTSCHE BANK AG**                                                                                 New York, NY
*Director, Head of East Coast Medical Device Investment Banking Group*                              2001 – 2005
- Primary responsibility for identifying and executing medical device investment banking opportunities
- Led execution of one of Deutsche Bank's highest fee transactions, Clayton Dubilier & Rice's $1.6 billion LBO of VWR
- Led the Medical Device Investment Banking Team in London, UK from 2001 to 2003

**ROBERTSON STEPHENS**                                                                               Boston, MA
*Vice President, Internet Investment Banking*                                                       1999 – 2001
- One of two calling officers responsible for the marketing and execution of over $2 billion in M&A and financing transactions
- Developed calling effort to enhance Robertson Stephens' position in the internet and internet infrastructure sectors
- Promoted to Vice President within six months of arriving at Robertson Stephens, and after two years as an Associate based on superior job performance

**DB ALEX. BROWN**                                                                                   Baltimore, MD
*Associate, Healthcare Investment Banking*                                                          1997 – 1999
- Performed extensive financial and valuation analysis, including merger and leveraged buy-out models, DCF, comparable companies, equity offering, precedent transaction and capital structure analyses for emerging growth companies.
- Positioned companies for investors and buyers, participated in new-business pitches and generated transaction ideas.
- Negotiated engagement letters and merger agreements.

**SALOMON BROTHERS INC**                                                                             New York, NY
*Analyst, Mergers & Acquisitions*                                                                   1992 – 1995
- Attained highest rating level for Analysts
- Selected by CEO as part of four person team to lead Salomon's own internal M&A activities

## Education:

**UNIVERSITY OF PENNSYLVANIA, THE WHARTON SCHOOL**                                                   Pennsylvania, PA
- Masters of Business Administration, Finance and Entrepreneurial Management                        1995 – 1997

**DARTMOUTH COLLEGE**                                                                                Hanover, NH
- Bachelor of Arts, *cum laude*, in Government and Economics                                        1988 – 1992
- GPA of 3.5

## Additional:

- NASD Series 7 and 63 licensed.

# STEPHEN BLUMENREICH

50 Summit Ave, Bronxville, NY, Ph: (917) 923-8086, sblumenreich@gmail.com

**Selected Deal Experience:**

| Date | Company / Transaction | Type | Role | Size |
|------|----------------------|------|------|------|
| Pending | Public Hospital Supplies Company | M&A | Sellside Advisor | |
| Pending | Private Israeli Device Company | M&A | Sellside Advisor | |
| Pending | Public Surgical Tools Company | M&A | Sellside Advisor | |
| Pending | Private Imaging Company | M&A | Sellside Advisor | |
| Pending | Public Aesthetics Company | M&A | Buyside Advisor | |
| Pending | Public Ophthalmology Company | M&A | Buyside Advisor | |
| Pending | Private Neuro Company | M&A | Sellside Advisor | |
| Pending | Private Plastic Surgery Company | M&A | Sellside Advisor | |
| Pending | Public Diagnostics Company | M&A | Buyside Advisor | |
| Pending | Private PE Backed Hospital Supplies Company | M&A | Sellside Advisor | |
| Pending | Private PE Backed Orthobiologics Company | M&A | Sellside Advisor | |
| Sep-14 | Hologic, Inc. (Sentinelle sold to Philips, Inc.) | M&A | Sellside Advisor | NA |
| Jul-14 | Catalent, Inc. | IPO | Co-Manager | $871 MM |
| Jul-14 | CareDx, Inc. | IPO | Co-Manager | $40 MM |
| Apr-14 | Transenterix, Inc. | FO | Co-Manager | $50 MM |
| Mar-14 | Preventice, Inc. | PP | Sole Placement Agent | $15 MM |
| Jan-14 | Laborie (Mediwatch) | M&A | Buyside Advisor | NA |
| Sep-13 | Bend Research Inc (Capsugel) | M&A | Buyside Advisor | $100 MM |
| Jul-13 | Activiews Inc. (Stryker) | M&A | Sellside Advisor | NA |
| May-13 | Alere Inc. | Sub Notes | Co-Manager | $425 MM |
| Jan-13 | Solta Medical Inc. (Sound Surgical) | M&A | Buyside Advisor | NA |
| Jan-13 | Neurologica Inc. (Samsung) | M&A | Sellside Advisor | $155 MM |
| Nov-12 | Merit Medical Systems, Inc. (GE - Thomas Medical) | M&A | Fairness Opinion | $167 MM |
| Jul-12 | Solta Medical Inc. | Block | Sole Placement Agent | $6 MM |
| Jan-12 | VetCentric Inc. (Vets First Choice) | M&A | Sellside Advisor | NA |
| Sep-11 | OrthoScan Inc. (Aton) | M&A | Sellside Advisor | NA |
| Sep-11 | Solta Medical Inc. (Liposonix) | M&A | Buyside Advisor | $35 MM |
| Jun-11 | Northern Digital Inc. (Roper) | M&A | Sellside Advisor | C$200 MM |
| Mar-11 | Polytouch Medical Inc. (Covidien) | M&A | Sellside Advisor | NA |
| Mar-10 | Solta Medical Inc. (Aesthera) | M&A | Buyside Advisor | $16 MM |
| Jan-10 | Solta Medical Inc. | PIPE | Sole Placement Agent | $17 MM |
| Dec-08 | Thermage, Inc. (Reliant Technologies) | M&A | Buyside Advisor | $95 MM |
| Dec-08 | Pioneer Surgical Inc. | PP | Sole Placement Agent | $15 MM |
| Nov-08 | InSound Medical Inc. | Investment | Lead Investor | $13 MM |
| Aug-08 | Thermage, Inc. (Defense Advisory) | M&A | Defense Advisor | NA |
| Aug-08 | Cytori Therapeutics, Inc. | PIPE | Financial Advisor | $17 MM |
| May-08 | Exactech, Inc. | RD | Co-Lead Agent | $20 MM |
| Nov-07 | Insulet Corporation | FO | Co-Manager | $114 MM |
| Oct-07 | IsoTis, Inc. (Integra Lifesciences Holdings, Inc.) | M&A | Sellside Advisor | $52 MM |
| May-07 | Insulet Corporation | IPO | Co-Manager | $116 MM |
| Mar-07 | Cytyc Corporation (Adiana, Inc.) | M&A | Buyside Advisor | $215 MM |
| Nov-06 | Metabolix, Inc. | IPO | Co-Manager | $109 MM |
| Nov-06 | Thermage, Inc. | IPO | Co-Manager | $43 MM |
| Jun-06 | Millipore, Inc. | Convertible | Co-Manager | $318 MM |
| Jun-06 | Millipore, Inc. | Convertible | Co-Manager | $565 MM |
| Feb-06 | NuVasive, Inc. | FO | Co-Manager | $166 MM |
| Nov-05 | Digene, Inc. | FO | Lead Manager | $97 MM |
| Sep-05 | Genomic Health, Inc. | IPO | Co-Manager | $60 MM |

