Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation*
*and Proposed Attorneys for Debtor in Possession*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>PERSEON CORPORATION,<br><br>Debtor. | Case No. 16-24435<br><br>Chapter 11<br><br>Judge R. Kimball Mosier |

---

**APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND FED. R. BANK. P. 2014(a) AUTHORIZING THE RETENTION AND EMPLOYMENT OF DAVID GREEN AS CHIEF RESTRUCTURING CONSULTANT FOR THE DEBTOR EFFECTIVE AS OF THE PETITION DATE**

---

Perseon Corporation ("Perseon" or "Debtor" or "Company"), the debtor in possession in the above captioned bankruptcy case, at the direction of the Board of Directors, by and through its proposed counsel, submits this application  (the "Application") for entry of an order substantially in the form submitted herewith (the "Order") pursuant to sections 105(a) and 363(b)

of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") authorizing the retention and employment of David Green ("Green") as Chief Restructuring Consultant for the Debtor effective as of May 23, 2016 (the "Petition Date").  This Application is supported by the *Declaration of David Green* (the "Green Declaration") a copy of which is attached hereto as **Exhibit A**, and the *Declaration of Timothy C. McQuay* (the "McQuay Declaration") a copy of which is attached as **Exhibit B**.  In further support of the Application, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND

3.      On the Petition Date the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Court") thereby commencing the above-captioned "Chapter 11 Case."

4.      No trustee, examiner, or official committee of unsecured creditors has been appointed in this case.  The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      A detailed discussion of the Debtor's history, description of its business and the events that led to its need for bankruptcy relief are set forth in the *Declaration of Clinton E.*

*Carnell Jr. in Support of Chapter 11 Petition and First Day Motions* (the "Omnibus Declaration") which has been filed with the Court and is incorporated herein by this reference.

6.      On or about September 21, 2015 Perseon retained David Green to provide services to Perseon including financial management, cash management, transaction advice and transaction execution.  At the time he was retained, Mr. Green assumed the responsibilities held by the former CFO of the Company, who resigned abruptly.  Mr. Green agreed to assume those responsibilities with no background in Perseon, and for substantially less than professionals with similar responsibilities are typically paid.[1]

7.      On October 26, 2015, as a result of Mr. Green's exceptional efforts, Perseon and Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned subsidiary of Galil through a tender offer and merger (the "Merger").[2]

8.      On December 22, 2015, Galil terminated the Merger Agreement.[3]

9.      Following Galil's termination of the Merger Agreement, on December 23, 2015, Perseon terminated a substantial number of its employees to materially reduce expenses.[4]

10.      The termination of substantially all of the Debtor's employees resulted in the tasks and responsibilities attributable to the employees, becoming the sole responsibility of Mr. Green.[5]

---

[1]      *McQuay Declaration* at ¶ 4.

[2]      *Id.* at ¶ 5.

[3]      *Id.* at ¶ 6.

[4]      *Id.* at ¶ 7.

11.     In addition to the tremendous amount of responsibility that was conferred upon Mr. Green, he also continued to act as the Chief Restructuring Consultant ("CRC") for the Debtor and substantially lowered the operating costs of the business by negotiating with creditors, terminating the Debtor's five-year lease agreement, securing a lower cost facility and moving the entire operation to the new facility, efficiently managing the cash and other resources of the company.  Mr. Green coordinated communications with the potential buyer and bidders of the Debtor's assets, and assisted the Debtor with the preparation of all of the documentation and information that was crucial for the filing of the Bankruptcy Petition.[6]

12.     Even through this severe diminution in the Debtor's workforce from 47 employees to only 3 part-time employees, Mr. Green has spearheaded the Debtor's efforts to maintain current customers, obtain new customers and continue operations of the Debtor.[7]

13.     On May 24, 2016, the Debtor filed *Debtor's Motion for Orders Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 365, 503, and 507 and Fed. R. Bankr. P. 6004 and 6007: (I)(A) Authorizing Entry Into and Assumption of Asset Purchase Agreement, (B) Authorizing Bid Protections, (C) Authorizing Bidding Procedures and Auction, and (D) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing Sale of Assets; and (III) Granting Related Relief* [Docket No. 24] (the "Sale Motion").  The Sale Motion seeks Court approval of a sale of substantially all of the Debtor's assets through an asset purchase agreement (the "APA") to

---

[5]      *Id.* at ¶ 8.

[6]      *Id.* at ¶ 9.

[7]      *Id.* at ¶ 10.

MedLink Technologies, LLC ("MedLink" or "Stalking Horse") for a total purchase price of $4,350,000.00, subject to higher and better offers at auction.

14.     Mr. Green has been, and continues to be, a critical part of the Debtor's business and day to day activities.  As such, in its business judgment, the Debtor, through its board of directors, has determined that it is in the best interest of the Debtor to amend and restate Green's agreement to provide restructuring services to the Debtor.[8]

15.     Mr. Green's services are critical to any disposition of assets and the confirmation of any chapter 11 plan in this case.  In that regard, on a go forward, post-petition basis, Mr. Green must do the following in order for the transaction contemplated under the APA to be consummated:

a.  Maintain the Debtor as a viable operating business and deliver the Purchased Assets as defined in the APA, including the following responsibilities .

i.  recruit, train, manage and direct staff performing sales, manufacturing, inventory management, customer service, shipping & receiving, purchasing, facilities management, asset management, business development, quality control, regulatory and reporting duties;

ii.  retain and manage distribution partners in the US and Europe;

iii.  retain and manage critical and non-critical vendors;

iv.  set pricing and terms for the sale of products and services;

v.  report to the Board of Directors and the Chief Executive Officer and execute on directives of each;

---

[8]     *Id.* at ¶ 11.

      vi.  manage financial institutions;

     vii.  direct tax reporting and compliance activities;

   viii.  forecast cash sources and uses, and recommend payments to-be-made to vendors, purchases of supplies and inventory, negotiate special customer requests and transaction terms;

     ix.  manage and direct intellectual property attorneys that prosecute the company's patents, trademark and other intellectual property;

      x.  maintain insurance policies and execute policy renewals; and

     xi.  plan the business and financial integration of the Purchased Assets with the buyer's business entity.

b.  Manage and assist the Licensee of the Debtor's technology with:

      i.  technology and know-how transfer;

     ii.  vendor introductions;

    iii.  IP prosecution;

    iv.  obsolete part management; and

     v.  inventory management.

c.  Manage and execute the chapter 11 process including:

      i.  reporting;

     ii.  creditor meeting attendance;

    iii.  court appearances;

    iv.  cash forecast preparation;

v.   preparing the corporation for a liquidation by discontinuing contracts for services for programs such as a 401(k) plan, health insurance, death and disability programs, technology services, consultant arrangements, facility shut-down, disposition of the assets remaining after the closing of the asset sale;

vi.   gathering and providing due diligence information to prospective buyers and bidders, and discuss such materials with prospective buyers and bidders;

vii.   assisting with transaction negotiations and structuring as such activities relate to prospective new bidders; and

viii.   recommending payments to critical and non-critical vendors, differentiating between pre-petition and post-petition vendor invoices.

d.   Communicate with various Debtor constituencies with regard to the strategic and bankruptcy plans of the company including:

i.   employees;

ii.   contract workers;

iii.   customers;

iv.   landlord;

v.   regulatory bodies;

vi.   vendors;

vii.   shareholders;

viii.   creditors;

7

ix.  the Board of Directors;

x.  the Bankruptcy Court and US Trustee; and

xi.  taxing authorities.[9]

## RELIEF REQUESTED

16.  By this Application, the Debtor requests entry of an Order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules, authorizing the retention and employment of Green as Chief Restructuring Consultant for the Debtor effective as of the Petition Date.

## QUALIFICATIONS AND RETENTION OF GREEN

17.  The Debtor respectfully requests the entry of an order pursuant to sections 327(a) and 328 of the Bankruptcy Code to employ Green as its Chief Restructuring Consultant to perform the services that are necessary in this Chapter 11 Case.

18.  On or about September 21, 2015, Mr. Green began providing the Debtor with consulting services pursuant to an agreement with the Company dated September 21, 2015 and a Statement of Work dated October 21, 2015.  A copy of that agreement is attached hereto as **Exhibit C**.[10]  Mr. Green stepped in to replace the former CFO of the company who resigned abruptly, requiring Mr. Green to immediately assume the responsibilities of the Company with little to no background on the Company, for significantly less compensation than restructuring consultants are typically paid.[11] Since that time, Mr. Green has become familiar with the Debtor,

---

[9]      *Id.* at ¶ 12.

[10]     *Id.* at ¶ 12.

[11]     *Id.* at ¶ 13.

its business operations, its financial conditions and other matters that may be relevant to the Chapter 11 Case.

19.      On or about December 23, 2015 and at the time the Company's Board of Directors decided to restructure the Company and terminate nearly all employees, Mr. Green assumed the operational leadership of the Company under the direction of the Chairman of the Board and the September 21, 2015 Agreement was amended, and a new Statement of Work dated February 12, 2016 was executed.  A copy of this amended agreement is attached hereto as **Exhibit D**.[12]  Beginning December 23, 2015, Mr. Green hired and retained a skeletal staff of employees and contract workers to continue the Company's business of manufacturing products, selling and distributing the Company's products to existing customers, servicing customers, developing new business, maintaining regulatory compliance, paying down the debts of the company, searching for all outstanding liabilities, closing the books for 2015 and accounting for the business under GAAP.[13]

20.      Mr. Green led a substantial reduction in the cost of operating the Company, from approximately $900,000 per month to less than $100,000 per month, and has also managed the cash flows of the Debtor.  Mr. Green has preserved and protected the assets for sale and has worked to maximize the value of the assets for the Company.  For example, prior to the Petition Date, Mr. Green successfully relocated the company from its previously leased premises, allowing Perseon to save approximately one million dollars on its previous lease obligation which positioned the company to enable the sale.  Mr. Green provided critical support during the

---

[12]      *Id.* at ¶ 14.

