Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation*
*and Proposed Attorneys for Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>PERSEON CORPORATION,<br><br>Debtor. | Case No. 16-24435<br><br>Chapter 11<br><br>Judge R. Kimball Mosier |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO ASSUME DEBTOR'S MODIFIED EMPLOYMENT AGREEMENT WITH CLINTON E. CARNELL JR.

Pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C.

§§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of this Court, Perseon

Corporation ("Perseon" or "Debtor"), the debtor in possession in the above captioned bankruptcy

case, by and through its proposed counsel, submits this motion (the "Motion") for entry of an

Order authorizing the Debtor's assumption of that certain Employment Agreement dated

November 10, 2014, by and between the Debtor[1] and Clinton E. Carnell Jr. (as amended, the "Employment Agreement"), a copy of which is attached hereto as **Exhibit A**.  This Motion is supported by the Declaration of Timothy C. McQuay (the "McQuay Declaration") a copy of which is attached hereto as **Exhibit B**.  In further support of the Motion, the Debtor states as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 365, as well as Bankruptcy Rules 2002, 6004, and 6006.

**BACKGROUND**

*Prepetition Background*

3.      For decades Perseon has invested its resources in fighting humanity's worst disease: cancer.  During this time it has developed, produced, and brought to market many innovative medical technologies that have saved lives and improved outcomes for thousands of cancer sufferers around the world.

4.      Beginning in roughly 2013, Perseon began searching for either a strategic partner or an acquirer of its assets.[2]

---

[1]      The Employment Agreement is between BSD Medical Corporation and Mr. Carnell, but BSD Medical Corporation amended its certificate of incorporation to change its legal name to "Perseon Corporation" in February 2015.

[2]      *McQuay Declaration* at ¶ 4.

5.    In order to facilitate this sale or partnership the Debtor entered into the Employment Agreement with Mr. Carnell on November 10, 2014, following Mr. Carnell's election and appointment as CEO and President of the Debtor and Perseon's board of directors expressly relied on Mr. Carnell's extensive expertise to facilitate such a merger or sale.[3]

6.    On April 1, 2015, with Mr. Carnell at the helm, Perseon sold the assets associated with its hyperthermia cancer treatment systems to Pyrexar Medical, Inc. ("Pyrexar") in exchange for 19.9% of the Series A Preferred Shares of Pyrexar and a percentage of revenues that Pyrexar would receive from sales of the hyperthermia cancer treatment systems.[4]

7.    In July and August of 2015, with Mr. Carnell again guiding the Debtor, Perseon was able to complete an offering of common stock and warrants which netted approximately $4.3 million in proceeds to the Debtor.[5]

8.    On October 26, 2015, as a result of Mr. Carnell's exceptional efforts, Perseon and Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned subsidiary of Galil through a tender offer and merger (the "Merger").[6]

9.    On December 22, 2015, Galil terminated the Merger Agreement.[7]

---

[3]    *Id.* at ¶ 5.

[4]    *Id.* at ¶ 6.

[5]    *Id.* at ¶ 7.

[6]    *Id.* at ¶ 8.

[7]    *Id.* at ¶ 9.

10.     On December 23, 2015, Perseon terminated a substantial number of employees in order to materially reduce expenses and Mr. Carnell generously agreed to defer compensation to further conserve the Debtor's limited cash.[8]

11.     Immediately after Galil terminated the Merger Agreement, Mr. Carnell renewed and redoubled his efforts to find either a strategic partner or a purchaser for Perseon's assets in an attempt to maximize the value of those assets for the benefit of Perseon's constituents and to keep Perseon's life-saving technologies in the marketplace.[9]

12.     With Perseon's financial condition deteriorating rapidly, in an effort to raise cash, on February 22, 2016, Mr. Carnell negotiated a sale of the shares Perseon obtained from Pyrexar back to Pyrexar for a $1,000,000 purchase price.[10]

13.     Prior to the Petition Date, Mr. Carnell turned over every rock to attempt to locate additional financing for Perseon outside of bankruptcy, but unfortunately despite Mr. Carnell's efforts, Perseon was unable to locate such financing.[11]

*General Case Background*

14.     On May 23, 2016 (the "Petition Date") the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Court") thereby commencing the above-captioned "Chapter 11 Case."

---

[8]     *Id.* at ¶ 10.

[9]     *Id.* at ¶ 11.

[10]    *Id.* at ¶ 12.

[11]    *Id.* at ¶ 13.

15.    No trustee, examiner, or official committee of unsecured creditors has been appointed in this case.  The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

16.    A detailed discussion of the Debtor's history, description of its business and the events that led to its need for bankruptcy relief are set forth in the *Declaration of Clinton E. Carnell Jr. in Support of Chapter 11 Petition and First Day Motions* (the "Omnibus Declaration") which has been filed with the Court.[12]

17.    On May 24, 2016, the Debtor filed *Debtor's Motion for Orders Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 365, 503, and 507 and Fed. R. Bankr. P. 6004 and 6007: (I)(A) Authorizing Entry Into and Assumption of Asset Purchase Agreement, (B) Authorizing Bid Protections, (C) Authorizing Bidding Procedures and Auction, and (D) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing Sale of Assets; and (III) Granting Related Relief* [Docket No. 24] (the "Sale Motion").  The Sale Motion seeks Court approval of a sale of substantially all of the Debtor's assets through an asset purchase agreement (the "APA") to MedLink Technologies, LLC ("MedLink" or "Stalking Horse") for a total purchase price of $4,350,000.00, subject to higher and better offers at auction.

*The Employment Agreement*

18.    The following chart briefly summarizes certain material provisions of the Employment Agreement.  The chart is qualified by reference to the Employment Agreement attached hereto as **Exhibit A**, and each capitalized term in the following chart that is not

---

[12]    Docket No. 13.

otherwise defined in this Motion has the meaning ascribed to such term in the Employment

Agreement.

| Duties | Section 3 |
|--------|-----------|
| | The Executive's duties may include any or all of the following in accordance with the needs of the organization as determined from time to time by the Executive and the Board and taking into consideration the Company's available assets:<br><br>a. Maintain the Debtor as a viable operating business and deliver the Purchased Assets as defined in the APA, including the following responsibilities .<br>    i. recruit, train, manage and direct staff performing sales, manufacturing, inventory management, customer service, shipping & receiving, purchasing, facilities management, asset management, business development, quality control, regulatory and reporting duties;<br>    ii. retain and manage distribution partners in the US and Europe;<br>    iii. retain and manage critical and non-critical vendors;<br>    iv. set pricing and terms for the sale of products and services;<br>    v. report to the Board of Directors execute on directives;<br>    vi. manage financial institutions;<br>    vii. direct tax reporting and compliance activities;<br>    viii. forecast cash sources and uses, and recommend payments to-be-made to vendors, purchases of supplies and inventory, negotiate special customer requests and transaction terms;<br>    ix. manage and direct intellectual property attorneys that prosecute the company's patents, trademark and other intellectual property;<br>    x. maintain insurance policies and execute policy renewals; and<br>    xi. plan the business and financial integration of the Purchased Assets with the buyer's business entity;<br>    xii. fulfill responsibilities as the sole officer of a publicly traded company;<br>    xiii. manage relationship with the Stalking Horse |

on all aspects of the business integration;

    xiv.  manage communication with the Board and other constituents on status of the bankruptcy case;

    xv.  manage critical vendor relationship introductions with the Stalking Horse;

    xvi.  manage key employee, customer relationships with Stalking Horse;

    xvii.  manage performance of IP, obsolescence, critical employee, customer relations and CE Mark re-certification consistent with Stalking Horse requirements;

    xviii.  manage relationship with SunTrust Bank in directing diligence with bidders;

    xix.  manage necessary technical employee/former executive's enlistment on diligence requirements; and

    xx.  advise and direct CRC in areas where there's limited knowledge of the business.

  b.  Manage and assist the Licensee of the Debtor's technology with:

    i.  technology and know-how transfer;

    ii.  vendor introductions;

    iii.  IP prosecution;

    iv.  obsolete part management; and

    v.  inventory management.

  c.  Manage and execute the chapter 11 process including:

    i.  reporting;

    ii.  creditor meeting attendance;

    iii.  court appearances;

    iv.  cash forecast preparation;

    v.  preparing the corporation for a liquidation by discontinuing contracts for services for programs such as a 401(k) plan, health insurance, death and disability programs, technology services, consultant arrangements, facility shut-down, disposition of the assets remaining after the closing of the asset sale;

    vi.  gathering and providing due diligence information to prospective buyers and bidders, and discuss such materials with prospective buyers and bidders;

    vii.  assisting with transaction negotiations and structuring as such activities relate to prospective

|  |  |
|---|---|
|  | new bidders; and<br><br>    viii.  recommending payments to critical and non-critical vendors, differentiating between pre-petition and post-petition vendor invoices.<br><br>  d.  Communicate with various Debtor constituencies with regard to the strategic and bankruptcy plans of the company including:<br><br>    i.  employees;<br>    ii.  contract workers;<br>    iii.  customers;<br>    iv.  landlord;<br>    v.  regulatory bodies;<br>    vi.  vendors;<br>    vii.  shareholders;<br>    viii.  creditors;<br>    ix.  the Board of Directors;<br>    x.  the Bankruptcy Court and US Trustee; and<br>    xi.  taxing authorities. |
| ***Compensation:*** | ***Section 5.1***<br>In consideration of the Executive's services with respect to furthering the completion of a transaction for the sale of the Company or substantially all of the Company's assets and other services to the Company that meet any of the criteria set forth in Section 5.1(c)(1)-(iv) of this Amendment ("Sale"), the Executive shall be entitled to:<br><br>  a.  a success bonus equal to Six Hundred Thousand Dollars ($600,000) ("<u>Success Bonus</u>"), and<br><br>  b.  an additional amount equal to $250,000, which shall not depend upon the completion of a Sale ("<u>Executive Compensation</u>") (collectively "<u>Aggregate Compensation</u>").<br><br>  c.  The Success Bonus shall be deemed earned and accrued upon the completion of a Sale satisfying any of the following criteria:<br><br>    i.  One person (or more than one person acting as a group), corporation or other entity acquires ownership of stock of the Company that, together with the stock held by such person or group prior to such acquisition, constitutes more than fifty-percent (50%) of the total voting power of all of the issued and |

outstanding stock of the Company; or

ii. One person (or more than one person acting as a group), corporation or other entity acquires (or has acquired during the twelve-month period ending on the date of the most recent acquisition) ownership, directly or indirectly, of the Company's stock possessing thirty percent (30%) or more of the total voting power of all of the issued and outstanding stock the Company; or

iii. A majority of the members of the Board are replaced during any twelve-month period by directors whose appointment or election is not endorsed by 2/3 of the members of the Board of Directors as constituted before the date of such appointment or election; or

iv. The sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all the assets of the Company; or

v. Approval by stockholders of the Company of (i) any consolidation or merger of the Company in which the Company is not the continuing or surviving corporation or pursuant to which shares of stock of the Company would be converted into cash, securities or other property, other than a consolidation or merger of the Company in which holders of its common stock immediately prior to the consolidation or merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the consolidation or merger as immediately before.

d. The Success Bonus shall be a claim entitled to administrative priority pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, which the Company shall use good faith, diligent efforts to have confirmed by the bankruptcy court. The Success

<table>
<tr><td></td><td>

Bonus will be paid as follows:

    i.   Three Hundred Thousand Dollars ($300,000) shall be paid upon the closing of any Sale; and

    ii.   One Hundred Thousand Dollars ($100,000) to be paid on or about October 1, 2016; and

    iii.   One Hundred Thousand Dollars ($100,000) to be paid on or about December 1, 2016; and

    iv.   One Hundred Thousand Dollars ($100,000) to be paid on or about the date of the Court's confirmation of any plan in the Bankruptcy Case.

    e.   The Executive Compensation payable under Section 5.1 (b) shall be treated as a general unsecured claim in the Bankruptcy Case.