# STEPHEN BLUMENREICH

50 Summit Ave, Bronxville, NY, Ph: (917) 923-8086, sblumenreich@gmail.com

**Selected Deal Experience:**

| Date | Company / Transaction | Type | Role | Size |
|------|----------------------|------|------|------|
| Jul-04 | Fisher Scientific International, Inc. | Senior Notes | Placement Agent | $300 MM |
| Feb-04 | Fisher Scientific International, Inc. | Convertible | Placement Agent | $300 MM |
| Feb-04 | Clayton, Dubilier & Rice, Inc. (VWR Intl, Inc.) | LBO | Buyside Advisor | $1,650 MM |
| Feb-04 | Clayton, Dubilier & Rice, Inc. (VWR Intl, Inc.) | Senior Notes | Joint Bookrunner | $740 MM |
| Feb-04 | Clayton, Dubilier & Rice, Inc. (VWR Intl, Inc.) | Sub Notes | Joint Bookrunner | $520 MM |
| Dec-03 | Danaher Corporation (Radiometer A/S) | M&A | Buyside Advisor | $730 MM |
| Apr-03 | Straumann Holding AG (Biora AB) | M&A | Buyside Advisor | $52 MM |
| Term. | Diagnostic Laboratory | M&A | Sellside Advisor | $300 MM |
| Dec-01 | Unipath Limited (Inverness Medical Innovations) | M&A | Sellside Advisor | $150 MM |
| Sep-01 | iPlace.com (HomeStore.com) | M&A | Sellside Advisor | $170 MM |
| Aug-01 | Teva Pharmaceutical Industries Limited | Convertible | Placement Agent | $300 MM |
| Apr-00 | iPlace.com (Qspace) | M&A | Buyside Advisor | NA |
| Mar-00 | Be Free Inc. | IPO | Co-Manager | $165 MM |
| Mar-00 | FairMarket.com | IPO | Co-Manager | $100 MM |
| Mar-00 | Switchboard.com | IPO | Lead Manager | $83 MM |
| Jan-00 | Homestore.com | FO | Co-Manager | $913 MM |
| Oct-99 | StarMedia Network Inc. | FO | Co-Manager | $204 MM |
| Oct-99 | NaviSite Inc. | IPO | Bookrunner | $83 MM |
| Oct-99 | About.com | FO | Co-Manager | $186 MM |
| Sep-99 | Warburg Pincus (Phycor, Inc.) | LBO | Buyside Advisor | $200 MM |
| Feb-99 | VarsityBooks.com | IPO | Bookrunner | $41 MM |
| Sep-98 | MRC Group (MedQuist, Inc.) | M&A | Sellside Advisor | $230 MM |
| May-98 | National Surgical Centers (HealthSouth Corp.) | M&A | Sellside Advisor | $590 MM |
| Feb-98 | Balanced Care, Inc. | IPO | Bookrunner | $42 MM |
| Dec-94 | Empire District Electric Company | Sub Notes | Bookrunner | $30 MM |
| Nov-94 | Foundation Health Corp. (TDMC) | M&A | Buyside Advisor | $439 MM |
| Term. | Foundation Health Corp. (TakeCare) | M&A | Buyside Advisor | $829 MM |