[13]      *Id.* at ¶ 15.

ongoing process of soliciting prospective buyers and coordinated due diligence meetings with prospective buyers.[14]

21.     Because of the expertise and knowledge shown by Mr. Green, the Stalking Horse is specifically and explicitly relying on Mr. Green throughout the consummation of the sale transaction contemplated by the APA.  In sum, Mr. Green has intimate knowledge of the highly specialized medical product that the Company produces and is absolutely critical to the consummation of the sale.[15]

22.     Mr. Green has more than 20 years of experience in financial management and advisory experience for both large established and growing entrepreneurial companies.  As an experienced professional, he has a proven record of success in managing private, SEC registered and exchange listed companies, including several medical device companies.  A copy of Mr. Green's biographical information is attached hereto as **Exhibit E**.

23.     The Debtor requires knowledgeable restructuring professionals to render restructuring services. As outlined above, based on his experience, knowledge, and familiarity with the Debtor's operations and financial condition, Mr. Green is irreplaceable and well suited to serve as the Debtor's CRC.[16]   Accordingly, the Debtor, through its Board of Directors, submits that in its business judgment, the employment of Mr. Green and the performance of related services are essential to the success of the Chapter 11 Case and should be approved.[17]

---

[14]      *Id.* at ¶ 16.

[15]      *Id.* at ¶ 17.

[16]      *Id.* at ¶ 18.

[17]      *Id.* at ¶ 19.

### GREEN IS DISINTERESTED AND HOLDS NO ADVERSE INTEREST

24.    Green has stated his desire and willingness to act in this case and render the necessary professional services as CRC to the Debtor.  The Green Declaration details all presently known connections of Green to the Debtor and its creditors.  To the best of the Debtor's knowledge, Green does not have any connection with the Debtor, its creditors or other parties in interest or their respective attorneys, except as set forth in the Green Declaration and is a disinterested person as that term is used in section 101(14) of the Bankruptcy Code, without consideration of his prepetition consulting agreement.

### SCOPE OF SERVICES AND COMPENSATION

25.    Prior to the Petition Date, the Debtor entered into the contract with Mr. Green in **Exhibits C** and **D**, to pay Mr. Green compensation in the amount of $20,000.00 per month[18] plus payment of Mr. Green's COBRA insurance premium in the amount of $750 per month.[19]  The contract with Mr. Green also provides for Mr. Green to earn additional compensation equal to 2.5% of the gross proceeds resulting from the successful restructuring and sale of the Company.[20]  This variable compensation component was modified at the request of the Board of Directors of the Debtor to eliminate the minimum payment that would be due under the Statement of Work in **Exhibit C**.[21]  The three compensation components were offered to Mr.

---

[18]    Mr. Green's compensation included a payment equal to 1% of gross proceeds from the sale of the company, subject to a minimum payment of $100,000.  When the Galil transaction failed and the company's prospects for a sale declined considerably, the guaranteed minimum payment to Mr. Green was then reduced to zero at the request of the Board, and as consideration for the reduction, the Board offered to increase the potential variable payment from 1% to 2.5% of the gross proceeds.

[19]    *McQuay Declaration* at ¶ 20.

[20]    *Id.* at ¶ 21.

[21]    *Id.* at ¶ 22.

Green as a package as consideration for the following services provided to the Debtor by Mr.

Green: general management of the business and supervision of staff; customer and vendor

management; accounting and financial management; transaction support; due diligence

documentation; support for the bankruptcy proceedings; business integration with the proposed

buyer; and reporting to this Court and the Debtor's Board of Directors.[22]   The Board of Directors

of the Debtor understood that Mr. Green's compensation could not be severed—in other words,

that Mr. Green's compensation should include both the monthly amounts due and his success fee

as a condition of his continued employment by the Debtor.[23]   Mr. Green's services are vital to

the continued operations of the Debtor, and it is essential that Mr. Green continue his duties as

CRC in order to avoid leaving the Debtor without management or a representative for any period

of time, especially during the critical period consummating the APA.[24]   The board of directors

fully supports the retention of Green and believes that his retention has been, and will be, critical

to the Debtor's restructuring process and essential to the proposed sale of assets.[25]   Absent the

retention of Green, the board of directors believes that the Company will be unable to

consummate the proposed sale and successfully complete the Chapter 11 process.  As such, the

board of directors has determined that it is in the best interest of the Debtor to amend and restate

the agreement with Mr. Green.[26]   Moreover, the Board of Directors does not believe that it can

---

[22]   *Id.* at ¶ 23.

[23]   *Id.* at ¶ 24.

[24]   *Id.* at ¶ 25.

[25]   *Id.* at ¶ 26.

[26]   *Id.* at ¶ 27.

request Mr. Green to continue working in good faith at his present rate of compensation if his success fee is not approved by the Court,[27] subject to the provisions of 11 U.S.C. § 327 et. seq.

26.    The overall compensation structure described herein is substantially less than what is typically paid to CRCs.[28]  Nonetheless, Green has agreed to continue to act in this case and render his professional services at a deep discount in order to ensure that the Debtor is able to successfully complete the Chapter 11 process.

27.    No retainer has been paid to Mr. Green.  Perseon has paid $153,482 to Mr. Green for the period of September 2015 through April 2016 for services rendered prior to the Bankruptcy filing.  Mr. Green has been compensated by the Debtor prior to the Petition Date on twice monthly basis, and has been paid through the Debtor's payroll servicer.  Mr. Green has been paid for services rendered through April 2016.

28.    Because Mr. Green is not being employed as a professional under section 327 of the Bankruptcy Code, he will not submit fee applications pursuant to Bankruptcy Code sections 330 and 331.  Instead, the Debtor requests that the Court authorize the Debtor to continue to pay Mr. Green through the Debtor's payroll servicer on a twice monthly basis.

29.    Because Mr. Green's compensation is based on a flat fee for services rendered and not an hourly rate, the Debtor requests that Mr. Green not be required to submit time records to the Court.

30.    Pursuant to the requirements of the "Jay Alix Protocol":

    a.    Green shall not act in any other capacity in connection with this Chapter 11 Case.

---

[27]    *Id.* at ¶ 28.

[28]    *Id.* at ¶ 29.

b. In the event that Debtor seeks to have Green assume an executive officer position that is different from that position disclosed in this application, or to materially change the terms of the engagement by either (i) modifying the functions of personnel, (ii) adding new personnel, or (iii) altering or expanding the scope of engagement, a motion to modify the retention shall be filed.

c. Green shall not serve as a director of the Debtor during the pendency of the Chapter 11 Case.

d. For a period of three years after the conclusion of the engagement, Green shall not make any investment in Debtor.

e. Green shall disclose any and all facts that may have a bearing on whether he holds or represents any interest adverse to the Debtor, its creditors, or other parties-in-interest, including whether he is engaged on a full time or part time basis, and if part-time whether any simultaneous or prospective engagement exists that may be pertinent to the question of conflict or adverse interest.  The obligation to disclose identified in this subparagraph is a continuing obligation.

## BASIS FOR RELIEF REQUESTED

31.    Section 363(b) of the Bankruptcy Code provides in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts interpreting section 363(b) have held that transactions should be approved pursuant to this provision when, as here, they are supported by management's sound business judgment. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169,

176 (D. Del. 1991) (outlining requirements for sale of assets pursuant to section 363); *In re*

*Phoenix Steel Corp.*, 82 B.R. 334, 336-36 (Bankr. D. Del. 1987).

32.     The proposed use, sale, or lease of property of the estate may be approved under

section 363(b) of the Bankruptcy Code if it is supported by sound business justification. *See In re*

*Montgomery Ward*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the

use, sale or lease of property of the estate under this section, courts require the debtor to show

that a sound business purpose justifies such actions"). Although established in the context of a

proposed sale, the "business judgment" standard has been applied in non-sale situations. *See,*

*e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental*

*Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in

context of proposed "use" of estate property). Moreover, pursuant to section 105 of the

Bankruptcy Code, a court has expansive equitable powers to fashion any order or decree which is

in the interest of preserving or protecting the value of a debtor's assets. *See, e.g., In re*

*Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986).

33.     Once a debtor articulates a valid business justification, the "business judgment"

standard "is a presumption that in making a business decision the directors of a corporation acted

on an informed basis, in good faith, and in the honest belief that the action was in the best

interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992)

(quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has

vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.

*See id., In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("The Code

favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

34.     Courts recognize the applicability of section 363(b) of the Bankruptcy Code to the use of estate property to compensate individuals employed outside the ordinary course of business. *See, e.g., In re Spheris Inc, et al.*, Case No. 10-10352 (KG) (Bankr. D. Del. Mar. 2, 2010); *In re Flying J, Inc.*, Case No. 08-13384 (MFW) (Bankr. D. Del. 2008); *In re Eddie Bauer Holdings, Inc.*, Case No. 09-12099 (MFW) (Bankr. D. Del. 2009); *In re Indalex Holdings Finance, Inc.*, Case No. 09-10982 (PJW) (Bankr. D. Del. 2009); *In re Fluid Routing Solutions Intermediate Holding Corp.*, Case No. 09-10384 (CSS) (Bankr. D. Del. 2009); *In re SemCrude, L.P.*, Case No. 08-11525 (BLS) (Bankr. D. Del. 2008).

35.     The Debtor believes that it is necessary and in the best interest of its estate to continue to employ Green as CRC to the Debtor during the Chapter 11 Case.  The board of directors, in its business judgment, has determined that the retention of Mr. Green is vital to the continued operations of the Debtor.  Therefore, the board of directors has determined that it is appropriate to amend and restate Mr. Green's contract with the Debtor.[29]  Mr. Green has been involved in all facets of the Debtor's business since September 21, 2015, and he has been significantly involved the Debtor's day-to-day business operations and restructuring activities. Mr. Green has successfully cut the Debtor's expenses and facilitated the proposed sale of assets, which are critical to the continued operation of the Debtor.[30]  His continued involvement throughout the post-petition period will be imperative to continuing the Debtor's post-petition

---

[29]     *McQuay Declaration* at ¶ 30.