</td></tr>
</table>

| ***Termination:*** | ***Section 6.2*** |
|---|---|
| | Either the Executive or the Company may terminate the Executive's employment under this Agreement without Cause by giving the other party thirty (30) days written notice; provided, however, in consideration of the Executive's substantial efforts heretofore rendered with respect to pursuing and endeavoring to complete a Sale transaction, such termination for Cause shall not relieve Company of the obligation to pay the Executive the Aggregate Compensation pursuant to Section 5.1 of this Agreement, which shall be paid by Company to Executive in accordance with the terms of Section 5.1 notwithstanding any termination of this Agreement other than for Cause. |
| | For the purpose of this Amendment, "Cause" shall mean only the following: (a) the Executive's grossly negligent or willful misconduct in the performance of the Executive's duties that are set forth in Section 3 of the Agreement; (b) the Executive's willful commission of an act of fraud with respect to the Company or its property; (c) the Executive's conviction of a crime that constitutes a felony or a crime that constitutes a misdemeanor involving moral turpitude but only if such felony or applicable misdemeanor is work related, materially impairs the Executive's ability to perform his duties hereunder or results in material harm to the Company. |
| | Upon the occurrence of any act or omission that constitutes Cause for termination, the Company shall provide the Executive with written notice reasonably detailing such Cause and the Executive shall have |

|  | thirty (30) days to remedy such act or omission and, if not remedied within such thirty (30) day period, then Company shall have the right to terminate the Executive's employment. |
|  | For purposes of this Agreement, no conduct by the Executive will be deemed "willful" unless it is done by the Executive in bad faith or without reasonable belief that such conduct was in the best interest of the Company or was done in direct contradiction to written instructions or directions of the Company's Board. Any conduct based upon specific authority given pursuant to a resolution duly adopted by the Board, or upon the specific instructions of the Board, shall be conclusively presumed to be done by the Executive in good faith and in the best interest of the Company to the extent such conduct is in accordance with such specific authority or specific instructions. The termination of the Executive's employment shall not be deemed for Cause unless and until the Company delivers to the Executive a copy of a resolution duly adopted by the affirmative vote of at least two thirds (2/3) of the Board at a meeting of the Board called and held for that purpose (after reasonable notice is provided to the Executive and the Executive is given a reasonable opportunity, together with counsel, to be heard before the Board) finding that in the good faith opinion of the Board, the Executive was engaged in the conduct described in subsections (a), (b), (c) or (d) of this Section 6.2 and, where applicable, that any other applicable conditions described in such subsections have been met. |
|  | The Company hereby acknowledges and agrees that, notwithstanding anything to the contrary herein contained in this Agreement, termination for Cause shall only apply to the Executive's acts or omissions that take place from and after the date of this Amendment. |
|  | Upon termination by the Company for unremedied Cause, the Executive shall be entitled to be paid fifty percent (50%) of the Aggregate Compensation in consideration of the Executive's services prior to any such termination. |

## **RELIEF REQUESTED**

19.     By this Motion, the Debtor seeks entry of an Order authorizing the Debtor to assume the Employment Agreement as amended.

## ARGUMENT

**I.    THE DEBTOR'S ASSUMPTION OF THE EMPLOYMENT AGREEMENT SHOULD BE APPROVED**

20.    Ample authority exists for the approval of the Debtor's assumption of the Employment Agreement.  Section 363 of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business. In relevant part, section 363 of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

21.    In order to approve a use or sale of a debtor's assets outside the ordinary course of business, the debtor must show that: (a) a sound business reason exists for the sale or use; (b) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale or use terms and the Debtor's relationship with the buyer or acquirer; (c) the price is fair and reasonable; and (d) the proposed buyer or user is proceeding in good faith.  *See In re Med. Software Solutions*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).

22.    The decision to use assets outside the ordinary course of business is based upon the business judgment of the debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Adelphia Communications Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002).  If a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when

applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

23.     Here, assumption of the Employment Agreement meets all applicable parts of the test:

<u>*Sound Business Purpose*</u>.

24.     A "presumption of reasonableness" attaches to the decisions of those controlling a debtor's assets.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986). Here, the Mr. Carnell has been the Debtor's CEO and President since December of 2014.  Mr. Carnell was retained as CEO by Perseon's board of directors to facilitate a merger or to find a purchaser for the Debtor's assets based on Mr. Carnell's extensive expertise.[13]  During his tenure with Perseon, Mr. Carnell's exceptional efforts facilitated the sale of Perseon's hyperthermia assets to Pyrexar and attempted to consummate the Merger with Galil, but Galil unilaterally terminated the Merger Agreement.[14]

25.     Immediately after Galil terminated the Merger Agreement, Mr. Carnell, with the full support of Perseon's board, made the difficult decision to terminate the vast majority of

---

[13]     *McQuay Declaration* at ¶ 14.

[14]     *Id.* at ¶ 15.

Perseon's employees, but to continue operations at a sufficient level to allow Mr. Carnell to continue his efforts to market Perseon as a going concern.[15]

26.    At this time, in an effort to conserve the Debtor's limited cash reserves, Mr. Carnell generously agreed to defer the compensation he was entitled to receive under the Employment Agreement and Mr. Carnell has not received compensation from the Debtor since.[16]

27.    In the six month period since Galil terminated the Merger Agreement, through Mr. Carnell's exceptional efforts, Perseon has managed to maintain its sales figures, despite the fact that Perseon's workforce was reduced by more than 90%.[17]

28.    Also during the past six months, despite receiving other employment offers and without receiving any compensation, Mr. Carnell has worked tirelessly to locate a purchaser for Perseon's assets, which culminated in the Debtor's entry into the APA with the Stalking Horse.[18]

29.    Mr. Carnell continues to communicate with the Stalking Horse frequently to address all issues with the transaction.  He is the main point of communication between the Debtor and the Stalking Horse and he continues to move the transaction forward to the benefit of Perseon's creditor constituents.  The Stalking Horse is explicitly and specifically relying on Mr. Carnell for his expertise in delivering the Debtor's highly specialized life-saving cancer treatment products.[19]

---

[15]    *Id.* at ¶ 16.

[16]    *Id.* at ¶ 17.

[17]    *Id.* at ¶ 18.

[18]    *Id.* at ¶ 19.

[19]    *Id.* at ¶ 20.

30.     Mr. Carnell is essential to consummating the transaction with the Stalking Horse and in his absence it is uncertain whether the Stalking Horse will purchase Perseon's assets.[20]

31.     Mr. Carnell's services are critical to any disposition of assets and the confirmation of any chapter 11 plan in this case.  In that regard, on a go forward, post-petition basis, Mr. Carnell must do the following in order for the transaction contemplated under the APA to be consummated:

a.  Maintain the Debtor as a viable operating business and deliver the Purchased Assets as defined in the APA, including the following responsibilities .

i.  recruit, train, manage and direct staff performing sales, manufacturing, inventory management, customer service, shipping & receiving, purchasing, facilities management, asset management, business development, quality control, regulatory and reporting duties;

ii.  retain and manage distribution partners in the US and Europe;

iii.  retain and manage critical and non-critical vendors;

iv.  set pricing and terms for the sale of products and services;

v.  report to the Board of Directors and execute on directives;

vi.  manage financial institutions;

vii.  direct tax reporting and compliance activities;

viii.  forecast cash sources and uses, and recommend payments to-be-made to vendors, purchases of supplies and inventory, negotiate special customer requests and transaction terms;

---

[20]      *Id.* at ¶ 21.

   ix.   manage and direct intellectual property attorneys that prosecute the company's patents, trademark and other intellectual property;

   x.   maintain insurance policies and execute policy renewals; and

   xi.   plan the business and financial integration of the Purchased Assets with the buyer's business entity;

   xii.   • fulfil/8l responsibilities as the sole officer of a publicly traded company;

   xiii.   • manage relationship with the Stalking Horse on all aspects of the business integration;

   xiv.   • manage communication with the Board and other constituents on status of the bankruptcy case;

   xv.   • manage critical vendor relationship introductions with the Stalking Horse;

   xvi.   • manage key employee, customer relationships with Stalking Horse;

   xvii.   • manage performance of IP, obsolescence, critical employee, customer relations and CE Mark re-certification consistent with Stalking Horse requirements;

   xviii.   • manage relationship with SunTrust Bank in directing diligence with bidders;

   xix.   • manage necessary technical employee/former executive's enlistment on diligence requirements; and

   xx.   • advise and direct CRC in areas where there's limited knowledge of the business.

    b.  Manage and assist the Licensee of the Debtor's technology with:

        i.  technology and know-how transfer;

        ii.  vendor introductions;

        iii.  IP prosecution;

        iv.  obsolete part management; and

        v.  inventory management.

    c.  Manage and execute the chapter 11 process including:

        i.  reporting;

        ii.  creditor meeting attendance;

        iii.  court appearances;

        iv.  cash forecast preparation;

        v.  preparing the corporation for a liquidation by discontinuing contracts for services for programs such as a 401(k) plan, health insurance, death and disability programs, technology services, consultant arrangements, facility shut-down, disposition of the assets remaining after the closing of the asset sale;

        vi.  gathering and providing due diligence information to prospective buyers and bidders, and discuss such materials with prospective buyers and bidders;

        vii.  assisting with transaction negotiations and structuring as such activities relate to prospective new bidders; and

viii.    recommending payments to critical and non-critical vendors, differentiating between pre-petition and post-petition vendor invoices.

d.  Communicate with various Debtor constituencies with regard to the strategic and bankruptcy plans of the company including:

i.    employees;

ii.    contract workers;

iii.    customers;

iv.    landlord;

v.    regulatory bodies;

vi.    vendors;

vii.    shareholders;

viii.    creditors;

ix.    the Board of Directors;

x.    the Bankruptcy Court and US Trustee; and

xi.    taxing authorities.[21]

32.    Mr. Carnell has the full and unwavering support of Perseon's board of directors, who recognize Mr. Carnell's efforts are essential to consummating the sale transaction with the Stalking Horse, which will allow Perseon's cancer treatment technologies to continue to save lives. Because Mr. Carnell is essential to the sale process, Perseon's board of directors decided

---

[21]    *Id.* at ¶ 22.

to enter into an amended Employment Agreement with Mr. Carnell to reaffirm both parties' obligations and commitments.[22]

33.    Pursuant to the original version of the Employment Agreement, Mr. Carnell is entitled to receive the following amounts:

    a.    $175,000, as of June 30, 2016, for the six months of salary that Mr. Carnell deferred;

    b.    $150,000 as a bonus for 2015, which Mr. Carnell did not receive;

    c.    $75,000, as of June 30, 2016, as the pro rata portion of Mr. Carnell's bonus for work performed by Mr. Carnell in 2016; and

    d.    $700,000 upon the change in control that will occur if the transaction contemplated in the APA is consummated.[23]

34.    Thus, pursuant to the original Employment Agreement, as of the closing of the transaction contemplated in the APA, Mr. Carnell would be entitled to receive $1.1 million in deferred compensation, bonuses, and severance payments upon the closing of the sale of the Debtor's assets.[24]

35.    Perseon's board of directors recognizes that Mr. Carnell's services are irreplaceable and that they owe a fiduciary duty to Perseon's creditors.  Consequently, in the business judgment of both Perseon's board and Mr. Carnell, the parties have agreed to amend and restate Mr. Carnell's Employment Agreement, which effectively reduces Mr. Carnell's compensation to the following amounts:

---

[22]    *Id.* at ¶ 23.