[30]     *Id.* at ¶ 31.

operation, consummating the proposed sale of assets, and navigating the Debtor's proposed liquidation process.[31] The Stalking Horse is relying on Mr. Green's expertise and knowledge of the company in conjunction with the sale of the assets, and Mr. Green's retention is critical to the consummation of the sale.[32] The board of directors fully supports the retention of Mr. Green and believes that he is vital to the Debtor's success in the Chapter 11 Case. Without the assistance of Mr. Green, the board of directors believes that the proposed sale of assets would be compromised, and the value of the assets would be severely diminished.[33]

36.    In addition to the necessity of Mr. Green in the sale process, the Debtor has been and will be required to complete various administrative tasks in connection with the administration of the Chapter 11 Case. These include preparing schedules of assets and liabilities and statements of financial affairs, meeting the Debtor's reporting obligations to the Office of the United States Trustee and responding to various documents and due diligence requests that may arise in the course of the Chapter 11 Case. Retaining Mr. Green as CRC, who is very familiar with the Debtor's business, will facilitate efficient compliance and completion of these bankruptcy-specific tasks.[34] Absent the retention of Green, the Debtor believes that it will be difficult, if not impossible, for the Debtor to complete these tasks, as the Debtor would be left without anyone to manage the operations of the Company.[35] Additionally, the board of directors

---

[31]    *Id.* at ¶ 32.

[32]    *Id.* at ¶ 33.

[33]    *Id.* at ¶ 34.

[34]    *Id.* at ¶ 35.

[35]    *Id.* at ¶ 36.

submits that any subsequent delay in the administration of the estate that would result would

cause irreparable harm to the Debtor.[36]

---

[36]     *Id.* at ¶ 37.

## <u>CONCLUSION</u>

WHEREFORE, pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Fed. R. Bankr. P. 2014, the Debtor respectfully requests the entry of an Order authorizing the retention and employment of Mr. Green as CRC for the Debtor.  The Debtor also requests such other relief as is just and proper.

DATED this 22nd day of June, 2016.

**DORSEY & WHITNEY LLP**

*/s/ Steven T. Waterman*
Steven T. Waterman
Michael F. Thomson
Jeffrey M. Armington

*Proposed Attorneys for Debtor Perseon Corporation*

# **<u>EXHIBIT A</u>**

Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: waterman.steven@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation
    and Proposed Attorneys for Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 16-24435 |
| PERSEON CORPORATION., | Chapter 11 |
| Debtor. | The Honorable R. Kimball Mosier |

**DECLARATION OF DAVID GREEN IN SUPPORT OF
APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO 11
U.S.C. §§ 105 AND 363 AND FED. R. BANK. P. 2014(a) AUTHORIZING THE
RETENTION AND EMPLOYMENT OF DAVID GREEN AS CHIEF
RESTRUCTURING CONSULTANT FOR THE DEBTOR *NUNC PRO TUNC* TO THE
PETITION DATE**

I, David Green, hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I make this Declaration (the

"Declaration") in support of the *Application of the Debtor for Entry of an Order, Pursuant to 11*

*U.S.C. §§ 105 and 363 and Fed. R. Bank. P. 2014(a) Authorizing the Retention and Employment*

*of David Green as Chief Restructuring Consultant for the Debtor nunc pro tunc to the Petition Date* (the "Application").[1]

2.      I have personal knowledge of the facts stated in this Declaration. If called as a witness, I could and would testify competently to these facts, except where matters are stated on information and belief. As to those facts, I am informed and believe that they are true and correct.

3.      On or about September 21, 2015, I began providing the Debtor with consulting services pursuant to an agreement with the Company dated September 21, 2015 and a Statement of Work dated October 21, 2015. A copy of that agreement is attached to the Application as Exhibit C. I stepped in to replace the former CFO of the company who resigned abruptly, requiring me to immediately assume the responsibilities of the Company with little to no background on the Company. Since that time, I have become familiar with the Debtor, its business operations, its financial conditions and other matters that may be relevant to the Chapter 11 Case.

4.      On or about December 23, 2015 and at the time the Company's Board of Directors decided to restructure the Company and terminate nearly all employees, I assumed the operational leadership of the Company under the direction of the Chairman of the Board and the September 21, 2015 Agreement was amended, and a new Statement of Work dated February 12, 2016 was executed. A copy of this amended agreement is attached to the Application as Exhibit D.

---

[1]      Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Application.

2

5.      Beginning December 23, 2015, I hired and retained a skeletal staff of employees and contract workers to continue the Company's business of manufacturing products, selling and distributing the Company's products to existing customers, servicing customers, developing new business, maintaining regulatory compliance, paying down the debts of the company, searching for all outstanding liabilities, closing the books for 2015 and accounting for the business under GAAP.

6.      In addition to these additional responsibilities, I also continued to act as the Chief Restructuring Consultant for the Debtor, negotiating with creditors, managing the cash flow of the company, coordinating communications with the potential buyer and bidders of the Debtor's assets, and assisting with the preparation of the documents required for the bankruptcy filing.

7.      I have more than 20 years of experience in financial management and advisory experience for both large established and growing entrepreneurial companies. As an experienced professional, I have a proven record of success in managing private, SEC registered and exchange listed companies, including several medical device companies. A copy of my biographical information is attached to the Application as Exhibit E.

8.      Prior to the Petition Date, I entered into the contract with the Debtor that is attached to the Application as Exhibits C and D, through which the Debtor paid me compensation in the amount of $20,000.00 per month[2] plus payment of my COBRA insurance premium in the amount of $750 per month. My contract with the Debtor also provides for me to

---

[2]     My compensation included a payment equal to 1% of gross proceeds from the sale of the company, subject to a minimum payment of $100,000. When the Galil transaction failed and the company's prospects for a sale declined considerably, the guaranteed minimum payment to me was then reduced to zero at the request of the Board, and as consideration for the reduction, the Board offered to increase the potential variable payment from 1% to 2.5% of the gross proceeds.

earn additional compensation equal to 2.5% of the gross proceeds resulting from the successful

restructuring and sale of the Company.

9.    The overall compensation structure described herein is comparable to the rates I

generally charge for my services.

10.    Perseon has paid $153,482 to me for the period of September 2015 through April

2016 for services rendered prior to the Bankruptcy filing.  I have been compensated by the

Debtor prior to the Petition Date on twice monthly basis, and have been paid through the

Debtor's payroll servicer.  I have been paid for services rendered through April 2016.

11.    My compensation is based on a flat fee for services rendered and not an hourly

rate.  Therefore I request that I not be required to submit time records to the Court.

12.    To the best of my knowledge based on the information that I have as of this date, I

believe that I do not have any connections to or conflicts of interest with, the Debtor, insiders of

the Debtor, equity holders of the Debtor checked as set forth above, creditors, or any other

known party in interest, their respective attorneys and accountants, the United States Trustee, or

any person employed in the Office of the United States Trustee.

13.    Pursuant to the "Jay Alix Protocol" I agree that:

a. I shall not act in any other capacity in connection with this Chapter 11 Case.

b. In the event that the Debtor seeks to have me assume an executive officer position

that is different from the position disclosed in the Application, or to materially

change the terms of my engagement by either (i) modifying the functions of

personnel, (ii) adding new personnel, or (iii) altering or expanding the scope of

engagement, a motion to modify the retention shall be filed.

    c.  I will not serve as a director of the Debtor during the pendency of the Chapter 11 Case.

    d.  For a period of three years after the conclusion of the engagement, I shall not make any investment in the Debtor.

    e.  I shall disclose any and all facts that may have a bearing on whether I hold or represent any interest adverse to the Debtor, its creditors, or other parties-in-interest.  My hours fluctuate based on the needs of the company.  I am simultaneously engaged with Intarcia Therapeutics, Inc., a company that has provided me with flexibility to complete my duties for the Debtor.  This engagement is not pertinent to the question of conflict or adverse interest.  I understand that my obligation to disclose these facts is a continuing obligation.

14.    To the best of my knowledge, I do not have any connections with the Bankruptcy Court or the Office of the United States Trustee that would prohibit employment under Rule 5002 of the Federal Rules of Bankruptcy Procedure.

15.    I understand that I have a continuing obligation to supplement this Declaration in event that it discovers additional connections related to this case not disclosed herein.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

David Green

# **<u>EXHIBIT B</u>**

Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation*
*and Proposed Attorneys for Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>PERSEON CORPORATION.,<br><br>Debtor. | Case No. 16-24435<br><br>Chapter 11<br><br>The Honorable R. Kimball Mosier |

**DECLARATION OF TIMOTHY C. McQUAY IN SUPPORT OF
APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO 11
U.S.C. §§ 105 AND 363 AND FED. R. BANK. P. 2014(a) AUTHORIZING THE
RETENTION AND EMPLOYMENT OF DAVID GREEN AS CHIEF
RESTRUCTURING CONSULTANT FOR THE DEBTOR EFFECTIVE AS OF THE
PETITION DATE**

I, Timothy C. McQuay, hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I make this Declaration (the

"Declaration") in support of the *Application of the Debtor for Entry of an Order, Pursuant to 11*

*U.S.C. §§ 105, 327, 328, and 363 and Fed. R. Bank. P. 2014(a) Authorizing the Retention and*

*Employment of David Green as Chief Restructuring Consultant for the Debtor Effective as of the*

*Petition Date* (the "Application").[1]

    2.     I have personal knowledge of the facts stated in this Declaration.  If called as a

witness, I could and would testify competently to these facts, except where matters are stated on

information and belief.  As to those facts, I am informed and believe that they are true and

correct.

    3.     I have served as a director of Perseon since February 2008 and I currently serve as

Chairman of the Board of Directors of the Debtor.  I am familiar with the Debtor, its business

operations, its financial conditions and other matters that may be relevant to the Chapter 11 Case.

    4.     On or about September 21, 2015 Perseon retained David Green to provide

services to Perseon including financial management, cash management, transaction advice and

transaction execution.  At the time he was retained, Mr. Green assumed the responsibilities held

by the former CFO of the Company, who resigned abruptly.  Mr. Green agreed to assume those

responsibilities with no background in Perseon, and for substantially less than professionals with

similar responsibilities are typically paid.

    5.     On October 26, 2015, as a result of Mr. Green's exceptional efforts, Perseon and

Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger

Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned

subsidiary of Galil through a tender offer and merger (the "Merger").

    6.     On December 22, 2015, Galil terminated the Merger Agreement.

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Application.

7.     Following Galil's termination of the Merger Agreement, on December 23, 2015, Perseon terminated a substantial number of its employees to materially reduce expenses.

8.     The termination of substantially all of the Debtor's employees resulted in the tasks and responsibilities attributable to the employees, becoming the sole responsibility of Mr. Green.