[23]    *Id.* at ¶ 24.

[24]    *McQuay Declaration* at ¶ 25.

a. $600,000 as a claim entitled to administrative priority pursuant to Section 503(b)(1)(A) of the Bankruptcy Code to be paid in the following amounts: (i) $300,000 upon closing of the sale, which is anticipated to be on or about August 1, 2016; (ii) $100,000 on or about October 1, 2016; (iii) $100,000 on or about December 1, 2016; and (iv) $100,000 upon the Court's confirmation of the any plan in the Chapter 11 Case; and

b. $250,000 as a general unsecured claim.[25]

36.     This amendment to the compensation structure in the Employment Agreement will save the Debtor at least $250,000 and at least $100,000 in claims entitled to administrative priority.[26]

37.     Accordingly, amending, restating, and assuming the Employment Agreement is in the best interests of Perseon's constituents.[27]

### *Notice is Adequate*

38.     Second, this Motion will be served on all of the parties who have made an appearance in this case.

39.     Accordingly, the Debtor submits that the above notice procedures are fair, reasonable, and afford notice as required under the Bankruptcy Code under the circumstances.

### *Fair and Reasonable Consideration*

40.     As described above, the Debtor's assumption of Mr. Carnell's amended Employment Agreement and the concessions made by Mr. Carnell represent fair and reasonable

---

[25]     *Id.* at ¶ 26; *see* **Exhibit A**.

[26]     *Id.* at ¶ 27.

[27]     *Id.* at ¶ 28.

consideration that was derived from arms-length negotiation between Mr. Carnell and Perseon's board of directors.[28]   Assuming the amended Employment Agreement will reduce the compensation owed to Mr. Carnell by at least $250,000 for the benefit of Perseon's creditors.[29]

### *Good Faith*

41.     Although the Bankruptcy Code does not define "good faith," the Tenth Circuit has determined, in the context of 11 U.S.C. § 363(m), that a "good faith" purchaser is "one that buys in good faith, and for value."  *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F.2d 301, 304 (10th Cir. 1983).

42.     Here, Mr. Carnell's agreement to reduce the amounts owed to him by the Debtor under the original Employment Agreement by at least $250,000 represents a good faith payment for value.[30]

## II.   THE DEBTOR'S ASSUMPTION OF THE EMPLOYMENT AGREEMENT IS APPROPRIATE

43.     A debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease[.]" 11 U.S.C. § 365(a). A debtor may not assume an executory contract or unexpired lease under which there is an existing default unless the debtor:

a.   cures, or provides adequate assurance that [it] will promptly cure, such default . . ;

b.   compensates, or provides adequate assurance that [it] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

---

[28]     *Id.* at ¶ 29.

[29]     *Id.* at ¶ 30.

[30]     *Id.* at ¶ 31.

c.   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

44.     A debtor's decision to assume or reject an executory contract under section 365 is governed by the business judgment standard.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that section 365 is traditionally subject to the "business judgment" standard; *Orion Pictures Corp v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (stating that section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject"); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) ("A bankruptcy court reviewing a trustee's decision to assume or reject an executory contract should apply its 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.").  Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract would benefit the debtor's estate.  *See In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005) ("A court 'should defer to a debtor's decision that rejection of a contract would be advantageous.'") (quoting *In re Sundial Asphalt Co.*, 147 B.R. 72, 84 (E.D.N.Y. 1992)); *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor….Courts should generally defer to debtor's decision whether to reject an executory contract.").  The "business judgment" test merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the Debtor's estate.  *See, e.g., Bregman v. Meehan (In re Meehan)*,

22

59 B.R. 380, 385 (E.D.N.Y. 1986) ("The primary issue under the business judgment test is whether rejection of the contract would benefit general unsecured creditors."); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must establish that rejection will benefit the estate.").

45.     Here, as described above, the Debtor's assumption of the modified Employment Agreement will reduce the amount owed to Mr. Carnell by at least $250,000.   Accordingly, assuming the Employment Agreement as modified is in the best interests of the Debtor's estate.[31] Consequently the Court should find that this requirement has been met.

---

[31]     *Id*. at ¶ 30.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests the entry of an Order authorizing the

Debtor to assume the amended Employment Agreement.

DATED this 27th day of June, 2016.

**DORSEY & WHITNEY LLP**

*/s/ Steven T. Waterman*
Steven T. Waterman
Michael F. Thomson
Jeffrey M. Armington

*Proposed Attorneys for Debtor Perseon*
*Corporation*

# **EXHIBIT A**

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made and shall be effective as of November 10, 2014 (the "Effective Date"), by and between **BSD Medical Corporation**, a Delaware corporation ("BSD" or the "Company"), and **Clinton E Carnell Jr.**, an individual and resident of the state of Utah (the "Executive"). The Company and the Executive are referred to herein collectively as the "Parties" and may be referred to herein individually as a "Party".

## RECITALS:

A.      The Executive has, since November 10, 2014, served as the duly elected and appointed President and Chief Executive Officer ("CEO") of the Company.

B.      The Executive has also served as a member of the Board of Directors of the Company (the "Board") since November 10, 2014.

C.      The Company desires to continue the Executive's employment as President and CEO on the terms and conditions set forth herein.

D.      The Executive is willing to continue his employment with the Company in the positions as President and CEO, and is also willing to continue to serve as a member of the Company's Board, all on the terms and conditions set forth herein.

E.      On or about November 10, 2014, the Parties also executed a Notice of Grant of Stock Option (the "Option Agreement").

## AGREEMENT:

NOW THEREFORE, in consideration of the foregoing Recitals and the covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      **Employment**. The Company hereby hires and engages the Executive as a full time employee of BSD in the position of President and CEO of BSD, and the Executive accepts such employment. In such capacities, the Executive shall be subject to the terms and conditions of this Agreement, serve at the pleasure and direction of the Board of Directors of the Company, and shall have such duties, authority and responsibilities as are consistent with and customary for the Executive's positions as President and CEO of a public company. Additionally, the Executive will continue to serve as a member of the Board, so long as he is duly elected or appointed to so serve.

2.      **Term**. The Executive's employment hereunder shall continue from and after the Effective Date until terminated in accordance with the applicable provisions of this Agreement (the "Term").

3.      **Duties**. During the Term the Executive shall devote substantially all of his business time and attention to the performance of his duties hereunder and will not engage in any other

business, occupation or profession for compensation which would materially interfere or conflict with such duties. Notwithstanding the foregoing sentence or anything else to the contrary in this Agreement, BSD hereby acknowledges that the Executive is currently obligated contractually to provide up to five (5) hours per week of consulting services for the Executive's prior employer, MyoScience, Inc., through August 31, 2015, and BSD hereby approves such continued consulting services. The Executive will report to the Board of Directors and will have such additional duties as may reasonably be assigned to him from time to time by the Board. The Executive will be expected to work at least 40 hours per week and generally will be asked to devote such time to his duties as is necessary to perform them to the best of his ability. Because this is an exempt position, the Executive will not be paid overtime compensation when he works more than 40 hours per week. The Company acknowledges that the Executive may, in the future, serve as a director, as a trustee or in a similar position with one or more other entities provided that such positions do not materially interfere with Executive's duties to BSD. Any fees or other compensation received by the Executive for services as a director, or as a trustee or in a similar position with another entity, shall be retained by the Executive. The Executive may also engage in such charitable, civic and community endeavors during the Term as he shall reasonably deem appropriate.

4.      **Place of Performance**.  The principal place of the Executive's employment shall be BSD's principal executive offices, located at 2188 West 2200 South, Salt Lake City, Utah; provided that the Executive may be required to travel on Company business from time to time during the Term, but in no event will the Executive be required to travel on business for the Company in excess of **100** days during any calendar year of the Term (which may be prorated for the portion of calendar year 2014 and the portion of the last calendar year of the Term).

5.      **Compensation.**

5.1      **Base Salary**.

        (a)      The Company shall pay the Executive an annual base salary at the rate of $350,000, in periodic installments in accordance with the Company's customary payroll practices, but no less frequently than monthly. The Executive's base salary shall be reviewed at least annually by the Compensation Committee of the Board, and the Board may increase (but not decrease) the base salary of the Executive during the Term. The Executive's base salary is also subject to adjustment under Section 5.1(b) below. The Executive's annual base salary, as in effect from time to time during the Term is referred to herein as the "Base Salary".

        (b)      If BSD completes and closes in fiscal year 2015 an equity offering that generates to BSD at least $5 million in net proceeds (i.e. after BSD's actual, reasonable and customary, direct, out-of-pocket expenses [excluding overhead charges]), then BSD shall engage a compensation consulting firm (selected by the Compensation Committee of the Board) in fiscal year 2015, such as Radford or a similar firm, and obtain from that firm, at the conclusion of fiscal year 2015, a study/survey of chief executive officer compensation in companies comparable to BSD (the "Compensation Study"). This Compensation Study shall then serve as a basis to determine and negotiate overall

compensation (including Base Salary) for the CEO for fiscal years after August 31, 2015; provided, however, in no event shall Executive's Base Salary be reduced.

If BSD does not complete and close an equity offering as described above in fiscal year 2015, then BSD shall engage the compensation consulting firm (selected by the Compensation Committee of the Board) in fiscal year 2016 and obtain a Compensation Study from that firm at the conclusion of fiscal year 2016 . This Compensation Study shall then serve as a basis to determine and negotiate overall compensation (including Base Salary) for the CEO for fiscal years after August 31, 2016; provided, however, in no event shall Executive's Base Salary be reduced.