9.     In addition to the tremendous amount of responsibility that was conferred upon Mr. Green, he also continued to act as the Chief Restructuring Consultant ("CRC") for the Debtor and substantially lowered the operating costs of the business by negotiating with creditors, terminating the Debtor's five-year lease agreement, securing a lower cost facility and moving the entire operation to the new facility, efficiently managing the cash and other resources of the company.  Mr. Green coordinated communications with the potential buyer and bidders of the Debtor's assets, and assisted the Debtor with the preparation of all of the documentation and information that was crucial for the filing of the Bankruptcy Petition.

10.     Even through this severe diminution in the Debtor's workforce from 47 employees to only 3 part-time employees, Mr. Green has spearheaded the Debtor's efforts to maintain current customers, obtain new customers and continue operations of the Debtor.

11.     Mr. Green has been, and continues to be, a critical part of the Debtor's business and day to day activities.  As such, in its business judgment, the Debtor, through its board of directors, has determined that it is in the best interest of the Debtor to amend and restate Green's agreement to provide restructuring services to the Debtor.

12.     Mr. Green's services are critical to any disposition of assets and the confirmation of any chapter 11 plan in this case.  In that regard, on a go forward, post-petition basis, Mr.

3

Green must do the following in order for the transaction contemplated under the APA to be consummated:

    a.  Maintain the Debtor as a viable operating business and deliver the Purchased Assets as defined in the APA, including the following responsibilities .

        i.  recruit, train, manage and direct staff performing sales, manufacturing, inventory management, customer service, shipping & receiving, purchasing, facilities management, asset management, business development, quality control, regulatory and reporting duties;

        ii.  retain and manage distribution partners in the US and Europe;

        iii.  retain and manage critical and non-critical vendors;

        iv.  set pricing and terms for the sale of products and services;

        v.  report to the Board of Directors and the Chief Executive Officer and execute on directives of each;

        vi.  manage financial institutions;

        vii.  direct tax reporting and compliance activities;

        viii.  forecast cash sources and uses, and recommend payments to-be-made to vendors, purchases of supplies and inventory, negotiate special customer requests and transaction terms;

        ix.  manage and direct intellectual property attorneys that prosecute the company's patents, trademark and other intellectual property;

        x.  maintain insurance policies and execute policy renewals; and

       xi.  plan the business and financial integration of the Purchased Assets with the buyer's business entity.

b.  Manage and assist the Licensee of the Debtor's technology with:

       i.  technology and know-how transfer;

      ii.  vendor introductions;

    iii.  IP prosecution;

    iv.  obsolete part management; and

      v.  inventory management.

c.  Manage and execute the chapter 11 process including:

       i.  reporting;

      ii.  creditor meeting attendance;

    iii.  court appearances;

    iv.  cash forecast preparation;

      v.  preparing the corporation for a liquidation by discontinuing contracts for services for programs such as a 401(k) plan, health insurance, death and disability programs, technology services, consultant arrangements, facility shut-down, disposition of the assets remaining after the closing of the asset sale;

    vi.  gathering and providing due diligence information to prospective buyers and bidders, and discuss such materials with prospective buyers and bidders;

      vii.  assisting with transaction negotiations and structuring as such activities relate to prospective new bidders; and

     viii.  recommending payments to critical and non-critical vendors, differentiating between pre-petition and post-petition vendor invoices.

  d.  Communicate with various Debtor constituencies with regard to the strategic and bankruptcy plans of the company including:

       i.  employees;

      ii.  contract workers;

     iii.  customers;

     iv.  landlord;

      v.  regulatory bodies;

     vi.  vendors;

     vii.  shareholders;

    viii.  creditors;

     ix.  the Board of Directors;

      x.  the Bankruptcy Court and US Trustee; and

     xi.  taxing authorities.

13.    On or about September 21, 2015, Mr. Green began providing the Debtor with consulting services pursuant to an agreement with the Company dated September 21, 2015 and a Statement of Work dated October 21, 2015.  A copy of that agreement is attached to the Application as Exhibit C.

14.     On or about December 23, 2015 and at the time the Company's Board of Directors decided to restructure the Company and terminate all employees, Mr. Green assumed the operational leadership of the Company under my direction and the September 21, 2015 Agreement was amended, and a new Statement of Work dated February 12, 2016 was executed. A copy of this amended agreement is attached to the Application as <u>Exhibit D</u>.

15.     Beginning December 23, 2015, Mr. Green hired and retained a skeletal staff of employees and contract workers to continue the Company's business of manufacturing products, selling and distributing the Company's products to existing customers, servicing customers, developing new business, maintaining regulatory compliance, paying down the debts of the company, searching for all outstanding liabilities, closing the books for 2015 and accounting for the business under GAAP.

16.     Mr. Green led a substantial reduction in the cost of operating the Company, from approximately $900,000 per month to less than $100,000 per month, and has also managed the cash flows of the Debtor.  Mr. Green has preserved and protected the assets for sale and has worked to maximize the value of the assets for the Company.  For example, prior to the Petition Date, Mr. Green successfully relocated the company from its previously leased premises, allowing Perseon to save approximately one million dollars on its previous lease obligation which positioned the company to enable the sale.  Mr. Green provided critical support during the ongoing process of soliciting prospective buyers and coordinated due diligence meetings with prospective buyers.

17.     Because of the expertise and knowledge shown by Mr. Green, the Stalking Horse is specifically and explicitly relying on Mr. Green throughout the consummation of the sale

transaction contemplated by the APA.  In sum, Mr. Green has intimate knowledge of the highly specialized medical product that the Company produces and is absolutely critical to the consummation of the sale.

18.    The Debtor requires knowledgeable restructuring professionals to render restructuring services. As outlined above, based on his experience, knowledge, and familiarity with the Debtor's operations and financial condition, Mr. Green is irreplaceable and well suited to serve as the Debtor's CRC.

19.    Accordingly, in my business judgment, the employment of Mr. Green and the performance of related services are essential to the success of the Chapter 11 Case and should be approved.

20.    Prior to the Petition Date, the Debtor entered into the contract with Mr. Green in Exhibits C and D to the Application, to pay Mr. Green compensation in the amount of $20,000.00 per month[2] plus payment of Mr. Green's COBRA insurance premium in the amount of $750 per month.

21.    The contract with Mr. Green also provides for Mr. Green to earn additional compensation equal to 2.5% of the gross proceeds resulting from the successful restructuring and sale of the Company.

---

[2]    Mr. Green's compensation included a payment equal to 1% of gross proceeds from the sale of the company, subject to a minimum payment of $100,000.  When the Galil transaction failed and the company's prospects for a sale declined considerably, the guaranteed minimum payment to Mr. Green was then reduced to zero at the request of the Board, and as consideration for the reduction, the Board offered to increase the potential variable payment from 1% to 2.5% of the gross proceeds.

22.     This variable compensation component was modified at the request of the Board of Directors of the Debtor to eliminate the minimum payment that would be due under the Statement of Work in <u>Exhibit C</u>.

23.     The three compensation components were offered to Mr. Green as a package as consideration for the following services provided to the Debtor by Mr. Green: general management of the business and supervision of staff; customer and vendor management; accounting and financial management; transaction support; due diligence documentation; support for the bankruptcy proceedings; business integration with the proposed buyer; and reporting to this Court and the Debtor's Board of Directors.

24.     The Board did not intend, nor does it now intend, that Mr. Green's compensation be severed—in other words, that Mr. Green's compensation should include both the monthly amounts due and his success fee as a condition of his continued employment by the Debtor.

25.     Mr. Green's services are vital to the continued operations of the Debtor, and it is essential that Mr. Green continue his duties as CRC in order to avoid leaving the Debtor without management or a representative for any period of time, especially during the critical period consummating the APA.

26.     The board of directors fully supports the retention of Green and believes that his retention has been, and will be, critical to the Debtor's restructuring process and essential to the proposed sale of assets.

27.     Absent the retention of Green, I believe that the Company will be unable to consummate the proposed sale and successfully complete the Chapter 11 process.  As such, the

board of directors has determined that it is in the best interest of the Debtor to amend and restate the agreement with Mr. Green.

28.     Moreover, the Board of Directors does not believe that it can request Mr. Green to continue working in good faith at his present rate of compensation if his success fee is not approved by the Court.

29.     It is my understanding that the overall compensation structure described herein is substantially less than what is typically paid to CRCs.

30.     The Board believes that it is necessary and in the best interest of its estate to continue to employ Mr. Green as CRC to the Debtor during the Chapter 11 Case.  The Board, in its business judgment, has determined that the retention of Mr. Green is vital to the continued operations of the Debtor.  Therefore, the board of directors has determined that it is appropriate to amend and restate Mr. Green's contract with the Debtor.

31.     Mr. Green has been involved in all facets of the Debtor's business since September 21, 2015, and is significantly involved the Debtor's day-to-day business operations and restructuring activities. Mr. Green has successfully cut the Debtor's expenses and facilitated the proposed sale of assets, which are critical to the continued operation of the Debtor.

32.     Mr. Green's continued involvement throughout the post-petition period will be imperative to continuing the Debtor's post-petition operation, consummating the proposed sale of assets, and navigating the Debtor's proposed liquidation process.

33.     The Stalking Horse is relying on Mr. Green's expertise and knowledge of the company in conjunction with the sale of the assets, and Mr. Green's retention is critical to the consummation of the sale.

34.    The board of directors fully supports the retention of Mr. Green and believes that he is vital to the Debtor's success in the Chapter 11 Case.  Without the assistance of Mr. Green, I believe that the proposed sale of assets would be compromised, and the value of the assets would be severely diminished.

35.    In addition to the necessity of Mr. Green in the sale process, the Debtor has been and will be required to complete various administrative tasks in connection with the administration of the Chapter 11 Case.  These include preparing schedules of assets and liabilities and statements of financial affairs, meeting the Debtor's reporting obligations to the Office of the United States Trustee and responding to various documents and due diligence requests that may arise in the course of the Chapter 11 Case.  Retaining Mr. Green as CRC, who is very familiar with the Debtor's business, will facilitate efficient compliance and completion of these bankruptcy-specific tasks.

36.    Absent the retention of Green, I believe that it will be difficult, if not impossible, for the Debtor to complete these tasks, as the Debtor would be left without anyone to manage the operations of the Company.