5.2    **Bonuses**.

(a)    On the first anniversary of the Effective Date, and subject to the Executive's continued employment with BSD, BSD shall pay the Executive a bonus of $150,000.

On the second anniversary of the Effective Date, and subject to the terms and conditions of a bonus program to be determined by the Board of Directors, after reasonable consultation with the Executive (the "Year Two Bonus Program"), BSD shall pay to the Executive a performance bonus of $150,000, or a pro rata portion thereof, as will be set forth in the Year Two Bonus Program.

(b)    However, each performance bonus is subject to adjustment based upon the Compensation Study, as referenced in Section 5.1(b) above; provided, however, in no event shall the Executive's second anniversary bonus be less than $150,000.

(c)    In addition to the bonus amounts set forth in Sections 5.2(a) and 5.2(b) of this Agreement, the Executive shall be entitled to participate in and be considered for any annual incentive bonus program adopted or implemented by the Company for its executive or "Named Executive" officers and shall be entitled to receive, in addition to the Base Salary, any incentive bonus which may be awarded to the Executive by the Board from time to time. Any annual incentive bonus awarded to the Executive by the Board shall be paid (and may not be deferred) to the Executive within forty five (45) days of the date such incentive bonus is approved by the Board.

5.3    **Stock Based Compensation**.    The Executive will be awarded a nonqualified stock option to purchase 1,400,000 shares of BSD's common stock, representing approximately 3.5% of the currently issued and outstanding common shares.  This option is intended as an inducement option under NASDAQ Listing Rule 5635(c)(4).  The exercise price per share will be equal to the fair market value per share on the date the option is granted, the effective date of which date will be on or near the Effective Date of this Agreement. The option will be outside of any existing equity incentive plans of BSD and will be subject to the terms and conditions of the Option Agreement. Subject to the Executive's continued employment, the option will vest under the Option Agreement one-third each year on the first, second and third anniversaries of the Effective Date. If there is any inconsistency between the terms of this Agreement and the terms of the Option Award, the terms of this Agreement shall be controlling.  In conjunction with

BSD's next round of equity financing following the Effective Date, BSD will award an additional stock option to the Executive (for common shares), to enable the Executive to maintain, via the Executive's options, the right to purchase approximately 3.5% of the then-issued-and-outstanding common shares following such round of equity financing. However, the options described herein are subject to adjustment based upon the Compensation Study, as referenced in Section 5.1(b) above; provided, however, in no event shall the amount of shares subject to such option be less than 3.5% of the then-issued-and-outstanding common shares following such round of equity financing.

5.4     **Employee Benefits**.   During the Term, the Executive shall be entitled to participate in all employee benefit plans, practices and programs maintained by the Company for its employees including, without limitation, it most senior executives, as in effect from time to time (collectively the "Employee Benefit Plans"). The Company reserves the right to amend or terminate any Employee Benefit Plans so as to eliminate, reduce or otherwise change any benefit payable thereunder, so long as such change complies with the terms of such Employee Benefit Plans, and applicable law, and so long as such change similarly affects all of the Company's most senior executive level employees.

5.5     **Vacation**.   During the Term, the Executive shall be entitled to paid vacation per fiscal year (pro-rated for partial years) in accordance with the Company's vacation policies, as in effect from time to time. Any vacation days to which the Executive is entitled during any fiscal year and which are not actually used by the Executive, for any reason, shall carry over to the next succeeding fiscal year and may be used in addition to, and not in limitation of, the vacation days to which the Executive is entitled in such successive fiscal year.

5.6     **Business Expenses**.   The Executive shall be entitled to reimbursement for all reasonable out-of-pocket business, entertainment and travel expenses incurred by the Executive in connection with the performance of the Executive's duties hereunder in accordance with, and subject to compliance with, the Company's expense reimbursement policies and procedures.

5.7     **Legal Fees incurred in Negotiating this Agreement**.   The Company shall pay, or the Executive shall be reimbursed for, the legal fees incurred in negotiation and drafting this Agreement up to a maximum of $ 5,000 and such payment shall be made within forty five (45) days of the Effective Date.

5.8     **Tax Withholdings**.   All compensation payable to the Executive, including without limitation any Severance Payments, shall be subject to applicable Federal and state withholding taxes.

5.9     **Indemnification.**

        (a)     In the event that the Executive is made a party, or threatened to be made a party, to any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), arising from the Executive's acts or omissions made in the course of Executive carrying out his duties for the Company or otherwise by reason of the fact that the Executive is, or was, a director or officer of the Company or is, or was, serving, at the request of the Company, as a director, officer, member, employee or agent

of another corporation or a partnership, joint venture, trust or other enterprise, the Company shall defend, indemnify and hold harmless the Executive to the maximum extent permitted under applicable law and the Bylaws of the Company, from and against any liabilities, costs, claims and expenses, including all costs and expenses incurred in defense or appeal of any proceeding (including attorneys' fees).  The Company's foregoing indemnification obligations shall not apply (i) to any Proceeding initiated by the Executive or the Company related to any dispute between the Executive and the Company with respect to this Agreement or the Executive's employment hereunder; (ii) if the Proceeding arose because the Executive acted in bad faith or in a manner the Executive knew was contrary to the best interests of the Company; or (iii) if the Proceeding arises from the Executive's willful misconduct as determined by final judgment by a court of competent jurisdiction. Notwithstanding any other provision of this Section 5.9, the Executive shall not be indemnified hereunder for any expenses or amounts paid in settlement with respect to any action to recover short-swing profits under Section 16(b) of the Securities Exchange Act of 1934, as amended.

(b)     Costs and expenses incurred by the Executive in defense or appeal of a Proceeding (including attorneys' fees) shall be paid by the Company in advance of the final disposition of such litigation upon receipt by the Company of: (x) a written request for payment and (y) appropriate documentation evidencing the incurrence, amount and nature of the costs and expenses for which payment is being sought. The Executive shall remain obligated to repay such amounts paid by Company if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Company pursuant to the terms of this Agreement.

(c)     During the Term and for a period of six (6) years thereafter, the Company or any successor to the Company shall purchase and maintain, at its own expense, directors and officers liability insurance providing coverage to the Executive on terms that are no less favorable than the coverage provided to other directors and senior officers of the Company.

5.10     **Claw Back Provisions**.  Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based compensation, or any other compensation, paid to the Executive pursuant to this Agreement, or any other Agreement or arrangement with the Company concerning the Executive's employment hereunder, which is subject to recovery under any law, government regulation, or stock exchange listing requirement, will be subject to such deductions and claw back as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy adopted by the Company as required pursuant to such law, government regulation or stock exchange listing requirement).

6.     **Termination and Termination Payments and Rights.**

6.1     **Termination Upon Death**. If the Executive dies during the Term of his employment with the Company, this Agreement shall terminate as of the date of his death. On termination upon the Executive's death, the Executive's estate shall be entitled to be paid that portion of the Executive's Base Salary that would otherwise have been payable to the Executive through and including the final day of the month in which the Executive's death occurs, together

with all benefits due to the Executive under the Employee Benefit Plans through and including such month-end date.

6.2 **Termination By the Company for Cause**. The Company may, at any time, by written notice to the Executive terminate the Executive's employment under this Agreement immediately, but subject to the procedures set out in the last paragraph of this Section 6.2 to the extent such are applicable, and the Executive shall have no right to receive any compensation or benefit hereunder on or after the date of such notice, in the event that an event of "Cause" occurs and is not remedied by the Executive within thirty (30) days of written notice from the Company reasonably detailing such Cause. For purposes of this Agreement "Cause" shall mean:

(i)      The Executive's willful and repeated refusal or failure to comply with a lawful, written and valid directive of the Company's Board;

(ii)      The Executive's grossly negligent or willful misconduct in the performance of his duties to the Company which causes material harm to the Company;

(iii)      The Executive's willful commission of an act of fraud with respect to the Company or its property; or

(iv)      The Executive's conviction of a crime that constitutes a felony (or the state law equivalent) or a crime that constitutes a misdemeanor involving moral turpitude, if such felony or such other crime is work related, materially impairs the Executive's ability to perform his duties hereunder or results in material harm to the Company.

For purposes of this Agreement, no conduct by the Executive will be deemed "willful" unless it is done by the Executive in bad faith or without reasonable belief that such conduct was in the best interest of the Company or was done in direct contradiction to written instructions or directions of the Company's Board. Any conduct based upon specific authority given pursuant to a resolution duly adopted by the Board, or upon the specific instructions of the Board, shall be conclusively presumed to be done by the Executive in good faith and in the best interest of the Company to the extent such conduct is in accordance with such specific authority or specific instructions. The termination of the Executive's employment shall not be deemed for Cause unless and until the Company delivers to the Executive a copy of a resolution duly adopted by the affirmative vote of at least two thirds (2/3) of the Board at a meeting of the Board called and held for that purpose (after reasonable notice is provided to the Executive and the Executive is given a reasonable opportunity, together with counsel, to be heard before the Board) finding that in the good faith opinion of the Board, the Executive was engaged in the conduct described in subsections (i), (ii), (iii) or (iv) of this Section 6.2 and, where applicable, that any other applicable conditions described in such subsections have been met. Upon termination by the Company for Cause, the Executive shall be entitled to be paid that portion of the Executive's Base Salary that is due through and including the effective date of such termination.

6.3 **Termination Without Cause.**

(a)     The Company may terminate the Executive's employment under this Agreement without Cause by giving thirty (30) days written notice to the Executive, and the Executive shall have the right to receive an amount equal to his Base Salary for a period of two (2) years (such amount, the "Severance Payment"), in addition to all portions of the Executive's Base Salary due as of the effective date of such termination of employment and a prorated portion of any bonus that otherwise would be owed to the Executive.

(b)     Subject to the Executive's compliance with his covenants set forth in Section 9 below, the Severance Payment and applicable pro-rated bonus payment shall be paid to the Executive in one lump sum payment, which shall be made by the Company thirty (30) days following the effective date of the termination of the Executive's employment pursuant to this Section 6.3.

(c)     In addition to the Severance Payment, the Executive shall, to the extent permitted by the terms of the Employee Benefit Plans, be entitled to receive (without cost to the Executive) all benefits provided by such Employee Benefit Plans for a period of twelve (12) months following the termination of his employment pursuant to this Section 6.3. In the event that such termination results in the Executive not being covered by the Company's health insurance benefits, Company shall pay in cash to Executive (within 10 business days of each applicable monthly period) for twelve (12) months following the date of termination, an amount equal to the premiums charged to the Executive to maintain COBRA benefits continuation coverage for Executive and Executive's eligible dependents.