37.    Additionally, I believe that any subsequent delay in the administration of the estate that would result would cause irreparable harm to the Debtor.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

*/s/ Timothy C. McQuay*
Timothy C. McQuay

# <u>EXHIBIT C</u>

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT is made effective as of <u>September 21, 2015</u> by and between the following:

| | | |
|---|---|---|
| PERSEON CORPORATION | | David Green |
| 2188 West 2200 South | and | 2174 Preston Street |
| Salt Lake City, UT 84119 | | Salt Lake City, UT |
| (the "<u>Company</u>") | | ("<u>Consultant</u>"). |

In consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, Perseon Corporation (the "Company") and Consultant agree as follows:

1.    <u>Consulting</u>.  The Company hereby engages Consultant to perform, and Consultant hereby agrees to perform consulting services ("<u>Consulting Services</u>") for the Company from time to time.  The specific services to be provided to the Company will be determined on an assignment-by-assignment basis by agreement of the parties.  For each assignment, the parties will use a Statement of Work, in the form attached hereto as <u>Exhibit A</u> (each a "<u>SOW</u>"), to stipulate the services that the Company has requested and that Consultant has agreed to perform.  Each SOW will be governed by and subject to the terms and conditions of this Agreement, provided if the specific terms of any engagement conflict with the terms of this Agreement, the express terms in the SOW will control.  Nothing in this Agreement shall obligate either party to enter into any particular SOW.

2.    <u>Term</u>.  The term of any particular engagement will be governed by the applicable SOW.  The term of this Agreement will continue until terminated by either party on no less than thirty (30) days' prior written notice to the other party; provided this Agreement shall remain effective as to any SOW outstanding at the time a notice of termination has been provided until completion of the engagement specified in the SOW.

3.    <u>Compensation</u>.  The Company shall pay Consultant for billable hours worked in performing the Consulting Services (billable hours shall be actual approved hours during which the Consultant is performing the services and shall not include any travel time, unless specifically noted in advance in the SOW) (a) at the rate indicated in the applicable SOW and (b) within 10 days of the Consultant submitting an invoice after the last day of each calendar month during which the applicable Consulting Services are performed.  The Company also will reimburse Consultant for reasonable out-of-pocket expenses incurred by Consultant in connection with the performance of the Consulting Services, to the extent such expenses are specified in the applicable SOW or otherwise pre-approved by the Company and, in each case, supported by the appropriate receipts and supporting documentation. Consultant is required to complete and submit a W-9 form to Company accounting department (form is attached, or is available on-line) and any other requested and reasonable documentation prior to compensation being paid by the Company.

4.    <u>Relationship of Parties</u>.

(a)    Consultant is an independent contractor and is not an agent or employee of, and has no authority to bind, the Company by contract or otherwise.  Consultant will perform the Consulting Services under the general direction of the Company, but Consultant will determine, in Consultant's sole discretion, the manner and means by which the Consulting Services are accomplished, subject to the requirement that Consultant shall at all times comply with applicable law.

(b)    The Company has no right or authority to control the manner, method, means, or details by which the Consulting Services are accomplished, including the determination of the need for and hiring of assistants, subcontractors, or employees at the Consultant's own expense.  The Company may not control, direct, or otherwise supervise Consultant's assistants, subcontractors, or employees in the performance of those services.

(c)    Consultant will supply all tools, equipment, and supplies required to perform the Consulting Services under this Agreement.

(d)    Consultant will report as self-employment income all compensation received by Consultant pursuant to this Agreement.  Consultant will be responsible to pay his own withholding taxes, social security taxes, unemployment taxes, and similar items in connection with compensation received by Consultant pursuant to this Agreement.  Consultant will not be entitled to receive any vacation or illness payments, or to participate in any plan, arrangement, or distribution by the Company pertaining to any bonus, profit sharing, equity incentive, insurance or similar benefits for Company employees.

(e)    In the performance of this Agreement, Consultant shall comply with all applicable laws and maintain all required licenses.

(f)    The Company shall name the Consultant as an insured party under the Company's Director & Officer insurance policy and any other insurance policy held by the Company.  The Company will also extend to Consultant protections and reimbursement for the costs for the Consultant to defend himself, consistent with the Company's practice or policy extended to its other officers and directors, when and if any party brings a lawsuit or other complaint against Consultant for actions performed by the Consultant while performing the Consulting Services.

(g)    The Company is not responsible for providing workers' compensation insurance for Consultant or Consultant's employees or agents.

5.    Protection of Information.

(a)    Consultant recognizes that during the course of performing the Consulting Services hereunder Consultant may be exposed to confidential business information or trade secrets of the Company and/or its customers (the "Customers").  Accordingly, during the term of this Agreement and thereafter, Consultant shall hold all such information in strictest confidence and shall not directly or indirectly publish, communicate, divulge, use or disclose, for its own benefit or for the benefit of any third party, any such confidential business information or trade secrets, except as necessary in connection with Consultant's performance of the Consulting Services.

(b)     Such confidential business information and trade secrets (including, without limitation, any such materials developed by Consultant for the Company and/or its Customers in connection with the performance of the Consulting Services) are and shall remain the property of the Company and/or its Customers, as applicable, and upon termination or expiration of this Agreement Consultant shall deliver to the Company all records, data, information, and other computer or other media or documents produced or acquired during the performance by Consultant of the Consulting Services and all copies thereof.

(c)     The covenants and obligations of confidentiality herein shall not apply with respect to information that is (i) available to Consultant from third parties on an unrestricted basis; or (ii) disclosed by the Company and/or its Customers, as applicable, to the general public on an unrestricted basis.

(d)     Consultant agrees to execute, upon the Company's request, such supplemental confidentiality and nondisclosure agreements as may be required by the Company's clients in connection with the performance of its Consulting Services.

6.     Property of the Company.

(a)     If, at any time or times, during the term of this Agreement, Consultant shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any invention, creation, modification, discovery, concept, idea, design, development, improvement, innovation, machinery, equipment, process, software program, documentation, data, technique, know-how, trade secret or other intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes) (collectively, "Developments"), that (i) relates to the business of the Company or any Customer of the Company or any of the products or services being developed, produced or sold by the Company or any Customer of the Company or which may be used in relation therewith; (ii) results from tasks assigned or information disclosed to Consultant by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then Consultant shall promptly disclose to the Company each such Development, and all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns as "works made for hire" pursuant to the United States Copyright Act (17 U.S.C. Section 101, *et seq.*) or other applicable law.  To the extent any Developments are not deemed "works made for hire", Consultant shall assign, and hereby does assign, any and all right, title and interest in and to the Developments (including, but not limited to, rights to any inventions, patentable subject matter in the Developments and all benefits and/or rights resulting therefrom) to the Company and its assigns without additional compensation, and shall communicate to the Company, without cost or delay, and without disclosing to others the same, all valuable information relating thereto (with all necessary plans or models).  At the Company's request and expense, Consultant shall execute such documents as the Company deems necessary or desirable to vest in the Company sole and exclusive title to, or to otherwise secure and protect the Company's rights in, such Developments (and in all related trademarks, copyrights and/or patent rights), and Consultant shall provide such assistance (including, without limitation, acting as a witness) as may be deemed necessary by the Company to apply for, defend or enforce any United States and foreign letters patent, trademarks or copyrights based upon or related to such Developments, as well as all reissues, renewals, and extensions thereof.  If the Company is unable, as a result of inability to locate Consultant after a reasonably diligent effort, as a result of the death

4834-6478-4927:2

or incapacity of Consultant, or as a result of the refusal of Consultant, to secure Consultant's signature on any documents, applications, letters patent, copyright or other analogous protection relating to Developments or other proprietary rights, Consultant hereby irrevocably designates and appoints the Company, by its duly authorized managers and agents, as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright, or other analogous protection thereon with the same legal force and effect as if executed by Consultant.

(b)      If, at any time or times during the term of this Agreement, Consultant shall incorporate into a Company product, process or machine any Developments that Consultant, alone or jointly with others, conceived, developed or reduced to practice (or caused to be conceived, developed or reduced to practice) prior to the effective date of this Agreement (collectively, "Prior Developments"), the Company shall immediately be granted and shall have (without the necessity of any writing) a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have, modify, use and sell such Prior Developments.   Notwithstanding the foregoing, Consultant agrees that Consultant will not incorporate, or permit to be incorporated, Prior Developments in any Company product, process or machine in violation of any existing confidentiality agreement that applies to Consultant or without the Company's prior written consent.

7.      Nonsolicitation.  During the term of this Agreement and for a period of one (1) year thereafter, Consultant shall not, directly or indirectly, (a) solicit or induce (or assist or encourage any third party to solicit or induce) any Company employees or consultants to leave employment with the Company or otherwise cease performing services for the Company, or (b) call on, solicit, divert or take away (or attempt to divert or take away) any Customers or prospective customers of the Company upon whom Consultant called, solicited, catered or became acquainted in the course of providing the Consulting Services hereunder or any of the business of such Customers or prospective customers or clients with the Company.

8.      Indemnification.  Each party shall indemnify and hold harmless the other party and, as applicable, its shareholders, directors, members, managers, employees and agents against all liabilities, suits, claims, damages, losses and expenses, including reasonable attorneys' fees (hereinafter, "Losses"), that arise out of, result from or are related to (a) any breach by the other party of any covenant or agreement set forth in, or legally owed under, this Agreement; or (b) any act by the Company or Consultant (or its subcontractor, assistant, agent, or employee) that compromises either the Company's or Consultant's, as applicable, industry or professional standing and reputation, including, but not limited to, Losses directly associated with investigations by state or federal regulatory agencies and civil or criminal investigations or proceedings arising from conduct by the other party.

9.      General Provisions.

(a)      All notices required or permitted hereunder shall be given to the parties at the respective addresses first shown above, including a copy via email to the Consultant.  Such notices shall be effective when delivered to the appropriate address by hand or by national

overnight delivery service (with receipt confirmed), or three (3) days after the date of mailing if sent by registered or certified mail to the appropriate address.

(b)  The covenants and agreements set forth in Sections 5 (Protection of Information), 6 (Property of Company), 7 (Nonsolicitation), 8 (Indemnification) and 9 (General Provisions) shall survive the termination of this Agreement for any reason whatsoever.

(c)  This Agreement contains the entire understanding and contract between the parties with respect to the subject matter hereof and there are no agreements, covenants or undertaking other than those expressly set forth herein.