(d)     Any compensation awards of the Executive based on, or in the form of, Company equity (e.g. the stock options under the Option Agreement or any other restricted stock, restricted stock units, stock options or similar instruments) ("Equity Awards") that are outstanding and unvested at the time of such termination but which would, but for a termination of employment, have vested during the eighteen (18) months following such termination (such period, the "Equity Acceleration Period") shall vest (and with respect to awards other than stock options and stock appreciation rights, settle) as of the date of such termination of employment, and any amount that would vest under this provision but for the fact that outstanding performance conditions have not been satisfied shall vest (and with respect to awards other than stock options and stock appreciation rights, settle) if, and at such point as, such performance conditions are satisfied; and provided further that if any Equity Awards made subsequent to the Effective Date of this Agreement specifies a more favorable post-termination vesting schedule for such equity, the terms of the award agreement for such Equity Award shall govern; and

(e)     Any options of Executive (including options vesting as a result of 6.3(d) above) to purchase Company equity, shall remain exercisable through the date that is eighteen (18) months following the date of such termination or, if earlier, through the scheduled expiration date of such options.

6.4    **Termination by the Executive With Good Reason.**

(a)    The Executive may at any time and upon thirty (30) days written notice to the Company with Good Reason terminate his employment under this Agreement, and provided that such notice is given within ninety (90) days of the date of the occurrence of an event or circumstance giving rise to Good Reason and further provided that the Executive signs and delivers to Company a general release in the form set forth in Exhibit A, attached hereto on or before the Good Reason Payment Date, the Executive will have the right to receive (i) the Severance Payment and a prorated portion of the Executive's bonus, which amounts shall be paid by the Company thirty (30) days following the effective date of the termination of the Executive's employment pursuant to this Section 6.4 ("Good Reason Payment Date"), and (ii) the Employee Benefit Plans and COBRA reimbursement benefits provided by Section 6.3(c) hereof). In addition, upon the Executive's termination of this Agreement for Good Reason, Sections 6.3(d) and 6.3(e) shall apply.

(b)    For purposes of this Agreement "Good Reason" shall mean one of the reasons set forth below which remains uncured for a period of fifteen (15) days following receipt of notice thereof from the Executive to the Company:

(i)    The Company's material breach of any material provision of this Agreement;

(ii)    The material reduction in the Executive's title, duties, reporting responsibilities or level of responsibilities as President and CEO;

(iii)    The Company's requirement that the Executive perform the duties of his employment at a location that is more than fifty (50) miles from the Company's present principal executive offices, which are located at 2188 West 2200 South, Salt Lake City, Utah.

6.5    **Termination by the Executive Without Good Reason.** The Executive may terminate his employment under this Agreement without Good Reason upon thirty (30) days prior written notice to the Company, and upon the effective date of such termination the Executive will be entitled to receive only that portion of his Base Salary which is due and owing upon such effective date of termination.

6.6    **Termination by the Executive Following a Change of Control.**

(a)    If a "Change Control" (as herein defined) occurs during the Term, and if during the period of two (2) months immediately prior to or six (6) months immediately following the effective date of such Change in Control (i) the Company terminates the employment of the Executive without Cause, or (ii) the Executive terminates his employment with Good Reason, in addition to the Severance Payment, all options or other incentive awards granted to the Executive by the Company shall immediately vest and become fully exercisable for a period of one-hundred eighty (180) days following the effective date of such Change in Control, notwithstanding any provision of this

Agreement or of any Employee Benefit Plans pursuant to which such options or awards were granted.

(b)    For purposes of this Agreement, the term "Change in Control" shall mean the occurrence of any of the following:

(i)    One person (or more than one person acting as a group), corporation or other entity acquires ownership of stock of the Company that, together with the stock held by such person or group prior to such acquisition, constitutes more than fifty-percent (50%) of the total voting power of all of the issued and outstanding stock of the Company; or

(ii)    One person (or more than one person acting as a group), corporation or other entity acquires (or has acquired during the twelve-month period ending on the date of the most recent acquisition) ownership, directly or indirectly, of the Company's stock possessing thirty percent (30%) or more of the total voting power of all of the issued and outstanding stock the Company; or

(iii)    A majority of the members of the Board are replaced during any twelve-month period by directors whose appointment or election is not endorsed by 2/3 of the members of the Board of Directors as constituted before the date of such appointment or election; or

(iv)    The sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all the assets of the Company; or

(v)    Approval by stockholders of the Company of (a) any consolidation or merger of the Company in which the Company is not the continuing or surviving corporation or pursuant to which shares of stock of the Company would be converted into cash, securities or other property, other than a consolidation or merger of the Company in which holders of its common stock immediately prior to the consolidation or merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the consolidation or merger as immediately before.

6.7    **No Mitigation.**    In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provision of this Agreement and any amounts payable to the Executive pursuant to this Section 6 shall not be reduced by any compensation earned by the Executive on account of employment with another employer following the termination of his employment hereunder.

6.8    **Return of Materials**.    BSD may provide the Executive with certain equipment and materials for his use as CEO.  Upon termination of employment by either Party for any reason herein, the Executive agrees to immediately deliver such equipment and materials to an authorized representative of BSD, as directed by the Chairman of BSD's Board.

7.    **Section 280G.**

(a)    If any of the payments or benefits received or to be received by the Executive (including, without limitation, any payment or benefits received in connection with a Change in Control or the termination of the Executive's employment, whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement, or otherwise) (all such payments collectively refer to herein as the "280G Payments") constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code") and will be subject to the excise tax imposed under Section 4999 of the Code (the "Excise Tax"), the Company shall pay to the Executive, no later than the time such Excise Tax is required to be paid by the Executive or withheld by the Company, an additional amount equal to the sum of the Excise Tax payable by the Executive, plus the amount necessary to put the Executive in the same after-tax position (taking into account any and all applicable federal, state and local excise, income or other taxes at the highest applicable rates on such 280G Payments and on any payments under this Section 7(a) or otherwise) as if no Excise Tax had been imposed.

(b)    All calculations and determinations under this Section 7 shall be made by an independent accounting firm or independent tax counsel appointed by the Company (the "Tax Counsel") whose reasonable, good faith determination shall be conclusive and binding on the Company and the Executive for all purposes. For purposes of making the calculations and determinations required by this Section 7(b), the Tax Counsel may rely on reasonable, good faith assumptions and approximations concerning the applicability of Section 280G and Section 4999 of the Code. The Company and the Executive shall furnish the Tax Counsel with such information and documents as the Tax Counsel may reasonably request in order to make its determinations under this Section 7(b). The Company shall bear all costs of the Tax Counsel reasonably incurred in connection with the performance of its duties under this Section 7(b).

8.    **Representations and Warranties of the Executive.** The Executive represents and warrants that neither the execution nor delivery of this Agreement, nor the employment of the Executive by the Company pursuant to the terms hereof will (a) result in the breach of any agreement to which the Executive is a party, or (b) result in the misappropriation of any confidential information or trade secrets of his former employer or any other third party.

9.    **Covenants.** In order to induce the Company to enter into this Agreement, the Executive covenants and agrees that:

(a)    **Confidentiality**. Subject to the exceptions provided in this Section 9(a), the Executive will not at any time, whether during or after the termination of the Executive's employment, knowingly and intentionally reveal to any entity, business, or person or use for the Executive's benefit or that of any other entity, business, or person any of the trade secrets or confidential information concerning the organization, business or finances of the Company or any Affiliate (as defined below) or of any third party which the Company or any Affiliate is under an obligation to keep confidential (including but not limited to trade secrets or confidential information respecting finances, members,

shareholders, officers, managers, directors, providers, inventions, products, designs, methods, business plans, methods of operation, know-how, techniques, systems, processes, works of authorship, customer lists, projects, plans and proposals), (collectively, "Confidential Information") except as may be required in the ordinary course of performing the Executive's duties as an employee of the Company. The Executive will keep secret all confidential matters entrusted to him and shall not use or attempt to use any such Confidential Information in any manner which is likely to injure or cause loss or may be intended to injure or cause loss to the Company or any Affiliate. Confidential Information shall not include that information defined as Confidential Information above that is or subsequently becomes publicly available without the Executive's breach of this Agreement. The requirements of this Section 9(a) shall not apply to the Executive's disclosure of Confidential Information in accordance with any subpoena, order or process issued by any court or government agency, provided the Executive gives the Company reasonable notice prior to such disclosure and complies with any applicable protective order.

(b) **Non-compete**. During the term of Executive's employment, and continuing for a period of one (1) year after the termination of the Executive's employment with the Company ("Restricted Period"), the Executive shall not, directly or indirectly, whether as principal, agent, consultant, independent contractor, partner or otherwise, manage, operate, finance, control, participate in, advise, perform services to or guarantee the obligations of any entity, business, or person other than the Company engaged in or planning to become engaged in during the Restricted Period, anywhere in North America, any business that is competitive with the business conducted by the Company (i.e. microwave tumor ablation and oncology products) ("Restricted Businesses"). Nothing in this Section shall prohibit the Executive from owning as a passive investment not in excess of 2% in the aggregate of any class of capital stock of any corporation if such stock is publicly traded or from being. With respect to entities that have multiple divisions or affiliates, the restrictions set forth in this Section shall only apply to the divisions and affiliates that constitute Restricted Businesses and not the parent company or other divisions or affiliates that whose operations would not otherwise qualify them as Restricted Businesses.

(c) **Nonsolicitation**. During the term of Executive's employment and for a period ending one (1) year after the termination of Executive's employment pursuant to this Agreement hereof, the Executive will not, directly or indirectly, employ, retain or hire any employee of the Company or induce or attempt to persuade, on behalf of any other business organization in competition with the Company or any Affiliate, any employee, agent or customer of the Company or any Affiliate at any time during the term of Executive's employment to terminate such employment, consulting, agency or business relationship in order to enter into any such relationship with any such business organization. This restriction shall not apply to general solicitations or advertisements. For purposes of this Agreement, a "customer" of the Company means any person or entity to whom Company provided any products or services at any time during the six (6) month period immediately preceding the effective date of the termination of this Agreement. The terms of this Section 9(c) shall not apply to the Executive's personal

assistant, which the Executive may solicit for employment elsewhere following the Executive's termination.

(d) **Representation of the Executive**.  The Executive understands, acknowledges, and represents that (i) he is familiar with the covenants in this Section 9, (ii) he is fully aware of his obligations hereunder, (iii) finds the length of time, and scope of these covenants to be reasonable, (iv) is receiving specified, bargained-for consideration for these covenants, including without limitation the employment given and compensation promised to the Executive herein and an extraordinary investment that will be made by the Company in the training and education of the Executive, and (v) the covenants here are necessary to protect the goodwill, trade secrets, and other legitimate business interests of BSD.

(e) **Remedies**.  The Executive agrees that any breach of this Section 9 by the Executive will cause irreparable damage to the Company or its Affiliates and that in the event of such breach the Company shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of the Executive's obligations hereunder, without any requirement of posting bond or other security.  The Company agrees that in the event of any material breach of this Agreement by the Company, the provisions of Subsections (b) and (c) of this Section 9 shall be null and void.