(d)  This Agreement shall be governed by and construed in accordance with the laws of the State of Utah, without regard to the applicable principles of conflicts of law. Any legal action to enforce or construe any provision of this Agreement must be brought only in a state or federal court located in Salt Lake County, State of Utah, and all parties hereby submit to the personal jurisdiction and venue of such courts.

(e)  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable for any reason, such provision will be deemed to apply only to the maximum extent permitted by law, and the remainder of this Agreement shall remain valid and enforceable in accordance with its terms.

(f)  This Agreement (which is for personal services) may not be assigned, in whole or in part, by Consultant without the Company's prior written consent. Any assignment or attempted assignment by Consultant in contravention of this prohibition shall be void and of no effect.

(g)  This Agreement may not be amended or modified except by the mutual written agreement of the parties.

(h)  No rights in favor of any person other than the parties to this Agreement will be created, implied or inferred from the provisions of this Agreement.

(i)  No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of obligations hereunder by such other party hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights hereunder.

(j)  The parties hereto each covenant and agree that if, at any time after the execution of this Agreement, any of the parties shall reasonably consider and be advised that any further actions, assignments or assurances are necessary or desirable to carry out the intent and accomplish the purposes of this Agreement, according to its terms, all the other parties will take such actions, execute and make all such assignments and assurances and do all things necessary or appropriate to carry out the intent and accomplish the purposes of this Agreement or otherwise consummate the transactions contemplated by this Agreement according to its terms.

(k)     The headings in this Agreement have been inserted for reference and as a matter of convenience only and in no way define, limit or enlarge the scope or meaning of this Agreement or any provision hereof.

(l)     Neither party shall be liable to the other for any alleged loss or damage resulting from any delay of performance caused by acts of the other, acts of civil or military authority, governmental priorities, earthquake, fire, flood, epidemic, quarantine, energy crisis, strike, labor trouble, war, riot, accident, shortage, delay in transportation, or any other causes beyond the reasonable control of the delayed party.

(m)     Nothing in this Agreement shall be construed as causing the parties to be treated as partners or joint venturers.  Neither party shall have the right to enter into a contract or incur any obligation on behalf of the other party.

(n)     This Agreement may be executed in any number of counterparts, and each such counterpart will be deemed to be an original instrument, but all such counterparts together will constitute but one agreement.  Signatures transmitted via facsimile transmission or email (pdf) will be considered the same as original signatures. Each person executing this Agreement in behalf of an entity represents and warrants that he/she has been duly authorized to execute and deliver this Agreement, acting for and in behalf of that entity, as a contract binding on that entity.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the effective date first shown above.

PERSEON CORPORATION

By: _____

Name: _____ Clint Carnell

Title: CEO/ President

CONSULTANT:

_____
David Green

**EXHIBIT A**

**Form of
Statement of Work**

**Project Name: Interim Financial Advisor**

**Services to be provided by Consultant:** Consultant will serve in a part-time capacity as Financial Advisor (part-time hours = 80 hours or less per calendar month). Hours worked in such capacity will be actual approved hours.  In the event hours exceed part-time, Consultant's compensation will be re-evaluated and renegotiated at that time.

**Compensation:** Consultant will be paid $10,000.00 per month as long as Consultant is acting as a financial advisor for the Company.  Also, in material good faith, Consultant will be awarded a Success Fee equal to the greater of (1) $100,000, or (2) the amount equal to 100,000 multiplied by the value of one share of common stock if a merger, acquisition, restructuring or going private transaction; or if an equity infusion of at least $3 million is consummated during the consulting term described below under "Approximate commencement date" and "Approximate termination date" or anytime during the three-month period ending after the termination date.  Payment of the Success Fee is due and payable at the close of the related transaction.

For purposes of the paragraph above, if an equity infusion is consummated for less than $3 million, value shall be equal to no less than the price at which the common stock is sold to the investors.  The Company's CEO may use his judgment to increase the success fee based on the contributions made by the Consultant.

Travel time to and from the primary place of business of Perseon in Salt Lake City (the "Perseon Office") will not constitute billable hours.  However, travel time to attend meetings and other events at locations other than the Perseon Office that is completed in the normal course of performing the services of Interim Financial Advisor will constitute billable hours.

The Company will reimburse Consultant for reasonable out-of-pocket expenses incurred by Consultant in connection with the performance of the Interim Financial Advisor services and supported by appropriate receipts and supporting documentation consistent with Company policy.

As long as Consultant is acting as a financial advisor for the Company, the Company will pay $245.00 per month towards Consultants COBRA premium. It is the Consultants responsibility to include this amount on the monthly invoice.

**Approximate commencement date: September 21, 2015**

**Approximate termination date: March 21, 2016**

This Statement of Work is subject to the covenants, terms, and provisions of Consulting Agreement executed by both parties with an effective date of _September 21, 2015_ .

ACCEPTED AND AGREED TO:

**PERSEON CORPORATION**

By: _____
   Name: _____
   Title: _____

Date: _____10/21/15_____

Address:  2188 W 2200 S
          Salt Lake City, UT 84119

**CONSULTANT**

By: _____
   Name: _David Green_
   Title: _Financial Advisor_

Date: _____10/21/15_____

Address: 2174 Preston St
        Salt Lake City, UT 84106

# **EXHIBIT D**

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT is made effective as of <u>September 21, 2015</u> by and between the following:

PERSEON CORPORATION                              David Green
2188 West 2200 South               and           2174 Preston Street
Salt Lake City, UT 84119                         Salt Lake City, UT
(the "<u>Company</u>")                                    ("<u>Consultant</u>").

In consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, Perseon Corporation (the "Company") and Consultant agree as follows:

1.      <u>Consulting</u>.  The Company hereby engages Consultant to perform, and Consultant hereby agrees to perform consulting services ("<u>Consulting Services</u>") for the Company from time to time.  The specific services to be provided to the Company will be determined on an assignment-by-assignment basis by agreement of the parties.  For each assignment, the parties will use a Statement of Work, in the form attached hereto as <u>Exhibit A</u> (each a "<u>SOW</u>"), to stipulate the services that the Company has requested and that Consultant has agreed to perform.  Each SOW will be governed by and subject to the terms and conditions of this Agreement, provided if the specific terms of any engagement conflict with the terms of this Agreement, the express terms in the SOW will control.  Nothing in this Agreement shall obligate either party to enter into any particular SOW.

2.      <u>Term</u>.  The term of any particular engagement will be governed by the applicable SOW.  The term of this Agreement will continue until terminated by either party on no less than thirty (30) days' prior written notice to the other party; provided this Agreement shall remain effective as to any SOW outstanding at the time a notice of termination has been provided until completion of the engagement specified in the SOW.

3.      <u>Compensation</u>.  The Company shall pay Consultant for billable hours worked in performing the Consulting Services (billable hours shall be actual approved hours during which the Consultant is performing the services and shall not include any travel time, unless specifically noted in advance in the SOW) (a) at the rate indicated in the applicable SOW and (b) within 10 days of the Consultant submitting an invoice after the last day of each calendar month during which the applicable Consulting Services are performed.  The Company also will reimburse Consultant for reasonable out-of-pocket expenses incurred by Consultant in connection with the performance of the Consulting Services, to the extent such expenses are specified in the applicable SOW or otherwise pre-approved by the Company and, in each case, supported by the appropriate receipts and supporting documentation. Consultant is required to complete and submit a W-9 form to Company accounting department (form is attached, or is available on-line) and any other requested and reasonable documentation prior to compensation being paid by the Company.

4834-6478-4937\3

4.     Relationship of Parties.

(a)     Consultant is an independent contractor and is not an agent or employee of, and has no authority to bind, the Company by contract or otherwise.  Consultant will perform the Consulting Services under the general direction of the Company, but Consultant will determine, in Consultant's sole discretion, the manner and means by which the Consulting Services are accomplished, subject to the requirement that Consultant shall at all times comply with applicable law.

(b)     The Company has no right or authority to control the manner, method, means, or details by which the Consulting Services are accomplished, including the determination of the need for and hiring of assistants, subcontractors, or employees at the Consultant's own expense.  The Company may not control, direct, or otherwise supervise Consultant's assistants, subcontractors, or employees in the performance of those services.

(c)     Consultant will supply all tools, equipment, and supplies required to perform the Consulting Services under this Agreement.

(d)     Consultant will report as self-employment income all compensation received by Consultant pursuant to this Agreement.  Consultant will be responsible to pay his own withholding taxes, social security taxes, unemployment taxes, and similar items in connection with compensation received by Consultant pursuant to this Agreement.  Consultant will not be entitled to receive any vacation or illness payments, or to participate in any plan, arrangement, or distribution by the Company pertaining to any bonus, profit sharing, equity incentive, insurance or similar benefits for Company employees.

(e)     In the performance of this Agreement, Consultant shall comply with all applicable laws and maintain all required licenses.

(f)     The Company shall name the Consultant as an insured party under the Company's Director & Officer insurance policy and any other insurance policy held by the Company.  The Company will also extend to Consultant protections and reimbursement for the costs for the Consultant to defend himself, consistent with the Company's practice or policy extended to its other officers and directors, when and if any party brings a lawsuit or other complaint against Consultant for actions performed by the Consultant while performing the Consulting Services.

(g)     The Company is not responsible for providing workers' compensation insurance for Consultant or Consultant's employees or agents.

5.     Protection of Information.

(a)     Consultant recognizes that during the course of performing the Consulting Services hereunder Consultant may be exposed to confidential business information or trade secrets of the Company and/or its customers (the "Customers").  Accordingly, during the term of this Agreement and thereafter, Consultant shall hold all such information in strictest confidence and shall not directly or indirectly publish, communicate, divulge, use or disclose, for its own benefit or for the benefit of any third party, any such confidential business information or trade

secrets, except as necessary in connection with Consultant's performance of the Consulting Services.

(b)     Such confidential business information and trade secrets (including, without limitation, any such materials developed by Consultant for the Company and/or its Customers in connection with the performance of the Consulting Services) are and shall remain the property of the Company and/or its Customers, as applicable, and upon termination or expiration of this Agreement Consultant shall deliver to the Company all records, data, information, and other computer or other media or documents produced or acquired during the performance by Consultant of the Consulting Services and all copies thereof.