10. **Section 409A; Section 105(h).**

(a) It is intended that the provisions of this Agreement comply with Section 409A, and all provisions of this Agreement shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under **Section 409A.**

(b) If, at the time of the Executive's separation from service (within the meaning of Section 409A), (i) the Executive shall be a specified employee (within the meaning of Section 409A and using the identification methodology selected by the Company from time to time) and (ii) the Company shall make a good faith determination that an amount payable under a Company benefit plan ("**Company Plan**") constitutes deferred compensation (within the meaning of Section 409A) the payment of which is required to be delayed pursuant to the six-month delay rule set forth in Section 409A in order to avoid taxes or penalties under Section 409A, then the Company (or its affiliate, as applicable) shall not pay such amount on the otherwise scheduled payment date but shall instead accumulate such amount and pay it, together with interest credited at the Applicable Federal Rate in effect as of the date of your termination of employment, on the first business day after such six-month period.

(c) Notwithstanding any provision of this Agreement or any Company Plan to the contrary, in light of the uncertainty with respect to the proper application of Section 409A, the Company reserves the right to make amendments to any Company Plan as the Company deems necessary or desirable to avoid the imposition of taxes or penalties under Section 409A.

(d)     For purposes of Section 409A, each payment under the terms of this Agreement will be deemed to be a separate payment as permitted under Treasury Regulation Section 1.409A-2(b)(2)(iii).

(e)     To the extent that the reimbursement of any expenses or the provision of any in-kind benefits under this Agreement is subject to Section 409A, (i) the amount of such expenses eligible for reimbursement, or in-kind benefits to be provided, during any one calendar year shall not affect the amount of such expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year (provided, that, this clause (i) will not be violated with regard to expenses reimbursed under any arrangement covered by Code Section 105(b) solely because such expenses are subject to a limit related to the period the arrangement is in effect); (ii) reimbursement of any such expense shall be made by no later than December 31 of the year following the calendar year in which such expense is incurred; and (iii) Employee's right to receive such reimbursements or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

(f)     Notwithstanding any provision of this Agreement to the contrary, to the extent necessary to satisfy Section 105(h) of the Internal Revenue Code, the Company will be permitted to alter the manner in which medical benefits are provided to the Executive following termination of the Term; provided that the after-tax cost to the Executive of such benefits shall not be greater than the cost applicable to similarly situated executives of the Company who have not terminated employment.

11.   **Miscellaneous.**

(a)     **Company Policies**.  The Executive shall comply with the Company's lawful policies and rules that are provided to Executive, as they may be in effect from time to time.

(b)     **Notices**.  Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, or sent by certified, registered or express mail, postage prepaid, to the Parties at the following addresses, or at such other addresses as shall be specified by the Parties by like notice, and shall be deemed given when so delivered personally or, if mailed, two days after the date of mailing, as follows:

|  |  |
|---|---|
| If to Company to: | BSD Medical Corporation |
|  | 2188 West 2200 South |
|  | Salt Lake City, Utah 84119 |
|  | Attn:  Chief Financial Officer |
|  |  |
| If to the Executive: | Clinton E. Carnell Jr. |
|  | 2891 West View Trail |
|  | Park City, UT 84098 |

With a copy to:        Roger L. Armstrong, Esq.
                       2574 Aspen Springs Drive
                       Park City, Utah 84060

(c)    **Entire Agreement**.   This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior contracts and other agreements, written or oral, with respect thereto.

(d)    **Waivers and Amendments**.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance.

(e)    **Governing Law**.  This Agreement shall be governed by, and construed in accordance with and subject to, the laws of the State of Utah without regard to its conflicts of laws principles.

(f)    **Consent to Jurisdiction.**  The Parties irrevocably submit to the exclusive jurisdiction of any state or federal court in Salt Lake City, Utah, in any action, suit or proceeding brought by or against such Party in connection with, arising from or relating to this Agreement, and each Party hereby waives and further agrees not to assert as a defense in any such suit, action or proceeding any claim that such Party is not personally subject to the jurisdiction of any such courts, that the venue of the suit, action or proceeding is brought in an inconvenient forum or that this Agreement or the subject matter hereof may not be enforced in or by such courts.

(g)    **Assignment**.  This Agreement, and the Executive's rights and obligations hereunder, may not be assigned by the Executive.   The Company may assign this Agreement and its rights, together with its obligations, hereunder only in connection with any sale, transfer or other disposition of all or substantially all of its assets or business, whether by merger, consolidation or otherwise.  This Agreement will be binding upon the Company's successors and assigns which shall be required to perform this Agreement in the same manner and to the same extent that Company would be required to perform if no sale, transfer or other disposition of all or substantially all of its assets or business, whether by merger, consolidation or otherwise, had occurred. This Agreement shall inure to the benefit of and be binding upon the Parties hereto and any successors and permitted assigns.

(h)    **Counterparts; Execution**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Execution and delivery of this Agreement by facsimile or e-mail is legal, valid and binding execution and delivery for all purposes.

(i)    **Headings**.  The headings in this Agreement are for reference purposes only and shall in no way affect the meaning or interpretation of this Agreement.

(j)    **Survival**. Sections 5.9, 5.10, 6, 7, 10, and 11 shall survive termination of this Agreement.

(k)    **Severability**. To the extent any provision of this Agreement shall be invalid or unenforceable, it shall be considered deleted herefrom and the remainder of such provision and of this Agreement shall be unaffected and shall continue in full force and effect.

(l)    **Delays or Omissions**. No delay or omission to exercise any right, power or remedy accruing to either Party upon any breach or default of the other party hereto shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of a breach or default be deemed to be a waiver of any other breach or default.

IN WITNESS WHEREOF, the Parties have executed this Employment Agreement as of the Effective Date, as herein first written.

The Company.

BSD MEDICAL CORPORATION

_____
Chairman Compensation Committee

The Executive:

_____
CLINTON E. CARNELL JR.

15

**AMENDMENT
TO
EMPLOYMENT AGREEMENT**

This Amendment (the "**Amendment**") amends that certain Employment Agreement (the "**Agreement**") dated November 10, 2014, by and between BSD Medical Corporation, which has since changed its name to Perseon Corporation ("**Perseon**" or "**Debtor**"), and Clinton E. Carnell Jr. ("**Carnell**" and together with Perseon, the "**Parties**"). All capitalized terms used but not defined in this Amendment shall have the meanings assigned to such terms in the Agreement.

WHEREAS, on May 23, 2016 (the "**Petition Date**"), Perseon filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "**Court**") thereby commencing the bankruptcy case styled as *In re Perseon Corporation*, Case No. 16-24435 (Bankr. D. Utah) (the "**Bankruptcy Case**"); and

WHEREAS, on May 24, 2016, the Debtor filed *Debtor's Motion for Orders Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 365, 503, and 507 and Fed. R. Bankr. P. 6004 and 6007: (I)(A) Authorizing Entry Into and Assumption of Asset Purchase Agreement, (B) Authorizing Bid Protections, (C) Authorizing Bidding Procedures and Auction, and (D) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing Sale of Assets; and (III) Granting Related Relief* (the "**Sale Motion**") in the Bankruptcy Case. The Sale Motion seeks Court approval of a sale of substantially all of the Debtor's assets through an asset purchase agreement (the "**APA**") to MedLink Technologies, LLC for a total purchase price of $4,350,000.00, subject to higher and better offers at auction; and

WHEREAS, following a failed merger agreement, on December 23, 2015, Perseon was forced to terminate the majority of its employees and Mr. Carnell agreed to defer all compensation owed to him under the Agreement in an effort to conserve Perseon's limited cash reserves; and

WHEREAS, Perseon's Board of Directors recognizes that Mr. Carnell's continuing efforts during the Bankruptcy Case have been and are necessary and essential to continuing the Debtor's operations during the pendency of the Bankruptcy Case and to consummating and closing the sale transaction contemplated under the APA; and

WHEREAS, Perseon's Board of Directors has decided to enter into this Amendment to the Employment Agreement to compensate Mr. Carnell for his irreplaceable efforts after the Petition Date to consummate the sale of the Debtor's assets and to preserve the value of those assets pending any sale; and

WHEREAS, Perseon and Carnell desire to amend the Agreement pursuant to the terms herein.

**NOW, THEREFORE**, the Parties hereto agree as follows:

1. The WHEREAS clauses in this Amendment are incorporated into the Agreement as if stated therein.

2.   Section 3 of the Agreement is hereby deleted in its entirety and replaced with the following:

3. The Executive's duties may include any or all of the following in accordance with the needs of the organization as determined from time to time by the Executive and the Board and taking into consideration the Company's available assets:

a.   Maintain the Debtor as a viable operating business and deliver the Purchased Assets as defined in the APA, including the following responsibilities .

  i.   recruit, train, manage and direct staff performing sales, manufacturing, inventory management, customer service, shipping & receiving, purchasing, facilities management, asset management, business development, quality control, regulatory and reporting duties;

  ii.   retain and manage distribution partners in the US and Europe;

  iii.   retain and manage critical and non-critical vendors;

  iv.   set pricing and terms for the sale of products and services;

  v.   report to the Board of Directors and execute on directives of each;

  vi.   manage financial institutions;

  vii.   direct tax reporting and compliance activities;

  viii.   forecast cash sources and uses, and recommend payments to-be-made to vendors, purchases of supplies and inventory, negotiate special customer requests and transaction terms;

  ix.   manage and direct intellectual property attorneys that prosecute the company's patents, trademark and other intellectual property;

  x.   maintain insurance policies and execute policy renewals; and

  xi.   plan the business and financial integration of the Purchased Assets with the buyer's business entity;

  xii.   fulfill responsibilities as the sole officer of a publicly traded company;

  xiii.   manage relationship with the Stalking Horse on all aspects of the business integration;

  xiv.   manage communication with the Board and other constituents on status of the bankruptcy case;

  xv.   manage critical vendor relationship introductions with the Stalking Horse;

  xvi.   manage key employee, customer relationships with Stalking Horse;

  xvii.   manage performance of IP, obsolescence, critical employee, customer relations and CE Mark re-certification consistent with Stalking Horse requirements;

  xviii.   manage relationship with SunTrust Bank in directing diligence with bidders;

  xix.   manage necessary technical employee/former executive's enlistment on diligence requirements; and

  xx.   advise and direct CRC in areas where there's limited knowledge of the business.

b.   Manage and assist the Licensee of the Debtor's technology with:

    i. technology and know-how transfer;
    ii. vendor introductions;
   iii. IP prosecution;
   iv. obsolete part management; and
    v. inventory management.

    c.  Manage and execute the chapter 11 process including:
    i. reporting;
    ii. creditor meeting attendance;
   iii. court appearances;
   iv. cash forecast preparation;

      v.    preparing the corporation for a liquidation by discontinuing contracts for services for programs such as a 401(k) plan, health insurance, death and disability programs, technology services, consultant arrangements, facility shut-down, disposition of the assets remaining after the closing of the asset sale;

      vi.    gathering and providing due diligence information to prospective buyers and bidders, and discuss such materials with prospective buyers and bidders;

     vii.    assisting with transaction negotiations and structuring as such activities relate to prospective new bidders; and

    viii.    recommending payments to critical and non-critical vendors, differentiating between pre-petition and post-petition vendor invoices.

    d.  Communicate with various Debtor constituencies with regard to the strategic and bankruptcy plans of the company including:
    i. employees;
    ii. contract workers;
   iii. customers;
   iv. landlord;
    v. regulatory bodies;
   vi. vendors;
   vii. shareholders;
  viii. creditors;
   ix. the Board of Directors;
    x. the Bankruptcy Court and US Trustee; and
   xi. taxing authorities..