(c)     The covenants and obligations of confidentiality herein shall not apply with respect to information that is (i) available to Consultant from third parties on an unrestricted basis; or (ii) disclosed by the Company and/or its Customers, as applicable, to the general public on an unrestricted basis.

(d)     Consultant agrees to execute, upon the Company's request, such supplemental confidentiality and nondisclosure agreements as may be required by the Company's clients in connection with the performance of its Consulting Services.

6.     <u>Property of the Company</u>.

(a)     If, at any time or times, during the term of this Agreement, Consultant shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any invention, creation, modification, discovery, concept, idea, design, development, improvement, innovation, machinery, equipment, process, software program, documentation, data, technique, know-how, trade secret or other intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes) (collectively, "<u>Developments</u>"), that (i) relates to the business of the Company or any Customer of the Company or any of the products or services being developed, produced or sold by the Company or any Customer of the Company or which may be used in relation therewith; (ii) results from tasks assigned or information disclosed to Consultant by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then Consultant shall promptly disclose to the Company each such Development, and all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns as "works made for hire" pursuant to the United States Copyright Act (17 U.S.C. Section 101, *et seq.*) or other applicable law.  To the extent any Developments are not deemed "works made for hire", Consultant shall assign, and hereby does assign, any and all right, title and interest in and to the Developments (including, but not limited to, rights to any inventions, patentable subject matter in the Developments and all benefits and/or rights resulting therefrom) to the Company and its assigns without additional compensation, and shall communicate to the Company, without cost or delay, and without disclosing to others the same, all valuable information relating thereto (with all necessary plans or models).  At the Company's request and expense, Consultant shall execute such documents as the Company deems necessary or desirable to vest in the Company sole and exclusive title to, or to otherwise secure and protect the Company's rights in, such Developments (and in all related trademarks, copyrights and/or patent rights), and

Consultant shall provide such assistance (including, without limitation, acting as a witness) as may be deemed necessary by the Company to apply for, defend or enforce any United States and foreign letters patent, trademarks or copyrights based upon or related to such Developments, as well as all reissues, renewals, and extensions thereof. If the Company is unable, as a result of inability to locate Consultant after a reasonably diligent effort, as a result of the death or incapacity of Consultant, or as a result of the refusal of Consultant, to secure Consultant's signature on any documents, applications, letters patent, copyright or other analogous protection relating to Developments or other proprietary rights, Consultant hereby irrevocably designates and appoints the Company, by its duly authorized managers and agents, as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf and stead to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright, or other analogous protection thereon with the same legal force and effect as if executed by Consultant.

(b)     If, at any time or times during the term of this Agreement, Consultant shall incorporate into a Company product, process or machine any Developments that Consultant, alone or jointly with others, conceived, developed or reduced to practice (or caused to be conceived, developed or reduced to practice) prior to the effective date of this Agreement (collectively, "Prior Developments"), the Company shall immediately be granted and shall have (without the necessity of any writing) a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have, modify, use and sell such Prior Developments. Notwithstanding the foregoing, Consultant agrees that Consultant will not incorporate, or permit to be incorporated, Prior Developments in any Company product, process or machine in violation of any existing confidentiality agreement that applies to Consultant or without the Company's prior written consent.

7.     Nonsolicitation.  During the term of this Agreement and for a period of one (1) year thereafter, Consultant shall not, directly or indirectly, (a) solicit or induce (or assist or encourage any third party to solicit or induce) any Company employees or consultants to leave employment with the Company or otherwise cease performing services for the Company, or (b) call on, solicit, divert or take away (or attempt to divert or take away) any Customers or prospective customers of the Company upon whom Consultant called, solicited, catered or became acquainted in the course of providing the Consulting Services hereunder or any of the business of such Customers or prospective customers or clients with the Company.

8.     Indemnification.  The Company shall indemnify and hold harmless the Consultant and, as applicable, its shareholders, directors, members, managers, employees and agents against all liabilities, suits, claims, damages, losses and expenses, including reasonable attorneys' fees (hereinafter, "Losses"), that arise out of, result from or are related to (a) any breach by the Company of any covenant or agreement set forth in, or legally owed under, this Agreement; or (b) any act by the Company that compromises the Consultant's industry or professional standing and reputation, including, but not limited to, Losses directly associated with investigations by state or federal regulatory agencies and civil or criminal investigations or proceedings arising from conduct by the other party.

9.      General Provisions.

(a)     All notices required or permitted hereunder shall be given to the parties at the respective addresses first shown above, including a copy via email to the Consultant. Such notices shall be effective when delivered to the appropriate address by hand or by national overnight delivery service (with receipt confirmed), or three (3) days after the date of mailing if sent by registered or certified mail to the appropriate address.

(b)     The covenants and agreements set forth in Sections 5 (Protection of Information), 6 (Property of Company), 7 (Nonsolicitation), 8 (Indemnification) and 9 (General Provisions) shall survive the termination of this Agreement for any reason whatsoever.

(c)     This Agreement contains the entire understanding and contract between the parties with respect to the subject matter hereof and there are no agreements, covenants or undertaking other than those expressly set forth herein.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of Utah, without regard to the applicable principles of conflicts of law. Any legal action to enforce or construe any provision of this Agreement must be brought only in a state or federal court located in Salt Lake County, State of Utah, and all parties hereby submit to the personal jurisdiction and venue of such courts.

(e)     If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable for any reason, such provision will be deemed to apply only to the maximum extent permitted by law, and the remainder of this Agreement shall remain valid and enforceable in accordance with its terms.

(f)     This Agreement (which is for personal services) may not be assigned, in whole or in part, by Consultant without the Company's prior written consent. Any assignment or attempted assignment by Consultant in contravention of this prohibition shall be void and of no effect.

(g)     This Agreement may not be amended or modified except by the mutual written agreement of the parties.

(h)     No rights in favor of any person other than the parties to this Agreement will be created, implied or inferred from the provisions of this Agreement.

(i)     No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of obligations hereunder by such other party hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights hereunder.

(j)     The parties hereto each covenant and agree that if, at any time after the execution of this Agreement, any of the parties shall reasonably consider and be advised that any further actions, assignments or assurances are necessary or desirable to carry out the intent and accomplish the purposes of this Agreement, according to its terms, all the other parties will take such actions, execute and make all such assignments and assurances and do all things necessary or appropriate to carry out the intent and accomplish the purposes of this Agreement or otherwise consummate the transactions contemplated by this Agreement according to its terms.

(k)     The headings in this Agreement have been inserted for reference and as a matter of convenience only and in no way define, limit or enlarge the scope or meaning of this Agreement or any provision hereof.

(l)     Neither party shall be liable to the other for any alleged loss or damage resulting from any delay of performance caused by acts of the other, acts of civil or military authority, governmental priorities, earthquake, fire, flood, epidemic, quarantine, energy crisis, strike, labor trouble, war, riot, accident, shortage, delay in transportation, or any other causes beyond the reasonable control of the delayed party.

(m)     Nothing in this Agreement shall be construed as causing the parties to be treated as partners or joint venturers. Neither party shall have the right to enter into a contract or incur any obligation on behalf of the other party.

(n)     This Agreement may be executed in any number of counterparts, and each such counterpart will be deemed to be an original instrument, but all such counterparts together will constitute but one agreement. Signatures transmitted via facsimile transmission or email (pdf) will be considered the same as original signatures. Each person executing this Agreement in behalf of an entity represents and warrants that he/she has been duly authorized to execute and deliver this Agreement, acting for and in behalf of that entity, as a contract binding on that entity.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the effective date first shown above.

PERSEON CORPORATION

By: _____
     Name:_____
     Title:_____

CONSULTANT:

_____
David Green

**EXHIBIT A**

**Form of
Statement of Work**

**Project Name: Restructure, Sale, Liquidation & Wind Down**

**Services to be provided by Consultant:** Consultant will serve as an advisor to the Company under the supervision of the Chairman of the Board of Directors. Consultant will spend time in such capacity as is required to develop and execute a Board approved restructuring of the company's operations, support a sale of company assets and subsequent liquidation and wind down. The Company acknowledges that Consultant may work on other projects and assignments in a professional capacity simultaneous with this Statement of Work.

**Compensation:** Consultant will be paid $20,000.00 per month as long as Consultant is acting as an advisor for the Company. Also, in material good faith, Consultant will be awarded a cash Success Fee equal to 2.5% multiplied by the undiscounted gross value of the transaction if all or substantially all of the Company's stock or assets are sold or restructured, in one or multiple transactions, including in a sale of assets, merger, acquisition, financing or restructuring in any form involving one or more entities or investors during the consulting term described below under "Approximate commencement date" and "Approximate termination date," or anytime during the twelve-month period ending after the termination date. Payment of the Success Fee is due and payable in cash at the close of the related transaction. No portion of Consultant compensation will be discounted for any reason. Consultant acknowledges that he has been fully paid for work performed under the prior SOW and the Company does not owe any additional compensation to Consultant under the prior SOW, including relating to any fee to be paid upon the consummation of a merger, acquisition, restructuring, going private transaction or an equity infusion.

The Company will reimburse Consultant for reasonable out-of-pocket expenses incurred by Consultant in connection with the performance of this SOW and supported by appropriate receipts and documentation.

As long as Consultant is acting as an advisor for the Company, the Company will pay $750.00 per month towards Consultants COBRA premium. It is the Consultants responsibility to include this amount on the monthly invoice. Consultant is responsible for his own compliance with regard to securing health insurance as may be required under the Affordable Care Act. The Company makes no representations regarding the tax treatment of this payment.

**Approximate commencement date: December 22, 2015**

**Approximate termination date: June 30, 2016**

This Statement of Work is subject to the covenants, terms, and provisions of Consulting Agreement executed by both parties with an effective date of September 21, 2015.

ACCEPTED AND AGREED TO:

**PERSEON CORPORATION**                    **CONSULTANT**

By: _____       By: _____
    Name:  Tim McQuay                       Name:  David Green
    Title:    Chairman                       Title:    Consultant

Date: _____       Date: February 12, 2016

Address:  391 Chipeta Way, Suite F      Address:  2174 Preston Street
          Salt Lake City, UT 84108                Salt Lake City, UT  84106

Page 8 of 9

4834-6478-4937\3

This page is left blank.