3.   Section 4 of the Agreement is hereby deleted in its entirety.

4.   Section 5.1 is hereby deleted in its entirety and replaced with the following:

5.1 In consideration of the Executive's services with respect to furthering the completion of a transaction for the sale of the Company or substantially all of the Company's assets and other services to any person or entity that meets any of the criteria set forth in Section 5.1(c)(i)-(v) of this Amendment ("Sale"), the Executive shall be entitled to:

a.  a success bonus equal to Six Hundred Thousand Dollars ($600,000) ("Success Bonus"), and

b. an additional amount equal to $250,000, which shall not depend upon the completion of a Sale ("Executive Compensation") (collectively "Aggregate Compensation").

c. The Success Bonus shall be deemed earned and accrued upon the completion of a Sale satisfying any of the following criteria:

    i. One person (or more than one person acting as a group), corporation or other entity acquires ownership of stock of the Company that, together with the stock held by such person or group prior to such acquisition, constitutes more than fifty-percent (50%) of the total voting power of all of the issued and outstanding stock of the Company; or

    ii. One person (or more than one person acting as a group), corporation or other entity acquires (or has acquired during the twelve-month period ending on the date of the most recent acquisition) ownership, directly or indirectly, of the Company's stock possessing thirty percent (30%) or more of the total voting power of all of the issued and outstanding stock the Company; or

    iii. A majority of the members of the Board are replaced during any twelve-month period by directors whose appointment or election is not endorsed by 2/3 of the members of the Board of Directors as constituted before the date of such appointment or election; or

    iv. The sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all the assets of the Company; or

    v. Approval by stockholders of the Company of any consolidation or merger of the Company in which the Company is not the continuing or surviving corporation or pursuant to which shares of stock of the Company would be converted into cash, securities or other property, other than a consolidation or merger of the Company in which holders of its common stock immediately prior to the consolidation or merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the consolidation or merger as immediately before.

d. The Success Bonus shall be a claim entitled to administrative priority pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, which the Company shall use good faith, diligent efforts to have confirmed by the Court. The Success Bonus will be paid as follows:

    i. Three Hundred Thousand Dollars ($300,000) shall be paid upon the closing of any Sale; and

    ii.   One Hundred Thousand Dollars ($100,000) to be paid on or about October 1, 2016; and

    iii.  One Hundred Thousand Dollars ($100,000) to be paid on or about December 1, 2016; and

    iv.  One Hundred Thousand Dollars ($100,000) to be paid on or about the date of the Court's confirmation of any plan in the Bankruptcy Case.

  e.  The Executive Compensation payable under Section 5.1 (b) shall be treated as a general unsecured claim in the Bankruptcy Case.

5.  Sections 5.2, 5.3, 5.4, and 5.5 of the Agreement are hereby deleted in their entirety.

6.  The following language is hereby added to the last sentence of Section 5.7: Executive shall be reimbursed for the legal fees incurred in negotiation and drafting the Amendment to this Agreement up to a maximum of $ 5,000.

7.  Section 5.10 of the Agreement is hereby deleted in its entirety.

8.  Section 6.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

Termination Upon Death. If the Executive dies during the Term of his employment with the Company, this Agreement shall terminate as of the date of his death; provided however, in consideration of the Executive's substantial efforts heretofore rendered with respect to pursuing and endeavoring to complete a Sale transaction, such termination by the Executive's death shall not relieve Company of the obligation to pay the Executive's estate the Aggregate Compensation, which shall be paid by Company to Executive's estate in accordance with Section 5.1 of this Agreement.

9.  Section 6.2 of the Agreement is hereby deleted in its entirety and replaced with the following:

6.2 (a) Either the Executive or the Company may terminate the Executive's employment under this Agreement without Cause by giving the other party thirty (30) days written notice; provided, however, in consideration of the Executive's substantial efforts heretofore rendered with respect to pursuing and endeavoring to complete a Sale transaction, such termination for Cause shall not relieve Company of the obligation to pay the Executive the Aggregate Compensation pursuant to Section 5.1 of this Agreement, which shall be paid by Company to Executive in accordance with the terms of Section 5.1 notwithstanding any termination of this Agreement other than for Cause.

(b) For the purpose of this Amendment, "Cause" shall mean only the following: (a) the Executive's grossly negligent or willful misconduct in the performance of the Executive's duties that are set forth in Section 3 of the Agreement; (b) the Executive's willful commission of an act of fraud with respect to the Company or its property; (c) the Executive's conviction of a crime that constitutes a felony or a crime that constitutes a

misdemeanor involving moral turpitude but only if such felony or applicable misdemeanor is work related, materially impairs the Executive's ability to perform his duties hereunder or results in material harm to the Company.

(c) Upon the occurrence of any act or omission that constitutes Cause for termination, the Company shall provide the Executive with written notice reasonably detailing such Cause and the Executive shall have thirty (30) days to remedy such act or omission and, if not remedied within such thirty (30) day period, then Company shall have the right to terminate the Executive's employment.

(d) For purposes of this Agreement, no conduct by the Executive will be deemed "willful" unless it is done by the Executive in bad faith or without reasonable belief that such conduct was in the best interest of the Company or was done in direct contradiction to reasonable and lawful written instructions or directions of the Company's Board. Any conduct based upon specific authority given pursuant to a resolution duly adopted by the Board, or upon the specific instructions of the Board, shall be conclusively presumed to be done by the Executive in good faith and in the best interest of the Company to the extent such conduct is in accordance with such specific authority or specific instructions. The termination of the Executive's employment shall not be deemed for Cause unless and until the Company delivers to the Executive a copy of a resolution duly adopted by the affirmative vote of at least two thirds (2/3) of the Board at a meeting of the Board called and held for that purpose (after reasonable notice is provided to the Executive and the Executive is given a reasonable opportunity, together with counsel, to be heard before the Board) finding that in the good faith opinion of the Board, the Executive was engaged in the conduct described in subsections (a), (b), (c) or (d) of this Section 6.2 and, where applicable, that any other applicable conditions described in such subsections have been met.

(e) The Company hereby acknowledges and agrees that, notwithstanding anything to the contrary herein contained in this Agreement, termination for Cause shall only apply to the Executive's acts or omissions that take place from and after the date of this Amendment.

(f) Upon termination by the Company for unremedied Cause, the Executive shall be entitled to be paid fifty percent (50%) of the Aggregate Compensation in consideration of the Executive's services prior to any such termination.

10. Sections 6.3, 6.4, 6.5 and 6.6 of the Agreement are hereby deleted in their entirety.

11. Section 9(b) of the Agreement is hereby deleted in its entirety and replaced with the following:

**Non-compete**. During the term of Executive's employment the Executive shall not, directly or indirectly, whether as principal, agent, consultant, independent contractor, partner or otherwise, manage, operate, finance, control, participate in, advise, perform services to or guarantee the obligations of any entity, business, or person other than the Company engaged in or planning to become engaged in during the Restricted Period, anywhere in North America, any business that is competitive with the business

conducted by the Company (i.e. microwave tumor ablation and oncology products) ("Restricted Businesses"). Nothing in this Section shall prohibit the Executive from owning as a passive investment not in excess of 2% in the aggregate of any class of capital stock of any corporation if such stock is publicly traded or from being. With respect to entities that have multiple divisions or affiliates, the restrictions set forth in this Section shall only apply to the divisions and affiliates that constitute Restricted Businesses and not the parent company or other divisions or affiliates that whose operations would not otherwise qualify them as Restricted Businesses

12. Section 9(c) of the Agreement is hereby deleted in its entirety and replaced with the following:

**Nonsolicitation**.  During the term of Executive's employment the Executive will not, directly or indirectly, employ, retain or hire any employee of the Company or induce or attempt to persuade, on behalf of any other business organization in competition with the Company or any Affiliate, any employee, agent or customer of the Company or any Affiliate at any time during the term of Executive's employment to terminate such employment, consulting, agency or business relationship in order to enter into any such relationship with any such business organization.  This restriction shall not apply to general solicitations or advertisements.  For purposes of this Agreement, a "customer" of the Company means any person or entity to whom Company provided any products or services at any time during the six (6) month period immediately preceding the effective date of the termination of this Agreement. The terms of this Section 9(c) shall not apply to the Executive's personal assistant, which the Executive may solicit for employment elsewhere following the Executive's termination.

13. Section 11(g) of the Agreement is hereby deleted in its entirety and replaced with the following:

This Agreement, and the parties' respective rights and obligations hereunder, may not be assigned by either party and any assignment in violation of this provision shall be voidable.

14. Except as set forth in this Amendment, the provisions of the Agreement shall remain unchanged and in full force and effect.

15. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  A facsimile, telecopy or other reproduction of this Amendment may be executed by one or more parties hereto, and an executed copy of this Amendment may be delivered by one or more parties hereto by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.

16. This Amendment shall be governed under the laws of the State of Utah without reference to the conflict of laws provisions thereof and shall be subject to the exclusive jurisdiction of the Court.

**PERSEON CORPORATION**

By: _____

Name: _TIMOTHY  C  M<sup>c</sup>QUAY_

Title: _CHAIRMAN  of  THE  BOARD_


**CLINTON E. CARNELL JR.:**

_____

# **EXHIBIT B**

Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
          thomson.michael@dorsey.com
          armington.jeff@dorsey.com

*Attorneys for Debtor Perseon Corporation*
*and Proposed Attorneys for Debtor in Possession*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>PERSEON CORPORATION.,<br><br>Debtor. | Case No. 16-24435<br><br>Chapter 11<br><br>The Honorable R. Kimball Mosier |

---

## DECLARATION OF TIMOTHY C. McQUAY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO ASSUME DEBTOR'S MODIFIED EMPLOYMENT AGREEMENT WITH CLINTON E CARNELL JR.

---

I, Timothy C. McQuay, hereby declare as follows:

1.      I am over the age of 18 and am mentally competent.  I make this Declaration (the "<u>Declaration</u>") in support of the *Debtor's Motion for Entry of an Order Authorizing Debtor to Assume Debtor's Modified Employment Agreement with Clinton E. Carnell Jr.* (the "<u>Motion</u>").[1]

2.      I have personal knowledge of the facts stated in this Declaration.  If called as a witness, I could and would testify competently to these facts, except where matters are stated on information and belief.  As to those facts, I am informed and believe that they are true and correct.