4834-6478-4937\3

**Approximate termination date: June 30, 2016**

This Statement of Work is subject to the covenants, terms, and provisions of Consulting Agreement executed by both parties with an effective date of September 21, 2015.

**ACCEPTED AND AGREED TO:**

**PERSEON CORPORATION**

By: _(signature)_

Name: Tim McQuay

Title:　Chairman

Date:

Address: 391 Chipeta Way, Suite F
Salt Lake City, UT 84108

**CONSULTANT**

By: _(signature)_

Name: David Green

Title: Consultant

Date: February 12, 2016

Address: 2174 Preston Street
Salt Lake City, UT 84106

4834-6478-9573

---

execution of this Agreement, any of the parties shall reasonably consider and be advised that any further actions, assignments or assurances are necessary or desirable to carry out the intent and accomplish the purposes of this Agreement, according to its terms, all the other parties will take such actions, execute and make all such assignments and assurances and do all things necessary or appropriate to carry out the intent and accomplish the purposes of this Agreement or otherwise consummate the transactions contemplated by this Agreement according to its terms.

(k)　The headings in this Agreement have been inserted for reference and as a matter of convenience only and in no way define, limit or enlarge the scope or meaning of this Agreement or any provision hereof.

(l)　Neither party shall be liable to the other for any alleged loss or damage resulting from any delay of performance caused by acts of the other, acts of civil or military authority, governmental priorities, earthquake, fire, flood, epidemic, quarantine, energy crisis, strike, labor trouble, war, riot, accident, shortages, delay in transportation, or any other causes beyond the reasonable control of the delayed party.

(m)　Nothing in this Agreement shall be construed as causing the parties to be treated as partners or joint venturers. Neither party shall have the right to enter into a contract or incur any obligation on behalf of the other party.

(n)　This Agreement may be executed in any number of counterparts, and each such counterpart will be deemed to be an original instrument, but all such counterparts together will constitute but one agreement. Signatures transmitted via facsimile transmission or email (pdf) will be considered the same as original signatures. Each person executing this Agreement in behalf of an entity represents and warrants that he/she has been duly authorized to execute and deliver this Agreement, acting for and in behalf of that entity, as a contract binding on that entity.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the effective date first shown above.

**PERSEON CORPORATION**

By: _(signature)_

Name: Tim McQuay

Title: Chairman

**CONSULTANT**

By: _(signature)_

David Green

4834-6478-9573

# **EXHIBIT E**

**David A. Green, CPA**

---

## Executive Summary

- Seasoned executive with deep life science experience and a proven record of success in managing private, SEC registered and exchange listed companies.
- Experienced in developing, implementing and tracking strategic plans and key corporate initiatives for both large established and growing entrepreneurial companies.
- High operational competence with experience in strategy, M&A, business development, commercialization, sales management, forecasting, reimbursement, engineering, regulatory, quality, supply chain, manufacturing, contract negotiations, IT and HR.

## Executive Operating and Advisory Experience

**DAG Advisors,** Consultant
October 2014 to present
Applies executive management, operating experience and best practices to accelerate profitable growth, rationalize and restructure operations, close strategic transactions and enhance positioning.

- CFO for an SEC reporting clinical stage cell therapy and regenerative medicine company focused on financing alternatives for ALS and transverse myelitis clinical trials.
- Restructuring Consultant reporting to the BOD for an SEC reporting medical device company with a microwave ablation product line used by interventional radiologists and oncologists.  Executed a major operational restructuring, stabilized the business and conducting an asset sale in Chapter 11.
- Advised a VC financed genetic testing company on acquiring, financing and the operational integration of a CLIA certified lab.  The company delivers an integrated genetic testing, counseling, and developmental screening service to aid in the clinical evaluation of children with autism spectrum disorder (ASD) or other forms of developmental delay.

**Catheter Connections, Inc**., Chief Financial Officer and Co-Head of Sales Operations
February 2012 to October 2014, Salt Lake City, UT
CCI is a venture funded, commercialization stage, medical device company developing the $1 billion global market for IV infection prevention products.

- Developed business plan and financial model, raised $17.5 million of debt and equity.
- Led commercializing efforts for the DualCap system used by hospitals, clinics and in home-based health care settings to prevent bloodstream infections and CLSBSI.
- Managed revenue growth of 80x, from $50,000 to $4 million in three years.
- Designed a sales protocol that lowered cost and improved effectiveness in US hospitals.
- Developed from scratch and implemented operations, purchasing, inventory management and cost accounting processes that were focused on driving COGS to forecast targets, managing the cash burn rate and creating efficiencies.  Recruited, hired and trained staff.
- Negotiated and managed agreements with corporate partners, specialty distributors and GPO networks for US and global distribution.
- With COO, negotiated and managed manufacturing partners.  Oversaw start-up, scale-up and volume growth for manual and automated manufacturing lines in the US and China.

**David A. Green**

Page 2 of 3

---

**SJW Corp.,** Chief Financial Officer and Treasurer, 2008 to 2010, San Jose, CA

SJW Corp. *[NYSE: SJW, $1+ billion enterprise value]* is a large, complex holding company that operates one of the largest water systems in the U.S. serving a population of 1+ million in California's Silicon Valley.  SJW was founded in 1866.

- Planned and executed a strategy to fund more than $200M infrastructure CapEx and $36M shareholder dividends.  Increased Dividend Champion status to 48 consecutive years.
- Raised $165M of bank debt and long-term notes from life insurance companies, completed a $50M IPO of S&P "A" rated notes, and divested non-operating financial assets.
- Led cost cutting campaign, managed supply mix and production costs, and rationalized operating projects to maximized earnings and protect the dividend during the 2008-2009 Great Recession.  Completed three tuck-in acquisitions.
- Developed favorable revenue recognition and accounting treatment for complex regulatory mechanisms and capital investments.  Accelerated revenue and shifted $300M cost from the income statement to the balance sheet.
- Managed $1B balance sheet, $500M equity, $500M debt and $50M pension assets.
- Led Investor Relations messaging.  Drafted and delivered earnings releases, call scripts, dividend announcements and investor presentations.
- Recruited new Wall Street analyst coverage.  Maintained relationships with analysts, bankers and investors, and managed road show planning and execution activities.
- Led 22 person accounting group in multiple locations.
- Led implementation of an Oracle enterprise ERP and further automated business processes.
- Oversaw accounting closing procedures, financial statement preparation, and *SEC 10-K, 10-Q, 8-K* and proxy filings.

**Specialized Health Products International, Inc.,** Chief Financial Officer and Treasurer
2006 to 2008, Bountiful, UT

SEC reporting [OTC:  SHPI] and private equity backed medical device company that designs, develops, manufactures and markets vascular access products on a global basis.

- Managed the sale of SHPI to C.R. Bard [NYSE: BCR] for 3.25x Revenue and 14.2x EBITDA.
- Partnered with executive team to accelerate growth, enhance profitability and exit.
- Achieved 65+% revenue growth and expanded EBITDA margin 100% in two years.
- Integrated acquired competitor, The Med-Design Corporation *[NASDAQ: MEDC].*
- Strengthened financial reporting, implemented SOX controls to remediate a pre-existing material weakness and formalized the budgeting process.
- Implemented revenue and earnings forecasting, strategic planning and valuation assessment processes to improve management decision making.
- Improved working capital and inventory management by implementing controls, formalizing purchasing and collection procedures, improving cost accounting processes and reporting.
- Managed growing cash and investment balance in volatile capital markets.
- Conducted road show investor meetings, wrote and delivered call scripts and press releases.
- Assisted the Audit Committee, presented financial and M&A matters to the BOD, reviewed and certified SEC *10-Q, 10-K, 8-K,* and proxy filings.

**David A. Green**

Page 3 of 3

---

**Duff & Phelps, Inc**., Managing Director, Investment Banking
San Francisco, CA 2003 to 2006, Los Angeles, CA 1993 to 1998
Founded in 1932, Duff & Phelps is a global valuation and corporate finance advisory firm.

- Established Duff & Phelps' San Francisco office, headed Life Science investment banking, led business development and execution for a wide range of financial advisory engagements.
- Completed approximately 100 engagements for IPOs, M&A, financings, restructurings, ESOPs and corporate planning purposes. Performed complex financial analysis including NPV, IRR, valuation, ROC, M&A and credit analyses. Rendered transaction opinions, valuation advice, designed complex securities and executed transaction processes. Presented advice and findings to Boards of Directors and senior management teams in formal settings.
- Clients included Fortune 1000, private equity and venture companies across a broad spectrum of industries and regulatory agencies (SEC, NYSE, NASDAQ, DCAA and IRS).
- Promoted from Associate, to Senior Associate, to Vice President to Managing Director.

**Ernst & Young, LLP,** Senior Manager Strategic Finance, CENTER FOR STRATEGIC TRANSACTIONS®
Palo Alto, CA, 1998 to 2001

- Founding member of the Palo Alto *Center for Strategic Transactions*, an EY management consulting practice charged with designing and implementing strategies for CEOs to accelerate growth and create shareholder value.
- Strategies included identifying targets for strategic mergers and acquisitions, divesting non-strategic operations, restructurings and distressed M&A, and financing growth using the IPO market, private equity, venture capital and the debt markets.
- Completed approximately 50 engagements for clients ranging from Fortune 500 companies across a broad spectrum of industries to venture capital portfolio companies concentrated in technology, life science and medical technology industries.

## Board of Directors Experience

- **Dermatrends, Inc**., Audit Committee Chairman, Minneapolis, MN based drug delivery company
- **Golden Gate Triathlon Club,** Chairman, San Francisco based non-profit athletic organization

## Publication

Mooney, R.A. and Green, D.A. 1989. Insulin Receptor Dephosphorylation in Permeabalized Adipocytes in Inhibitable by Manganese and Independent of Receptor Kinase Activity.
Biochemical Biophysical Research Communications, 162, 1200-1206.

## Education

**University of Rochester**, Master of Business Administration, June 1990, Rochester, NY
Concentrations: Finance, Organizations & Markets

**State University of New York**, Bachelor of Science, May 1986, Brockport, NY
Concentrations: Chemistry, Math, Biology

**University of Utah**, CPA pre-requisite coursework, 2011-2012, Salt Lake City, UT
Concentrations: Accounting

**Minsk State Linguistic University**, Certificate of Completion, 2003, Minsk, Belarus
Concentrations: Russian Language and Culture