3.      I have served as a director of Perseon since February 2008 and I currently serve as Chairman of the Board of Directors of the Debtor.  I am familiar with the Debtor, its business operations, its financial conditions and other matters that may be relevant to the Chapter 11 Case.

4.      Beginning in roughly 2013, Perseon began searching for either a strategic partner or an acquirer of its assets.

5.      In order to facilitate this sale or partnership the Debtor entered into the Employment Agreement with Mr. Carnell on November 10, 2014, following Mr. Carnell's election and appointment as CEO and President of the Debtor and Perseon's board of directors expressly relied on Mr. Carnell's extensive expertise to facilitate such a merger or sale.

6.      On April 1, 2015, with Mr. Carnell at the helm, Perseon sold the assets associated with its hyperthermia cancer treatment systems to Pyrexar Medical, Inc. ("<u>Pyrexar</u>") in exchange for 19.9% of the Series A Preferred Shares of Pyrexar and a percentage of revenues that Pyrexar would receive from sales of the hyperthermia cancer treatment systems.

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

2

7.      In July and August of 2015, with Mr. Carnell again guiding the Debtor, Perseon was able to complete an offering of common stock and warrants which netted approximately $4.3 million in proceeds to the Debtor.

8.      On October 26, 2015, as a result of Mr. Carnell's exceptional efforts, Perseon and Galil Medical, Inc. ("Galil") entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Perseon agreed to merge with and into a wholly owned subsidiary of Galil through a tender offer and merger (the "Merger").

9.      On December 22, 2015, Galil terminated the Merger Agreement.

10.     On December 23, 2015, Perseon terminated a substantial number of employees in order to materially reduce expenses and Mr. Carnell generously agreed to defer compensation to further conserve the Debtor's limited cash.

11.     Immediately after Galil terminated the Merger Agreement, Mr. Carnell renewed and redoubled his efforts to find either a strategic partner or a purchaser for Perseon's assets in an attempt to maximize the value of those assets for the benefit of Perseon's constituents and to keep Perseon's life-saving technologies in the marketplace.

12.     With Perseon's financial condition deteriorating rapidly, in an effort to raise cash, on February 22, 2016, Mr. Carnell negotiated a sale of the shares Perseon obtained from Pyrexar back to Pyrexar for a $1,000,000 purchase price.

13.     Prior to the Petition Date, Mr. Carnell turned over every rock to attempt to locate additional financing for Perseon outside of bankruptcy, but unfortunately despite Mr. Carnell's efforts, Perseon was unable to locate such financing.

14.    Mr. Carnell was retained as CEO by Perseon's board of directors to facilitate a merger or to find a purchaser for the Debtor's assets based on Mr. Carnell's extensive expertise.

15.    During his tenure with Perseon, Mr. Carnell's exceptional efforts facilitated the sale of Perseon's hyperthermia assets to Pyrexar and attempted to consummate the Merger with Galil, but Galil unilaterally terminated the Merger Agreement.

16.    Immediately after Galil terminated the Merger Agreement, Mr. Carnell, with the full support of Perseon's board, made the difficult decision to terminate the vast majority of Perseon's employees, but to continue operations at a sufficient level to allow Mr. Carnell to continue his efforts to market Perseon as a going concern.

17.    At this time, in an effort to conserve the Debtor's limited cash reserves, Mr. Carnell generously agreed to defer the compensation he was entitled to receive under the Employment Agreement and Mr. Carnell has not received compensation from the Debtor since.

18.    In the six month period since Galil terminated the Merger Agreement, through Mr. Carnell's exceptional efforts, Perseon has managed to maintain its sales figures, despite the fact that Perseon's workforce was reduced by more than 90%.

19.    Also during the past six months, despite receiving other employment offers and without receiving any compensation, Mr. Carnell has worked tirelessly to locate a purchaser for Perseon's assets, which culminated in the Debtor's entry into the APA with the Stalking Horse.

20.    Mr. Carnell continues to communicate with the Stalking Horse frequently to address all issues with the transaction.  He is the main point of communication between the Debtor and the Stalking Horse and he continues to move the transaction forward to the benefit of Perseon's creditor constituents.  The Stalking Horse is explicitly and specifically relying on Mr.

4

Carnell for his expertise in delivering the Debtor's highly specialized life-saving cancer treatment products.

21.     I believe that Mr. Carnell is essential to consummating the transaction with the Stalking Horse and in his absence it is uncertain whether the Stalking Horse will purchase Perseon's assets.

22.     Mr. Carnell's services are critical to any disposition of assets and the confirmation of any chapter 11 plan in this case.  In that regard, on a go forward, post-petition basis, Mr. Carnell must do the following in order for the transaction contemplated under the APA to be consummated:

    a.   Maintain the Debtor as a viable operating business and deliver the Purchased Assets as defined in the APA, including the following responsibilities .

        i.   recruit, train, manage and direct staff performing sales, manufacturing, inventory management, customer service, shipping & receiving, purchasing, facilities management, asset management, business development, quality control, regulatory and reporting duties;

        ii.   retain and manage distribution partners in the US and Europe;

        iii.   retain and manage critical and non-critical vendors;

        iv.   set pricing and terms for the sale of products and services;

        v.   report to the Board of Directors and execute on directives;

        vi.   manage financial institutions;

        vii.   direct tax reporting and compliance activities;

viii. forecast cash sources and uses, and recommend payments to-be-made to vendors, purchases of supplies and inventory, negotiate special customer requests and transaction terms;

ix. manage and direct intellectual property attorneys that prosecute the company's patents, trademark and other intellectual property;

x. maintain insurance policies and execute policy renewals; and

xi. plan the business and financial integration of the Purchased Assets with the buyer's business entity;

xii. • fulfill responsibilities as the sole officer of a publicly traded company;

xiii. • manage relationship with the Stalking Horse on all aspects of the business integration;

xiv. • manage communication with the Board and other constituents on status of the bankruptcy case;

xv. • manage critical vendor relationship introductions with the Stalking Horse;

xvi. • manage key employee, customer relationships with Stalking Horse;

xvii. • manage performance of IP, obsolescence, critical employee, customer relations and CE Mark re-certification consistent with Stalking Horse requirements;

xviii. • manage relationship with SunTrust Bank in directing diligence with bidders;

6

xix.  • manage necessary technical employee/former executive's enlistment on diligence requirements; and

xx.  • advise and direct CRC in areas where there's limited knowledge of the business.

b.  Manage and assist the Licensee of the Debtor's technology with:

i.  technology and know-how transfer;

ii.  vendor introductions;

iii.  IP prosecution;

iv.  obsolete part management; and

v.  inventory management.

c.  Manage and execute the chapter 11 process including:

i.  reporting;

ii.  creditor meeting attendance;

iii.  court appearances;

iv.  cash forecast preparation;

v.  preparing the corporation for a liquidation by discontinuing contracts for services for programs such as a 401(k) plan, health insurance, death and disability programs, technology services, consultant arrangements, facility shut-down, disposition of the assets remaining after the closing of the asset sale;

     vi.  gathering and providing due diligence information to prospective buyers and bidders, and discuss such materials with prospective buyers and bidders;

     vii.  assisting with transaction negotiations and structuring as such activities relate to prospective new bidders; and

    viii.  recommending payments to critical and non-critical vendors, differentiating between pre-petition and post-petition vendor invoices.

   d.  Communicate with various Debtor constituencies with regard to the strategic and bankruptcy plans of the company including:

     i.  employees;

     ii.  contract workers;

    iii.  customers;

    iv.  landlord;

     v.  regulatory bodies;

    vi.  vendors;

    vii.  shareholders;

   viii.  creditors;

    ix.  the Board of Directors;

     x.  the Bankruptcy Court and US Trustee; and

    xi.  taxing authorities.

23.    Mr. Carnell has the full and unwavering support of Perseon's board of directors, who recognize Mr. Carnell's efforts are essential to consummating the sale transaction with the

Stalking Horse, which will allow Perseon's cancer treatment technologies to continue to save lives. Because Mr. Carnell is essential to the sale process, Perseon's board of directors decided to enter into an amended and restated Employment Agreement with Mr. Carnell to reaffirm both parties' obligations and commitments.

24.     It is my understanding that pursuant to the original version of the Employment Agreement, Mr. Carnell is entitled to receive the following amounts:

    a.  $175,000, as of June 30, 2016, for the six months of salary that Mr. Carnell deferred;

    b.  $150,000 as a bonus for 2015, which Mr. Carnell did not receive;

    c.  $75,000, as of June 30, 2016, as the pro rata portion of Mr. Carnell's bonus for work performed by Mr. Carnell in 2016; and

    d.  $700,000 upon the change in control that will occur if the transaction contemplated in the APA is consummated.

25.     Thus, it is my understanding that pursuant to the original Employment Agreement, as of the closing of the transaction contemplated in the APA, Mr. Carnell would be entitled to receive $1.1 million in deferred compensation, bonuses, and severance payments upon the closing of the sale of the Debtor's assets.

26.     Perseon's Board believes that Mr. Carnell's services are irreplaceable. Consequently, in the business judgment of Perseon's board of directors, we have agreed to amend and restate Mr. Carnell's Employment Agreement, which effectively reduces Mr. Carnell's compensation to the following amounts:

9

a. $600,000 as a claim entitled to administrative priority pursuant to Section 503(b)(1)(A) of the Bankruptcy Code to be paid in the following amounts: (i) $300,000 upon closing of the sale, which is anticipated to be on or about August 1, 2016; (ii) $100,000 on or about October 1, 2016; (iii) $100,000 on or about December 1, 2016; and (iv) $100,000 upon confirmation by the Court of any plan; and

b. $250,000 as a general unsecured claim.

27.     I believe that this amendment to the compensation structure in the Employment Agreement will save the Debtor at least $250,000 and at least $100,000 in claims entitled to administrative priority.

28.     Accordingly, in my business judgment, amending, restating, and assuming the Employment Agreement is in the best interests of Perseon's constituents.

29.     I believe that the Debtor's assumption of Mr. Carnell's amended and restated Employment Agreement and the concessions made by Mr. Carnell represent fair and reasonable consideration that was derived from arms-length negotiation between Mr. Carnell and Perseon's board of directors.

30.     I believe that the Debtor's assumption of the amended and restated Employment Agreement will reduce the amount owed to Mr. Carnell by at least $250,000.  Accordingly, assuming the Employment Agreement as modified is in the best interests of the Debtor's estate.

31.     I believe that Mr. Carnell's agreement to reduce the amounts owed to him by the Debtor under the original Employment Agreement by at least $250,000 represents a good faith payment for value.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

_/s/ Timothy C. McQuay_                      
Timothy C. McQuay