Steven T. Waterman (4164)
Michael F. Thomson (9707)
Jeffrey M. Armington (14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  waterman.steven@dorsey.com
        armington.jeff@dorsey.com
        thomson.michael@dorsey.com

*Attorneys for Debtor-in-Possession BSD Medical Corporation
fka Perseon Corporation*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 16-24435 |
| PERSEON CORPORATION, | Chapter 11 |
| Debtor. | Chief Judge R. Kimball Mosier |

## DECLARATION OF MILO STEVEN MARSDEN IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION OF PAUL M. SCHWARTZ TO TERMINATE AUTOMATIC STAY TO ALLOW CONTINUATION OF FEDERAL COURT LITIGATION AGAINST NON-DEBTORS AND MEMORANDUM IN SUPPORT

I, Milo Steven Marsden, being of law age, hereby declare, certify, and state as follows:

1.     I am a partner at the law firm of Dorsey & Whitney LLP.

2.     I represented the Debtor, and eleven individuals, both current and former directors and officers of the Debtor (collectively, the "Defendants") in the United States District Court for the District of Delaware (the "Delaware Court") in the case captioned as *Schwartz v. Perseon*

*Corporation (f/k/a BSD Medical Corporation) et al.*, Case No. 1:15-cv-00344-LPS (D. Del.) (the

"Delaware Case").

3.      On June 30, 2015, I caused to be filed a "Motion to Dismiss" the Complaint

against all Defendants, a true and correct copy of which is attached hereto as **Exhibit A**.

4.      Also on June 30, 2015, I caused to be filed an opening brief in support of the

Motion to Dismiss, a true and correct copy of which is attached hereto as **Exhibit B**.

5.      The Motion to Dismiss was the only motion to dismiss filed by any of the

Defendants in the Delaware Case.

6.      On March 29, 2016, the Delaware Court entered the Order attached hereto as

**Exhibit C**, which granted the Motion to Dismiss.

7.      I declare that the foregoing is true and correct to the best of my knowledge,

information and belief.

DATED this 18th day of November, 2016.

/s/ *Milo Steven Marsden*
Milo Steven Marsden

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAUL SCHWARTZ, individually as a shareholder of Perseon Corporation (f/k/a BSD Medical Corporation), and on behalf of Perseon Corporation (f/k/a BSD Medical Corporation), | Civil Action No. 1:15-cv-00344-LPS |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| PERSEON CORPORATION (f/k/a BSD MEDICAL CORPORATION); TIMOTHY C. MCQUAY; GERHARD W. SENNEWALD; MICHAEL NOBEL; DOUGLAS P. BOYD; STEVEN G. STEWART; DAMIEN E. DUPUY; HAROLD R. WOLCOTT; WILLIAM S. BARTH, DENNIS P. GAUGER; SAM MARAVICH JR.; and CLINTON E. CARNELL, JR., | |
| Defendants | |

## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Defendants Perseon Corporation (f/k/a BSD Medical Corporation), Timothy C. McQuay, Gerhard W. Sennewald, Michael Nobel, Douglas P. Boyd, Steven G. Stewart, Damien E. Dupuy, Harold R. Wolcott, William S. Barth, Dennis P. Gauger, Sam Maravich Jr., and Clinton E. Carnell, Jr. (the "Defendants"), by and through their undersigned counsel, hereby move pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b), and 23.1 (the "Motion") for an Order dismissing the Complaint [D.I. 1] filed by Plaintiff Paul Schwartz, individually and as a shareholder of Perseon Corporation (f/k/a BSD Medical Corporation) and on behalf of Perseon Corporation (f/k/a BSD Medical Corporation), for failure to state a claim upon which relief can be granted.

The grounds for this Motion are set forth in the Opening Brief filed concurrently with this

Motion.

Dated:  June 30, 2015

Respectfully submitted,

DORSEY & WHITNEY (DELAWARE) LLP

_/s/ Robert W. Mallard_
Robert W. Mallard (DE Bar No. 4279)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue
Suite 1010
Wilmington, DE 19801
Telephone: (302) 425-7171
Facsimile:  (302) 425-7177
mallard.robert@dorsey.com
glorioso.alessandra@dorsey.com

Of Counsel:

Milo Steven Marsden (*pro hac vice*)
Kyle E. Witherspoon (*pro hac vice*)
DORSEY & WHITNEY LLP
Kearns Building
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone:  (801) 933-7360
Facsimile:  (801) 933-7373
E-mail:  marsden.steve@dorsey.com
             witherspoon.kyle@dorsey.com

***Attorneys for Defendants***

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2015, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF System, which will send a notification of such filing to the following:

Kevin J. Mangan, Esq.
Jill Agro, Esq.
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
E-mail:  kmangan@wcsr.com
      jagro@wcsr.com

Of Counsel:

David Graff, Esq.
Rachael Kierych, Esq.
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000
Facsimile:  (212) 278-1733
E-mail:  dgraff@andersonkill.com
      rkierych@andersonkill.com

*Attorneys for Plaintiffs*

              __ /s/ *Robert W. Mallard* __
              Robert W. Mallard

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAUL SCHWARTZ, individually as a shareholder of Perseon Corporation (f/k/a BSD Medical Corporation), and on behalf of Perseon Corporation (f/k/a BSD Medical Corporation), | Civil Action No.  1:15-cv-00344-LPS |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| PERSEON CORPORATION (f/k/a BSD MEDICAL CORPORATION); TIMOTHY C. MCQUAY; GERHARD W. SENNEWALD; MICHAEL NOBEL; DOUGLAS P. BOYD; STEVEN G. STEWART; DAMIEN E. DUPUY; HAROLD R. WOLCOTT; WILLIAM S. BARTH, DENNIS P. GAUGER; SAM MARAVICH JR.; and CLINTON E. CARNELL, JR., | |
| Defendants | |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Robert W. Mallard (DE No. 4279)
Alessandra Glorioso (DE No. 5757)
DORSEY & WHITNEY (DELAWARE) LLP
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail: mallard.robert@dorsey.com
       glorioso.alessandra@dorsey.com

Milo Steven Marsden (*pro hac vice*)
Kyle E. Witherspoon (*pro hac vice*)
DORSEY & WHITNEY LLP
Kearns Building
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone:  (801) 933-7360
Facsimile:  (801) 933-7373
E-mail:  marsden.steve@dorsey.com
       witherspoon.kyle@dorsey.com

*Attorneys for Defendants*

Dated: June 30, 2015

i

# TABLE OF CONTENTS

TABLE OF CITATIONS ..................................................................................... iv

NATURE AND STAGE OF PROCEEDINGS .............................................................1

SUMMARY OF ARGUMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................4

ARGUMENT ............................................................................................... 11

I.      Legal Standard for Motion to Dismiss. ................................................... 11

II.     The Complaint Fails To Meet The Pleading Requirements Of 15 U. S. C. §78u-
        4(B)(1) And (2). ............................................................................... 11

        A.      The Complaint Fails to Allege Any Fraudulent Statement or Omission. ............. 13

                1.      Alleged Misrepresentation Of Financial Performance, Growth And
                        Success. ............................................................................. 13

                2.      Alleged Misrepresentations Concerning Capital Raising Activities. ........ 15

                3.      Alleged Misrepresentations In Particular Press Releases ..................... 16

        B.      The Complaint Fails Adequately to Allege a Strong Inference of Scienter. ......... 20

        C.      The Complaint Fails Adequately to Plead Loss Causation. ............................. 22

III.    The Complaint Fails To Plead Fraud Under Delaware Law With Particularity, As
        Required By Fed. R. Civ. P. 9(b). ........................................................... 23

IV.     Plaintiff's Remaining Claims Are Derivative AND must Be Dismissed Under The
        Business Judgment Rule. ....................................................................... 24

        A.      Motion to Dismiss Standard for Judicial Review of Demand Refusal. ............... 25

        B.      The Complaint Does Not Adequately Allege That The Demand Was
                Wrongfully Refused. ............................................................................ 26

                1.      Plaintiff's "Participation" In The Investigative Process. .................... 26

                2.      Failure To Complete The Investigation On Plaintiff's Timetable. .......... 28

                3.      Board Involvement In The Investigation. .................................... 28

4.    Plaintiff's allegations actually support the existence of a reasonable
and good faith investigation. ...................................................................29

CONCLUSION ...........................................................................................................30

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)............................................................18, 19, 20, 21

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)..................................................................12, 19

*Aronson v. Lewis*,
    473 A.2d 805, (Del. 1984) ............................................................................29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................11

*Bartesch v. Cook*,
    941 F. Supp. 2d 501 (D. Del. 2013)........................................................14, 15, 21

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................12, 21

*Berckeley Inv. Group, Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)........................................................................13, 23

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)....................................................................................17

*Birnbaum v. Newport Steel Corp.*,
    193 F.2d 461 (2d Cir. 1952)........................................................................17

*Boeing Co. v. Shrontz*,
    1994 WL 30542 (Del. Ch. Jan. 19, 1994)................................................26, 27, 28

*Browne v. Robb*,
    583 A. 2d 949 (Del. 1990)............................................................................23

*In re Burlington Coat Factory Securities Litigation*,
    114 F.3d 1410 (3d Cir. 1997)........................................................................19

*Charal Inv. Co. v. Rockefeller*,
    1995 WL 684869 (Del. Ch. Nov. 7, 1995) ....................................................28

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)........................................................................19

Case 16-1441, Document 46, 06/30/16, 1805536, Page 12 of 45
Case 1:15-cv-00344-LPS Document 1-1 Filed 04/18/16 Page 12 of 45 PageID #: 74

Document      Page 12 of 45

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
    686 F.Supp.2d 404 (D. Del. 2009)................................................................21, 22

*In re Digital Island Sec. Litig.*,
    223 F.Supp.2d 546 (D. Del. 2002)......................................................................23

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................................................22

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009).........................................................................11, 22

*Gaffin v. Teledyne, Inc.*,
    611 A.2d 467 (Del.1992) .....................................................................................24

*Gamoran v. Neuberger Berman, LLC*,
    2012 WL 2148217 (S.D.N.Y. June 12, 2012) ...................................................27

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 227 (3d Cir. 2004)................................................................................12

*Heliotrope Gen., Inc., v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999) ..............................................................................14

*Inst. Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)................................................................................12

*In re J.P. Stevens & Co.*,
    542 A.2d at 780–81 .............................................................................................26

*In re J. P. Stevens & Co., Inc.*,
    542 A.2d 770 (Del. Ch. 1988).............................................................................25

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ..........................................................2, 3, 14

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991) ...............................................................................25, 27

*Litton Indus., Inc. v. Hoch*,
    1993 WL 241549 (C.D. Cal. Oct. 30, 1991).............................................27, 28, 30

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004)..................................................................................4

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007)................................................................................22

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ...............................................................................19

*Metro Commc'ns v. Advanced Mobilecomm Tech., Inc.*,
    854 A.2d 121 (Del. Ch. 2004) ............................................................................24

*Nacco Industries, Inc. v. Applica Inc.*
    991 A.2d 1 (Del. Ch. 2009) ................................................................................24

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ...............................................................................4

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
    818 A.2d 914 (Del. 2002) ...................................................................................25

*RCM Sec. Fund, Inc. v. Stanton*,
    928 F.2d 1318 (2d Cir. 1991) ...............................................................................3

*Scattered Corp. v. Chicago Stock Exchange, Inc.*,
    701 A.2d 70 (Del. 1997) .....................................................................................25

*Snowstorm Acquisition Corp. v. Tecumseh Prods Co.*,
    739 F. Supp. 2d 686 (D. Del. 2010) ...................................................................24

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ...................................................................................25

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir.2006) ...........................................................................12, 23

*Tellabs, Inc.  v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................12

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ..........................................................................13, 21

*In re Worlds of Wonder Securities Litigation*,
    35 F.3d 1407 (9th Cir. 1994) ..............................................................................13

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) ...................................................................................25

## Statutes

15 U.S.C. ¶78u-4 ...................................................................................1, 11, 12, 21

15 U.S.C. § 78u-5(c) ....................................................................................................19

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Paul Schwartz ("Plaintiff"), filed his Complaint ("D. I. 1") on April 29, 2015, alleging: (1) individual claims for purported violations of the Securities Exchange Act of 1934 and common law fraud; and (2) putative derivative claims, on behalf of Perseon Corporation, f/k/a BSD Medical Corporation ("BSD" or "the Company"), for breach of fiduciary duty and negligence. Defendants Timothy C. McQuay, Gerhard W. Sennewald, Michael Nobel, Douglas P. Boyd, Steven G. Stewart, Damien E. Dupuy and Harold R. Wolcott ("Director Defendants"), William S. Barth, Dennis P. Gauger, Sam Maravich Jr., and Clinton E. Carnell, Jr. ("Executive Defendants"), and BSD (collectively, "Defendants") submit this Opening Brief in Support of Defendants' Motion to Dismiss ("Motion"). In support of the Motion, Defendants rely on this Opening Brief, the Declaration of Kyle E. Witherspoon and attached exhibits A-JJ, and the record in this case.

## SUMMARY OF ARGUMENT

1.      Through the Complaint, Plaintiff purports to assert securities fraud and common law fraud against BSD, the Director Defendants, and the Executive Defendants. Plaintiff alleges that certain of BSD's press releases were false and misleading because they "touted" BSD's financial performance, when "in reality BSD was floundering and unable to cover its operating costs," D.I. 1, ¶ 47, they did not advise of the possibility of shareholder dilution from future capital raises, and they were otherwise misleading.

2.      Plaintiff's securities fraud claims are subject to the heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA") which, among other things, requires plaintiffs to allege with particularity why the challenged disclosures were fraudulent and plead particularized facts creating a strong inference of scienter as to each defendant.

1

3.  The Complaint fails to meet these standards and should be dismissed for three independent reasons: *First*, Plaintiff fails to adequately allege any fraudulent statement or omission.  BSD's filings both before and throughout the time Plaintiff says he was investing in fact accurately disclosed BSD's financial condition and performance, its need to raise capital, and the fact that any capital raise would dilute existing shareholders and lower the market price for the stock.  BSD's public filings also contained meaningful cautionary language warning investors of the risks presented by the business' lack of operating profits and consequent need to raise capital.  BSD's press releases similarly contained meaningful cautionary language warning investors of the risks presented in its forward-looking statements.  These disclosures belie Plaintiff's conclusory allegations of misrepresentation and omissions.

4.  *Second*, Plaintiff fails to plead facts, let alone with particularity, creating a strong inference of scienter.  Stripped of its boilerplate conclusions, and impermissible "group pleading," the Complaint contains literally no allegations suggesting that BSD or any other Defendant was aware that BSD's disclosures were false and misleading.  BSD's public reports show that the Defendants were forthright concerning BSD's financial results and its prospects.

5.  *Third,* Plaintiff fails to plead loss causation.  Indeed, Plaintiff plead no facts at all showing a causal connection between any alleged misrepresentations and Plaintiff's alleged loss, and the bare conclusions it pleads regarding causation are contradictory and nonsensical.

6.  Further, Plaintiff's common law fraud claim fails to meet the pleading standards of Rule 9.

7.  In addition to the alleged securities law and common law fraud claims, Plaintiff purports to assert breach of fiduciary duty and negligence claims derivatively against the Executive and Director Defendants arising out of BSD's capital raising activities and its response

to Plaintiff's derivative demand.   D.I. 1, ¶¶ 176, 177.  The Complaint acknowledges that

Plaintiff made a pre-suit derivative demand on BSD's Board of Directors, and challenges the

Board's *refusal* of his demand.  Under Delaware law, the Board's refusal of Plaintiff's demand is

protected by the business judgment rule.  To overcome the business judgment rule and establish

standing to sue on behalf of BSD, Plaintiff must plead particularized facts challenging the

Board's process, and showing that the Board's decision is so far beyond the bounds of

reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.  "

[F]ew, if any, plaintiffs surmount" the presumption of the business judgment rule.  *RCM Sec.*

*Fund, Inc. v. Stanton*, 928 F.2d 1318, 1328 (2d Cir.  1991).  Plaintiff's Complaint fails to do so

here as follows:

8.      *First*, by making demand on the Board, Plaintiff has waived any claim he might

have that the Board cannot act independently on his demand.  Thus, the only issues to be

examined are the good faith and reasonableness of the Board's investigation.

9.      *Second,* to challenge the good faith and reasonableness of the Board's

investigation, Plaintiff's Complaint must plead, with particularity, facts which create a

reasonable doubt that the Board's decision is protected by the business judgment rule.  Plaintiff's

few conclusory allegations regarding the Board's investigation do not lead to a reasonable belief

that the investigation was unreasonable, or conducted in bad faith.  To the contrary, the

allegations show that the Board properly initiated an investigation and hired outside Special

Counsel to advise and assist.  Special Counsel sought documentary evidence from Plaintiff and

others, interviewed witnesses, and took adequate time to fully investigate the matter.  The Board

then considered the recommendations of Special Counsel, and exercising its business judgment,

rejected Plaintiff's demand because it was unfounded, and not in the best interest of BSD to pursue litigation on behalf of BSD.

## STATEMENT OF FACTS

BSD is a small medical device company, based in Salt Lake City, Utah, that was principally focused on research, development and commercialization of two cancer therapies: "ablation" (used to destroy soft tissue with heat) and "hyperthermia," (used to destroy locally advanced tumors using a short intense focus of heat, usually used to increase the effectiveness of other therapies such as radiation). *See* D.I. 1, ¶10, Ex. A.[1]

### BSD's Public Reports

In its entire corporate history, BSD has never made or reported an annual operating profit. *See* Ex. B at p. 17. To the contrary, BSD has a long history of operating losses incurred in its attempts to commercialize and sell its ablation and hyperthermia technologies and products. (*See id.*). BSD's public reports, filed with the SEC, have consistently disclosed operating losses in every fiscal quarter and every fiscal year during the period relevant to the Complaint. [2] For instance, in its Form 10-K for the fiscal year ended August 31, 2009, (*i. e.,* the last 10-K before Plaintiff invested) BSD reported an operations loss of $6,526,493, and an accumulated deficit of $16,674,122. *See* Ex. U, pp. F-4 & 5.

---

[1] In resolving a motion to dismiss, the Court may consider the allegations in the Complaint, exhibits attached to the Complaint, matters of public record, documents that form the basis of a claim, documents "integral to or explicitly relied upon in the [C]omplaint," and documents filed with the SEC, without converting a motion to dismiss into a motion for summary judgment. *See Lum v. Bank of Am.*, 361 F.3d 217, 222 (3d Cir. 2004); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

[2] Copies of the pages from BSD's SEC filings disclosing operating losses and accumulated deficits for the relevant periods are attached as Exs. A through U. A chart summarizing the operating losses and accumulated deficits for the relevant periods is attached as Ex. JJ.

The 2009 Form 10-K expressly told the public that:

> Since inception through August 31, 2009, we have generated an accumulated deficit of $16,674,122.  Included in this amount is a realized loss on investments of $6,501,586 recorded in the year ended August 31, 2009.  _The remainder of the accumulated deficit can be attributed to our operations, where our operating revenues have been insufficient to cover our operating expenses_.

Ex. U, p. 32 (emphasis added).

If this disclosure was not sufficient, the "Risk Factors" section of the 2009 Form 10-K specifically calls out the following:

> **_We have a history of significant operating losses and such losses may continue in the future._**
>
> Since our inception in 1978, our expenses have substantially exceeded our revenue, resulting in continuing losses and an accumulated deficit of $16,674,122 at August 31, 2009.  We reported net losses of $11,384,870, $2,439,099 and $3,348,195 in fiscal years 2009, 2008 and 2007, respectively.
>
> We may continue to incur operating losses in the future as we continue to incur costs to develop our products, protect our intellectual property and expand our sales and marketing activities.  _To become profitable we will need to increase significantly the revenues we receive from sales of our hyperthermia therapy products and to successfully commercialize our new ablation product to improve our profitability on a quarterly or annual basis.  We have been unable to do this in the past and we may be unable to do so in the future, and therefore may never achieve profitability_.

Ex.  U, p.  17 (emphasis added). [3]

Because it has never generated an operating profit, BSD has had to turn to the capital markets to cover its operating expenses.  BSD's 2009 Form 10-K disclosed the risks from BSD's ongoing need to raise capital:

---

[3] The Company made similar disclosures in each of its public reports on Form 10-K that were filed throughout the relevant time frame.  _See_ Ex. E, p. 18; Ex. I, p. 18; Ex. M, p. 19; Ex. Q, p. 16; Ex. B, p. 16.

> We have historically financed our operations through cash from operations, research grants, licensing of technological assets, *issuance of common stock and sale of investments in spinoff operations*.
>
> &ast; &ast; &ast; &ast;
>
> If we cannot cover any future cash shortfalls with cost cutting and available cash, we would need to obtain additional financing.  .  . . *If we raise equity capital, our stockholders will be diluted*.

Ex. U, pp. 32-33 (emphasis added).

As of Summer 2010, BSD had an effective Form S-3 Registration Statement, pursuant to which BSD was authorized to issue an indeterminate number of shares of mixed securities with an aggregate initial offering price not to exceed $50,000,000.   Ex. V, p. 3.  BSD and its investment bankers have generally determined that BSD's best interests are served by raising capital in comparatively large blocks in sales transactions with institutional investors.  *See* Ex. W, pp.  2-3, Ex. X, pp. 2-3, Ex. Y, pp. 2-3, Ex. Z, pp. 23, Ex.  AA, pp.  2-3, Ex.  BB, pp.  2-3. These transactions have typically been structured as "registered direct" offerings.  *See id.* & D.I. 1, ¶¶ 49, 54, 56.

In fact, in the three quarters immediately preceding Plaintiff's first purchase, BSD disclosed that it had entered into three such offerings.  *See* Ex.  D, pp. 25-26, Ex.  A, pp. 27-28, Ex. Y, pp. 2-3.  BSD consistently disclosed that it raised operating funds via registered direct offerings, and the risks presented by such offerings, in its public reports:

> ***Future sales of shares of our securities pursuant to our universal shelf registration statement may negatively affect our stock price.***
>
> We currently have the ability to offer and sell up to $50.  0 million of [mixed securities] under a currently effective universal shelf registration statement.  Sales of substantial amounts of shares of our common stock or other securities under our universal shelf registration statement *could lower the market price of our common stock* and impair our ability to raise capital.

Ex. U, p. 23 (emphasis added).[4]

**BSD's Press Releases**

In the Complaint, Plaintiff complains that a handful of carefully selected press releases are misleading and omitted material facts.  *See* D.I. 1, ¶¶ 28-45.  In general, these press releases are announcements of interim anecdotal successes, for instance, the signing of a new distributor agreement *see id.,* ¶¶ 41, 42 or period over period results.  *See id.,* ¶¶ 33, 35, 36, 39.  Plaintiff claims that the releases are misleading and omitted material facts because they "tout[ed] impressive revenue figures and purported sales" when, in reality BSD was "floundering and unable to cover its operating costs…."  D.I. 1, ¶ 47.  Plaintiff seems to claim he was also misled because these press releases either did not notify him of the possibility of further dilution, or indicated that capital raises were in the distant future.  D.I.  1, ¶¶ 48, 51, 54, 56.

Plaintiff also complains about a variety of minor details, and forward-looking statements in the releases.  (*See* D.I.  1, ¶¶ 29-45).  Each Press Release contained notices regarding forward-looking statements, informing investors that the forward-looking statements were subject to the risks and uncertainties detailed in BSD's filings with the SEC.  *See* Exs. CC-EE.[5]

**Sale of Hyperthermia Product Lines**

In April of 2015, after years of trying to successfully commercialize its hyperthermia line of products, the Company publicly announced the sale of this product line for consideration including preferred stock, a percentage of gross revenues of the buyer, and the assumption of

---

[4] Similar disclosures were made in public reports filed throughout the relevant time period.  *See* Ex. E, p. 23, Ex. I, p. 24, Ex. M, p. 24, Ex. Q, p. 22, Ex. B, p. 30).

[5] As noted above, during the relevant time period BSD also filed Form 10-Ks with the SEC which detailed the "risks and uncertainties" of investing in BSD.  *See* Form 10-K's for the fiscal years ending August 31, 2010, (pp.  18-24), August 31, 2011 (pp.  18-24), August 31, 2012 (pp. 19-25), August 31, 2013 (pp.  16-22) and August 31, 2014 (pp.  18-30).  *See* Exs. B, C, I, M, Q.

certain liabilities associated with the hyperthermia product line.  *See* D.I. 1, ¶ 129, Ex. FF.  The Form 8-K also disclosed the financial interest of former BSD directors Sennewald and Boyd in the buyer, and BSD's procurement of a fairness report from Houlihan Valuation Advisors in light of these relationships.  *See id*.

The sale of the hyperthermia product line in April of 2015 was not a surprise to BSD shareholders.  Beginning no later than July of 2013 the Company, in public filings, had told shareholders that it had engaged Roth Capital Partners "to serve as our exclusive advisor with the goal to seek out, identify opportunities and, if possible, secure a transaction or transaction(s) relating to BSD's hyperthermia business, including but not limited to, partnering or other collaborative agreements, a sale of assets and/or other strategic arrangements."  Ex. P, p. 17. This disclosure was repeated and updated in BSD's 2013 Form 10-K and 10-K(A) (p.  4. & p. 4) and its November 2013 Form 10-Q (p. 12), February 2014 10-Q (p. 11), and May 2014 (p. 11), and its 2014 Form 10-K , p. 3.  *See* Exs. B, and Q-T.

In its Form 10-Q for the quarter ending November 30, 2014 BSD reported that its efforts to enter "partnering or other collaborative agreements" related to hyperthermia had been unsuccessful, that "efforts to continue supporting two capital equipment product lines have [also] proven to be unsuccessful," that BSD's management "believe[d] the future success for the Company currently will be from the commercialization of its MicroThermX product lines," and that as a result it "is now seeking to either sell the assets related to the hyperthermia products in the very near future and/or discontinue manufacturing and selling hyperthermia systems.  …" *See* Ex. GG, p. 12.

## Plaintiff's Purchases of BSD Shares

According to the Complaint, Plaintiff first learned of BSD in the Summer of 2010. D.I. 1,

¶ 22. Before investing in BSD, Plaintiff reviewed the "financials and press releases" issued by

BSD. *Id.* ¶ 23. Impressed with the Company's MicroThermX Microwave Ablation System,

Plaintiff purchased "a substantial quantity of BSD's stock in the fall of 2010." *Id.* ¶ 23. Plaintiff

alleges that he continued to invest "between the years of 2010 and 2013." *Id.* ¶ 26.[6]

## Plaintiff's Demand And Related Correspondence

According to the Complaint, Plaintiff sent his first correspondence related to this lawsuit on

August 13, 2014. D.I. 1, ¶ 84. Tellingly, the Complaint does not allege that the correspondence

made demand on the BSD Board to take action with respect to any particular conduct by any

officer or director. (*Id.*) Instead, it says that the purpose of the letter was to "request[] a

teleconference to discuss Plaintiff's concerns," (*id.*)—code for demanding settlement. In

---

[6] Although he is asserting only his own fraud claims, Plaintiff's Complaint adopts the familiar structure of a class action complaint. This structure does not work for Plaintiff's claims. First, the Complaint defines an "Investment Period" extending from the fall of 2010 to the present." D.I. 1, ¶ 2. But elsewhere, Plaintiff alleges that the last of his own purchases was in 2013. *Id.* ¶ 26. Thus, his "Investment Period" is irrelevant and misleading. Nonetheless, Plaintiff makes numerous misrepresentation claims about events after 2013.

Second, although the Complaint contains a section entitled "Executive Director Defendants' Materially False and Misleading Statements," the Complaint does not give any reasons why most of the statements in the section (*i.e.,* paragraphs 29, 30, 31, 36, 37, 43 and 44) are false or misleading. The same can be said for paragraphs 62, 66 and 67 which allege oral statements by BSD's former CEO, Butch Wolcott. The Complaint does not claim that these statements were false or misleading – only that Plaintiff relied on them. *See* D.I. 1, ¶¶ 62-68.

Third, although there is a section entitled "The Truth is Revealed," it does not identify any corrective disclosures regarding prior releases. And, the capital raises that it does reference occurred throughout the period of the alleged misrepresentations, not after them. Indeed, the first occurred at or before plaintiff's first purchase. D.I. 1, ¶¶ 49, 54, 56.

September of 2014, Plaintiff again wrote BSD and "reiterated his request to meet with the Company." *Id.* ¶ 86.

Only when BSD refused Plaintiff's overtures to "meet," did Plaintiff make a derivative demand, and enclose a draft complaint. *Id.* ¶ 87; Ex. HH. Between October 17, 2014 and April 20, 2015, Plaintiff sent the Company or its lawyers no fewer than eight letters castigating the investigation, demanding it be completed more quickly, demanding information about the investigation, and again requesting face to face meetings. *Id.* ¶¶ 88, 90, 92, 94, 95, 98, 104, 105.

**<u>The Board's Investigation and Refusal of Plaintiff's Demand</u>**

Although the Complaint, in conclusory terms, criticizes the Board's investigation, it at a minimum admits that: (1) the investigation was formally commenced by the Board no later than October 29, 2014, *id.* ¶ 89; (2) the Board hired Special Counsel to independently advise it and assist it in the investigation, *id.* ¶ 91 (Ex. II); (3) Special Counsel and selected Board members interviewed several individuals, including the Plaintiff (although Plaintiff's interview apparently was not completed) *id.*, ¶ 101; (4) Special Counsel sought from Plaintiff documents supporting his claims, *id.,* ¶ 96; (5) the investigation ultimately was completed in April of 2015; and (6) BSD's Special Counsel then wrote to inform Plaintiff that the investigation was "substantially complete," and that "Special Counsel has advised BSD's Board of Directors of its recommendations." *Id.* ¶ 109. Special Counsel's letter further advised Plaintiff that "[b]ased on the Board and its Special counsel's investigation, and exercising its business judgment, the Board had determined [Plaintiff's] claims are unfounded and entirely without merit," and that "[t]he Board of Directors has determined that pursuing [Plaintiff's] claims is not in the Company's best interest." *Id.*

10

<u>**Plaintiff's Complaint**</u>

Plaintiff now seeks to substitute his judgment for that of the Board by asserting breach of fiduciary duty and negligence claims, *id.* ¶¶ 175-83, notwithstanding the Board's decision that pursuit of such claims is not in the best interest of BSD. Plaintiff further alleges that the Board "failed to conduct an independent, reasonable investigation in good faith into the claims set forth in the Derivative Demand and Plaintiff's correspondence." *Id.* ¶ 107.

**ARGUMENT**

I.     **LEGAL STANDARD FOR MOTION TO DISMISS**.

When presented with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts in the Third Circuit conduct a two-part analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, courts separate the factual and legal elements of a claim, accepting only "the complaint's well-pleaded facts as true," but disregarding any "legal conclusions." *Id.* at 210-11. Second, courts then determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, Plaintiff's Complaint is subject to these standards, as well as the special heightened rules applicable to securities fraud claims and derivative claims.

II.    **THE COMPLAINT FAILS TO MEET THE PLEADING REQUIREMENTS OF 15 U.S.C. §78U-4(B)(1) AND (2).**

To state a claim for securities fraud under Section 10(b), a plaintiff must plead: "(1) a material misrepresentation (or omission) in connection with the purchase or sale of a security; (2) scienter, *i. e.,* a wrongful state of mind; (3) reliance; (4) economic loss; and (5) 'loss

11

causation,' *i. e.,* a causal connection between the material misrepresentation and the loss." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 275(3d Cir.2006) (citation omitted).

Congress enacted the PSLRA to serve as "a check against abusive litigation" in securities fraud cases. It imposes additional "exacting and distinct pleading requirements." *In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 277 (3d Cir. 2010). After the PSLRA, a securities fraud claim must be dismissed at the pleading stage unless it satisfies both Rule 8's requirement of factual allegations sufficient to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007), <u>and</u> the "heightened pleading requirement[s]" imposed by the PSLRA and Rule 9(b). *Suprema*, 438 F.3d at 276.

First, a complaint must contain factual allegations specifying each allegedly misleading statement, stating why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity.*" Inst. Investors Group v. Avaya, Inc.,* 564 F.3d 242, 252-53 (3d Cir. 2009) (quotation omitted).

Second, a complaint must allege with particularity facts giving rise to a "strong inference" that each defendant acted with scienter, that is, a "mental state embracing intent to deceive, manipulate, or defraud," which requires "a knowing or reckless state of mind." *Avaya,* 564 F.3d at 252. A statement is "reckless" only if it is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *GSC Partners CDO Fund v. Washington,* 368 F.3d 227, 238 (3d Cir. 2004). Further, "omissions and ambiguities count against inferring scienter." *Avaya*, 564 F.3d at 268 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 310 (2007)). Accordingly, to be "strong," the factual allegations must give rise to "a powerful or cogent inference that is at least as

compelling as any opposing inference one could draw from the facts alleged." *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (quoting *Tellabs*, 551 U. S. at 319).

Third, the plaintiff must plead and prove "loss causation," *i.e.,* that the fraudulent misrepresentations "actually caused the loss suffered." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006). In other words, that "it was the very facts about which the defendant lied which caused [plaintiff's] injuries." *Id.*

A.    **The Complaint Fails to Allege Any Fraudulent Statement or Omission.**

Plaintiff's claims of misrepresentation are based entirely on a cherry-picked set of press releases that BSD issued between April 6, 2012 and September 14, 2014. *See* D.I. 1, ¶¶ 28-46. The Complaint studiously avoids reference to the Company's public reports filed with the SEC throughout this timeframe. Plaintiff attacks the Company's press releases as "misleading" on three general grounds.

First, Plaintiff alleges that the press releases as a group "tout[ed BSD's] financial performance, sales initiatives, contract acquisitions, and purported success," D.I. 1, ¶ 28, when "in reality BSD was floundering and unable to cover its operating costs, including significant executive compensation." *Id.* ¶ 47. Second, although the Complaint is far from clear on this point, Plaintiff appears to allege that the press releases either did not put the Plaintiff on notice that BSD's capital raising activities would be dilutive to existing shareholders, or led him to believe that any capital raises would be in the distant future. *See id.,* ¶¶ 48, 51, 54, 56. Third, plaintiff alleges specific problems with a handful of particular releases. *See id.* ¶¶ 69-83.

1.    **Alleged Misrepresentation Of Financial Performance, Growth And Success.**

Under applicable law, claims like Plaintiff's "must be considered in the context of both the comprehensive disclosures made by the company," *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1413 (9th Cir. 1994) and the "extensive information in the market…."

13

*Heliotrope Gen., Inc., v. Ford Motor Co.,* 189 F.3d 971, 976-78 (9th Cir. 1999)).  Where "the alleged omissions are contradicted by the company's public disclosures … there can be no Section 10(b) claim."  *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D.  Del. 2013) (citing *In re The First Marblehead Corp. Sec. Litig.,* 639 F. Supp. 2d 145, 155 (D.  Mass. 2009) ("plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed").

Here Plaintiff's allegation is insufficient because before the Plaintiff's first investment and throughout the relevant period, BSD's public reports accurately showed BSD's financial condition and prospects.  These public reports consistently disclosed that BSD (i) had limited and inconsistent operating revenue, (ii) suffered sizeable operating losses throughout its life; and (iii) was dependent on stock and asset sales to fund its ongoing operations, which would dilute existing shareholders.  In other words, BSD's public reports disclosed precisely the information that Plaintiff claims was omitted.

BSD's 2009 Form 10-K (filed before Plaintiff's first purchase) made this plain.  It showed that BSD had an accumulated *deficit* of $16,674,122, as compared to $5,289,252 for the prior year, Ex. U, p.  F-4, that BSD had an operating loss of $6,526,493 and a net loss of $11,384,870 for the year.  *Id.,* p.  F-5.  Further, in *each and every one* of its Form 10-Ks and Form 10-Qs during the period, BSD consistently reported *for every fiscal quarter and every fiscal year*, an inability to cover its operating costs, a significant net loss, and increases in its accumulated deficit.

Plaintiff does not allege that the press releases "touting financial performance" were false, and they are not.  Rather, Plaintiff's claim is that the anecdotal positive news in the releases was misleading because it suggested that BSD was financially successful.  This claim

simply cannot be maintained in the face of BSD's well-publicized, consistent history of operating losses.  Here, the claimed omission is that "BSD was floundering and unable to cover its operating costs, including significant executive compensation."  D.I. 1, ¶ 47.  That omission is directly contradicted by the Company's public disclosures.  As such, "there obviously can be no Section 10(b) claim."  *See Bartesch*, 941 F. Supp.2d at 508.

### 2.  Alleged Misrepresentations Concerning Capital Raising Activities.

Plaintiff's other generalized claim of misrepresentation relates to the dilutive nature of BSD's capital-raising activities.  *See* D.I. 1 ¶¶ 48-58.

#### a.  Dilution

As shown in the section above, BSD's public reports disclosed that BSD had never posted an operating profit, and had a consistent history of operating losses.  BSD's public reports also specifically called out the obvious fact that (1) the Company would need additional capital in order to continue to operate and (2) capital raises would dilute existing shareholders, and lower the stock price.  As with the claim that the Company's financial performance was misrepresented, the claim that the possibility of dilution was omitted is belied by BSD's public filings.  And, where "the alleged omissions are contradicted by the company's public disclosures … there can be no Section 10(b) claim."  *Bartesch*, 941 F. Supp. 2d at 508.

#### b.  Timing of capital raises

Plaintiff also alleges that an October 1, 2012 press release, which announced the filing of a new shelf registration statement authorizing issuance of $50 million in new securities, and stated the Company "had no current plans" to offer securities, and a November 14, 2012 press release, which stated stating the Company "believe[s] we are sufficiently capitalized to continue its sales and marketing product development efforts," were misleading because (1) *six months after the October press release*, BSD entered into a securities purchase agreement, the proceeds

Case 1:14-cv-03004-CM   Document 118   Filed 06/30/15   Page 29 of 45
Case 1:14-cv-03004-CM-DCF   Document 116   Filed 06/30/15   Page 29 of 45   Desc Main
Document       Page 29 of 45

of which would be used for "general working capital" D.I. 1, ¶ 54, and (2) *20 months after the*
*October press release* BSD entered into an agreement to raise approximately $5.2 million in a
registered direct offering." *Id.*, ¶ 56.

Plaintiff says these later stock offerings are "in direct contravention to [BSD's] very
recent representation" that it had "no current plans."  But simply saying this does not make the
allegation plausible.  Six months passed between October 2012 and April 2013.  In that time,
BSD had posted additional operating losses of $2,229,925, and $1,864,495, for the first and
second quarters of fiscal 2013, respectively.  *See* Ex. N, p., 4; Ex. O, p.  4.  Plaintiff ignores the
plain language of the complete press release.  The full press release in fact clearly tells the
public, that while BSD had "no current plans" to offer securities, BSD "may periodically offer
one or more of these securities in amounts, prices and on terms to be announced when and if the
securities are offered."  *See* Ex. CC, October 1, 2012 Press Release.  And, under BSD's prior
Form S-3, BSD "completed four stock offerings during calendar year 2010, receiving total net
proceeds of approximately $16.2 million."  *Id.*.

Against these public facts, Plaintiff's claim of misrepresentation cannot stand.

### 3.       Alleged Misrepresentations In Particular Press Releases

In paragraphs 69-83 of the Complaint, Plaintiff alleges several press releases were
misleading in specific ways.  These allegations suffer from the same defect as Plaintiff's more
general allegations, and other defects as well.

### a.       Increases in sales in particular periods.

The Complaint identifies several press releases in which the Company reported sizeable
increases in sales of a particular product in one period over another.  *See* D.I. 1 ¶¶ 72, 73, 74, 77.
For example, paragraph 73 of the Complaint cites a December 6, 2012 press release announcing
"a 585% increase in sales for the MicroThermX Microwave Ablation System … for the fiscal

Case 1:14-cv-03800-L.P.S. Document 18-1 Filed 06/30/15 Page 28 of 32 PageID #: 92
Case 1:14-cv-03800-LPS Document 116 Filed 06/30/15 Page 30 of 45 PageID #: 92
Document     Page 30 of 45

quarter ended November 30, 2012 as compared to the fiscal quarter ended November 30, 2011."

Plaintiff alleges that these press releases were misleading either because they "fail[ed] to disclose

the actual number of machines sold," *id*. ¶ 74 or because the period chosen for comparison is not

"representative" *id*. ¶ 72.[7]

But BSD's public reports issued both before and after the subject press releases in fact

disclose the precise information Plaintiff says was omitted.  For instance, BSD's November 2011

Form 10-Q, filed on January 9, 2012, contains a chart showing the exact number of sales of each

of BSD's hyperthermia products in the quarter ended November 30, 2011.  Ex. J, p. 17.  Similar

charts are contained in each Form 10-K and Form 10-Q BSD filed between August of 2009 and

February of 2013.  [8]  Moreover, both the "Risk Factors" section and the "Management

Discussion and Analysis" sections of the 2011, 2012, and 2013 Form 10-Ks specifically tell

investors that revenues are generated from a relatively small number of sales and, therefore, sales

in any period may not be representative:

> Our revenues can fluctuate significantly from period to period
> because our sales, to date, *have been based upon a relatively small
> number of hyperthermia systems*, *the sales price of each being
> substantial enough to greatly impact revenue levels in the periods
> in which they occur*. . . .  As a result, there may be quarterly
> financial reporting periods where we may report no or minimal
> revenues from the sale of hyperthermia systems.  *Through August*

---

[7] In paragraph 77, Plaintiff similarly claims that a statement (made at a September 2014 analyst
and investor conference) that BSD's revenues had grown 105%, was misleading because it
"omitted revenue amounts for fiscal years 2007 through 2011."  Of course, revenue amounts for
years 2007 through 2011 were already in BSD's public filings for all the world to see.  More to
the point, however, this allegation concerns an alleged misrepresentation made at least nine
months after Plaintiff's last alleged purchase.  It is completely irrelevant.  *See Blue Chip Stamps
v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975) (citing *Birnbaum v. Newport Steel Corp*.,
193 F.2d 461 (2d Cir. 1952)) (bars claims not related to an actual purchase or sale of a security).

[8] *See* Ex. U, p. 29, Ex. C, p. 18 , Ex. D, p. 21, Ex. A, p. 22, Ex. E, p. 30, Ex. F, p. 18, Ex. G, p.
17, Ex. H, p. 18, Ex. I, p. 30, Ex. J, p. 17, Ex. K, p. 17, Ex. L, p. 17, Ex. M, p. 31, Ex. N, p. 17,
Ex. O, p. 17.

> *31, 2011, we had minimal revenues from our MicroThermX®*
> *family of products.*

Ex. I, p. 29 (emphasis added); *see* Ex. M, p. 3; Ex. Q, p.17.[9] With these public facts in hand, a reasonable investor is not misled by BSD's press releases.

### a.     **Distributor agreements.**

Plaintiff also complains that several press releases announcing exclusive distributor agreements were misleading. *See* D.I. 1, ¶¶ 70, 75. But the statements Plaintiff says are misleading are clearly inactionable, vague, forward-looking statements. For instance, Plaintiff complains that a press release announcing a distribution agreement with a Taiwanese distributor was misleading because it said the distributor's purchase commitment under the agreement "validated the belief that the hyperthermia business will flourish in Asia as regulatory approvals are secured," when the net effect of the announced commitment was only "sales of approximately four (4) machines per year." *Id.* ¶¶ 40, 75. Plaintiff also says this press release was misleading because it said "Asian distributors have committed to minimum purchases which *could* total more than $26. 0 million in revenue to BSD *over a five year period*." *Id.* ¶¶ 40, 70 (emphasis added). [10]

---

[9] Plaintiff complains that an October 9, 2012 press release (comparing sales in Sept. 2012 with 2011) is misleading because it "is indicative of only a month over on month comparative period" and not "representative of a continuing trend of accelerating revenue," as the release states. D.I. 1, ¶ 72. This should be obvious to a reasonable investor from the language of the release itself. But the allegation has an additional problem. Statements drawing conclusions about "continuing trends" are "[s]tatements of subjective analysis or extrapolation." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999). Such "opinions, motives, and intentions are 'soft information' and hence immaterial for purposes of Rule 10b-5." *Id.*

[10] Plaintiff also complains that while another press release reported that "a major East Coast academic medical center . . . has purchased a BSD-500 Hyperthermia System" and that the center "is launching an extensive new hyperthermia program," D.I. 1, ¶ 38, BSD ended up selling a decreased number of hyperthermia systems that year. *Id.* ¶ 70. Despite Plaintiff's allegation, these facts are not inconsistent.

But statements regarding future potential revenue and future potential success are explicitly forward-looking. As such, the Safe Harbor provision of the PSLRA, 15 U.S.C. § 78u-5(c) immunizes them from liability since they were identified as such and were accompanied with meaningful cautionary language. *See In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 278-79, 282 (3d Cir. 2010); *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 273, n.11 (3d Cir. 2005).

Moreover, the Third Circuit has consistently held that statements like the "business will flourish in Asia" in the future, are insufficient." "[G]eneral, non-specific statement[s] of optimism or hope that a trend will continue" are "too vague to be actionable." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1427-28 (3d Cir. 1997); *see also, City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 172 (3d Cir. 2014).

### b.   U.S. distribution network

Plaintiff claims that an October 15, 2014 press release announcing a new agreement with a distributor, which "fully expands our distribution network across the United States to include key states on the eastern seaboard, from Maine to Florida," *id.* ¶ 78, shows that its August 29, 2012 Press Release about BSD's U. S. distributor network was misleading. Plaintiff argues that the August 29, 2012 press release falsely "represented that [BSD] had sales coverage throughout the United States." *Id.* ¶ 78. Putting aside the materiality of this claim,[11] the allegation is belied by the plain language of the press release. It makes no claim that there is sales coverage throughout the United States. Rather, it says BSD is focusing on "key metropolitan areas."

---

[11] Plaintiff has not and cannot plead that these press releases "significantly altered the 'total mix' of information made available." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 538 (3d Cir. 1999).

c.      **Sale of hyperthermia product line.**

Plaintiff alleges that a September 24, 2014 press release, which announced that China's

FDA had approved and renewed a distributor's marketing and import license for the BSD-2000

(a hyperthermia product), was materially misleading because it failed to disclose that the

Company was attempting to sell the hyperthermia product line (or, using plaintiff's language was

"siphoning off assets related to the hyperthermia product line").  D.I. 1, ¶ 81.

To make this allegation, Plaintiff had to studiously ignore the Company's consistent

disclosures beginning no later than July 10, 2013, stating that the hyperthermia product line was

"for sale."  In light of BSD's consistent prior public disclosures, the September 2014 press

release cannot be misleading.  But more to the point, like many of Plaintiff's other allegations,

this one – even if true – is entirely irrelevant because the last of Plaintiff's purchases was in

2013, well before the September 2014 release he claims to have relied upon.  *Id.* ¶ 25.

B.      **The Complaint Fails Adequately to Allege a Strong Inference of Scienter.**

The Complaint entirely fails to plead scienter.  First, the only allegations containing any

facts supporting any defendant having *any* knowledge are based *solely* on the defendants'

positions at BSD or their execution of BSD's SEC filings.  *See* D.I. 1, ¶¶ 17, 18, 19, 20.  Beyond

that, Plaintiff does not identify any facts supporting an inference of scienter at all, much less a

strong one.  To the contrary, the only thing that Plaintiff alleges is that "BSD and its executive

and directors had inherent knowledge of BSD's true financial condition and hard sales figures,

yet willfully released materially misleading statements to entice investment."  *Id.* ¶ 83.

However, "[i]t is well established that a pleading of scienter 'may not rest on a bare

inference that a defendant 'must have had' knowledge of the facts."  *In re Advanta Corp. Sec.*

*Litig.,* 180 F.3d 525, 539 (3d Cir. 1999).  Indeed, "[a]llegations that a securities fraud defendant,

because of his position within the company, must have known a statement was false or

20

misleading are precisely the types of inferences which courts, on numerous occasions, have determined to be insufficient withstand Rule 9(b) scrutiny." *In re: Advanta,* 180 F.3d at 539; *Bartesch v. Cook*, 941 F. Supp.2d at 510-11. This is especially true when, as here, BSD disclosed its "true financial condition and hard sales figures" in its public reports.

Next, the Complaint fails adequately to plead scienter because it relies on impermissible group pleading and conclusory assertions regarding the individual Defendants' knowledge. The Complaint's few scienter allegations are made in blanket references to "BSD & its executives," D.I. 1, ¶ 83, 117, "Defendants," *id.,* ¶ 132 or the "Executive Defendants and Director Defendants," *id*., ¶¶ 138, 158, 160. The Third Circuit has explicitly rejected such "group pleading" as incompatible with the PSLRA's requirement that plaintiffs "specify the role of *each defendant* demonstrating *each defendant's* involvement in misstatements and omissions." *Winer Family Trust*, 503 F.3d at 335-37 (emphasis added).

Plaintiff's "general allegations" are insufficient to create a strong inference of scienter on the part of any, let alone each, Defendant. The claim that BSD's press releases were fraught with omissions is clearly contradicted by BSD's public filing. Further, boiler-plate Exchange Act claims and formulaic recitations of the elements of the statute and rule *see* D.I. 1, Counts I, II & III, do not meet the particularity requirements of 15 U.S.C. ¶78u-4 (b)(2). *See Twombly*, 550 U.S. at 555.

The only allegation of "corporate scienter" is premised on the alleged scienter of BSD's "officers, management and agents." D.I. 1, ¶ 148. This Court has rejected the "collective scienter" theory. *See City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,* 686 F.Supp. 2d 404, 402-03 (D. Del. 2009). Where the Complaint fails to show that "at least one individual

officer who made, or participated in the making of, a false or misleading statement did so with scienter," it fails to allege corporate scienter. *Id.*

### C.     The Complaint Fails Adequately to Plead Loss Causation.

For a complaint to survive a motion to dismiss, loss causation must be adequately pled. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). A complaint that does not give a defendant "notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation" must be dismissed. *Id.* To establish "loss causation" Plaintiff show that alleged "untruth was in some reasonably direct, or proximate way responsible for his loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 428 (3d Cir. 2007)." The loss causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation "touches upon the reasons for the investment's decline in value." *Id.* If, by contrast, "the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss," recovery is not permitted. *Id.*

Plaintiff's Complaint utterly fails this test. First, it pleads no facts showing a causal connection between the alleged misrepresentation and Plaintiff's claimed losses. The only paragraphs that reference causation at all are paragraphs 27, 58, 149, and 161. These paragraphs all recite conclusions. *See Fowler* 578 F.3d at 203.

Second, Plaintiff's pleading is not plausible because even its bare conclusions are nonsensical and contradictory. In paragraphs 27 and 58, Plaintiff alleges that "as a result of the three Dilution Events *and material misrepresentations*, BSD's share price decreased dramatically." D.I. 1, ¶ 58; *see ¶* 27 (emphasis added). These paragraphs absurdly assert that the optimistic misrepresentations which allegedly caused Plaintiff to buy BSD stock at the same time actually caused stock price to decrease dramatically. This is not plausible. Moreover, in

paragraphs 149 and 161 Plaintiff alleges the opposite.  There he alleges that, relying on "the false

and misleading statements and omissions made by BSD, or upon the integrity of the market in

which the stock trades, and/or the absence of material adverse information that was known to or

recklessly disregarded by BSD but not disclosed in public statements by BSD during the

Investment Period, Plaintiff acquired and held BSD stock" which then continued to decline.  This

is an allegation that the stock price was artificially inflated by misrepresentation.  That

contradicts Plaintiff's prior allegation.  And, it leaves out what caused the stock price to drop.  A

complaint that fails to plead a "causal nexus" between the price drop and any specific omission

or misrepresentation fails to plead loss causation.  *See Berckeley*, 455 F.3d at 223.[12]

## III.   THE COMPLAINT FAILS TO PLEAD FRAUD UNDER DELAWARE LAW WITH PARTICULARITY, AS REQUIRED BY FED. R. CIV. P. 9(b).

Plaintiff's common law fraud claim is asserted only against the individual defendants.

*See* D.I. 1, Count IV.  A claim for common law fraud under Delaware law requires a plaintiff to

plead the following elements:

> (1) defendant's false representation, usually of fact; (2) made either
> with knowledge or belief or with reckless indifference to its falsity;
> (3) with an intent to induce the plaintiff to act or refrain from
> acting; (4) the plaintiff's action or inaction resulted from a
> reasonable reliance on the representation; and (5) reliance damaged
> the defendant.

*Browne v. Robb,* 583 A.2d 949, 955 (Del. 1990).

---

[12] In addition, Plaintiff's formulaic recitation of the Individual Defendants' "positions of
management and control" and "inherent knowledge of BSD's true financial condition," *see* D.I.
1, ¶¶ 83, 117, 137 – 140 is insufficient to allege "control person" liability under Section 20(a)
because it fails to allege with particularity the Individual Defendants' control of BSD, or their
culpability as controlling persons.  *See Suprema Specialties,* 438 F.3d at 284; *In re Digital Island
Sec. Litig.,* 223 F.Supp.2d 546, 560, 562 (D. Del. 2002).

A claim for common law fraud must be pled with particularity pursuant to Fed. R. Civ. P. 9(b). *Snowstorm Acquisition Corp. v. Tecumseh Prods Co.,* 739 F. Supp. 2d 686, 708 (D. Del. 2010). The particularity standard is well established: "The circumstances which shall be stated with particularity refer to the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Metro Commc'ns v. Advanced Mobilecomm Tech., Inc.,* 854 A.2d 121, 144 (Del. Ch. 2004).

Plaintiff's Complaint entirely fails this test. While it does states the time, place and contents of the alleged misrepresentations, it does not attribute any particular misstatement or omission to any particular person. *See generally* Complaint. It does not identify any particular statement or omission that Plaintiff relied upon. *Id.* Rather, it alleges that Plaintiff relied upon "the integrity of the market in which the stock trades." D.I. 1, ¶ 171. This is insufficient for common law fraud purposes. Direct reliance on a misstatement or omission is required. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del.1992); *Nacco Industries, Inc. v. Applica Inc.* 991 A.2d 1, 21 (Del. Ch. 2009). Having failed to meet the pleadings standards of Rule 9(b), the Complaint must be dismissed.

## IV.     PLAINTIFF'S REMAINING CLAIMS ARE DERIVATIVE AND MUST BE DISMISSED UNDER THE BUSINESS JUDGMENT RULE.

In this case, Plaintiff alleges that he has made demand on the Company's Board of Directors to take legal action and redress the wrongs alleged in the Complaint. *See* D.I. 1, ¶¶ 84, 87. Plaintiff further alleges that the Board, after investigating the claims asserted in the Complaint, has refused to pursue them. *Id.* ¶ 109.

Under Delaware law, the effect of Plaintiff's allegation is two-fold. First, "the effect of a demand is to place control of the derivative litigation in the hands of the board of directors."

Case 1:15-cv-03344-PGG Document 36 Filed 11/18/16 Page 38 of 45
Case 1:15-cv-03344-PGG Document 36 Filed 11/18/16 Page 38 of 45 PageID #:100
Document      Page 38 of 45

*Spiegel v. Buntrock*, 571 A.2d 767, 775–76, 77 (Del. 1990). When, as here, "stockholders, after making demand and having their suit rejected, attack the board's decision as improper, the board's decision falls under the 'business judgment' rule and will be respected if the requirements of the rule are met." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 784 (Del. 1981).

Directors are presumed to have acted "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Omnicare, Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914, 928 (Del. 2002). A court may overturn a board's exercise of business judgment only if the decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J. P. Stevens & Co., Inc.,* 542 A.2d 770, 780–81 (Del. Ch. 1988).

Second, if the stockholders make a demand, as in this case, they are deemed to have waived any claim they might otherwise have had that the board cannot independently act on the demand. *Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70, 74 (Del. 1997).

A.    **Motion to Dismiss Standard for Judicial Review of Demand Refusal.**

Under Fed. R. Civ. P. 23.1, a plaintiff seeking to assert a derivative claim must "state with particularity … any effort by the plaintiff to obtain the desired action from the directors … and … the reasons for not obtaining the action or not making the effort." Delaware courts hold that this requires plaintiffs to plead, with particularity, facts "which create a reasonable doubt that the board of director's decision is protected by the business judgment rule." *Levine v. Smith*, 591 A.2d 194, 211 (Del. 1991). In a demand refusal case, because the shareholders have "tacitly concede[d] the independence of a majority of the board to respond," "*the only issues to be examined are the good faith and reasonableness of its investigation*." *Id.* at 212 (Del. 1991) (citations omitted).

Thus, for Plaintiff's derivative claims to survive, his Complaint must have pled facts with particularity that raise a "reasonable doubt" as to the Board's "good faith and/or the reasonableness of their investigation." *Boeing Co. v. Shrontz*, 1994 WL 30542, at *2 (Del. Ch. Jan. 19, 1994). That is, the facts pled must raise a reasonable belief that the decision to refuse a demand was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co.*, 542 A.2d at 780–81. The Complaint falls well short of this bar.

### B. **The Complaint Does Not Adequately Allege That The Demand Was Wrongfully Refused.**

Plaintiff's allegations necessitate dismissal of his derivative claims as a matter of law. The Complaint does not adequately allege that the demand was wrongfully refused. The Complaint's allegations regarding the Board's investigation of his demand assert essentially three deficiencies with the investigation: (1) Plaintiff is unhappy with his level of participation in the investigation, (2) the investigation was not commenced promptly enough and took too long, and (3) the Board was involved in its investigation. As explained below, these allegations do not raise a reasonable doubt about the good faith or reasonableness of the Board's investigation.

### 1. **Plaintiff's "Participation" In The Investigative Process.**

Plaintiff complains that the Board did not always respond to his extensive correspondence inquiring about the timing, substance, and staffing of the investigation, and that when the Board's Special Counsel did respond, he told Plaintiff he would be interviewed, but BSD would not "be consulting with [plaintiff or his counsel] as the investigation progressed." D.I. 1, ¶¶ 88, 91. Plaintiff also complains that the Board said it would interview him over the phone, but not in person, and that it did not request documents from him beyond the draft complaint. *Id.* ¶¶ 99, 100. He complains that there was difficulty scheduling an interview and

26

that the interview ultimately was terminated before it was completed. *Id.* ¶ 101. Finally, he

complains that during the interview it was discovered that the investigation was being conducted

without a "full record," *id.* ¶ 101, but does not say what he means by that term.

These picayune allegations do not provide "reasonable doubt" as to the Board's good

faith or the reasonableness of its investigation. First, there is no requirement that a board must

invite participation by a plaintiff at all, when responding to a demand. *See Levine*, 591 A.2d at

214. The involvement of external third-parties, if any, is entirely at the Board's discretion. *Id.*;

*see also Boeing*, 1994 WL 30542 at *2. The obligation of the Board is to be informed, and that

obligation is satisfied by seeking "the relevant information needed to make that decision." *Id.*

Here, Plaintiff's allegations are based entirely on public information and the alleged actions of

various individuals that were interviewed. Interviewing Plaintiff was not necessary for the

Special Counsel to make its recommendation or the Board to make its decision.[13]

Nor is there any requirement that a Board continuously inform a plaintiff of its

investigation. *See Gamoran v. Neuberger Berman, LLC*, 2012 WL 2148217 at *5 (S.D.N.Y.

June 12, 2012); *see also Boeing*, 1994 WL 30542 at *2 (upholding board's decision to refrain

from meeting with a shareholder plaintiff concerning a demand). The Board and its Special

Counsel are accountable, not to Plaintiff, but to BSD. The Complaint provides no factual basis

for a conclusion that failure to communicate with Plaintiff should impugn the investigation. Nor

does the Complaint allege any facts showing that responding to Plaintiff's correspondence

"would have changed the outcome of the investigation in any way." *Litton Indus., Inc. v. Hoch*,

---

[13] Moreover, Plaintiff's complaints about his aborted interview, even if believed, are trifling.
The Complaint admits that the Company tried to interview Plaintiff once—which, when it didn't
meet Plaintiff's standards, ended—and *then tried to reschedule*. D.I. 1 ¶¶ 101, 106.

1993 WL 241549 (C.D. Cal. Oct. 30, 1991).[14]  Finally, Plaintiff's claim of an "incomplete

record" is entirely conclusory.  The Complaint says nothing about what was in the record, what

was missing from the record, or why it mattered.  Conclusory allegations and speculation do not

provide the requisite reasonable doubt.

### 2.    Failure To Complete The Investigation On Plaintiff's Timetable.

Plaintiff also complains that the investigation took a long time, and in particular that it

took longer than the 90-120 days the Board originally estimated.  D.I. 1, ¶¶ 89, 109.  But

Plaintiff pleads no facts explaining how this shows bad faith or unreasonableness.  Plaintiff does

not, and could not, make any allegation that his substantive rights were affected by the additional

months the Board and its Special Counsel took to do their work.  Boards and their committees

are entitled to a reasonable amount of time to investigate a demand, and "the amount of time

needed for a response will vary in direct proportion to the complexity of the technological,

quantitative, and legal issues raised by the demand." *Charal Inv.  Co. v. Rockefeller*, 1995 WL

684869, at *3 (Del.  Ch.  Nov. 7, 1995) (citation omitted).

If anything, in this case the fact that additional time was taken supports the conclusion

that the Board did not conduct a "pro forma" investigation, but instead took the time necessary to

fully investigate and consider Plaintiff's claims.  The Complaint is devoid of any particularized

allegations that support a reasonable belief to the contrary.

### 3.    Board Involvement In The Investigation.

Finally, Plaintiff complains that in correspondence sent early in the investigation, the

Board's Special Counsel informed him that "the parameters and content of the investigation will

---

[14] In *Litton*, the court dismissed the plaintiff's claims under Delaware law because the plaintiff could not identify any witnesses or evidence that the committee neglected to review that would have changed anything, but rather had simply made suggestions as to how the investigation might have been conducted differently.  *Id*. at 10.

be determined by the BSD Board of Directors." (D.I. 1, ¶ 91).[15] This fact, according to Plaintiff,

"wholly undermines the credibility of any purported investigation as such investigation should be

impartial and conducted by outside Special Counsel." This argument fails.

First, as discussed above, by making demand upon the Board before filing suit, Plaintiff

conceded the independence of a majority of the Board to respond. Having done so, Plaintiff

cannot now complain that it is unreasonable or bad faith for the Board conduct the investigation.

Further, "the mere threat of personal liability for approving a questioned transaction, standing

alone, is insufficient to challenge either the independence or disinterestedness of directors."

*Aronson v. Lewis*, 473 A.2d 805,815 (Del. 1984).

Second, Plaintiff's allegation – that the Board's credibility is wholly undermined – is a

conclusion, not a fact. Plaintiff has offered no facts to show why the involvement of this Board,

legally conceded to be independent, undermines its investigation. Indeed, the contrary is true. It

would be a problem if the Board, having taken up the investigation, did not retain ultimate

authority over it. It is, after all, the job of a board of directors to investigate alleged harms to the

corporation and decide what, if any, action should be taken. Finally, in this case the Board in

fact did what Plaintiff complains was not done: it hired Special Counsel to advise it and to run

the investigation day to day. *See* D.I. 1, ¶¶ 5, 95-106.

### 4. Plaintiff's allegations actually support the existence of a reasonable and good faith investigation.

Finally, to the extent Plaintiff's Complaint does make specific allegations regarding the

reasonableness and good faith of the investigation, they actually cut against Plaintiff and in favor

of dismissal under the business judgment rule. The Complaint makes clear that the Board

---

[15] Plaintiff also complains that in connection with his interview he was told "BSD's Board members Mr. Steven Stewart and Mr. Tim McQuay would be participating in the interview," and they are defendants in the case. *Id*. ¶ 100.

responded to the demand, initiated an investigation, undertook the expense of hiring Special

Counsel to assist in conducting it, exchanged numerous emails, letters, and telephone calls

throughout the process, sought documentary evidence from Plaintiff and others, interviewed

witnesses, took adequate time to fully investigate the matter, and then finally—and only after and

upon the recommendation of the committee and Special Counsel—formally rejected Plaintiff's

demand.  *See* D.I. 1 ¶¶ 84–132.  That is not an unreasonable process conducted in bad faith.  It is

precisely what the law envisions and arguably more than it requires.  *See Litton*, 1993 WL

241549 at *3 (committee's investigative procedures need not be anything more than "adequate").

### CONCLUSION

Based on the foregoing, the Defendants respectfully request that the Complaint be

dismissed in its entirety, with prejudice.

Dated:  June 30, 2015                                  Respectfully submitted,

                                                       DORSEY & WHITNEY (DELAWARE) LLP

                                                        */s/ Robert W.  Mallard*
                                                       Robert W.  Mallard (DE Bar No.  4279)
                                                       Alessandra Glorioso (DE Bar No.  5757)
Of Counsel:                                            300 Delaware Avenue
                                                       Suite 1010
Milo Steven Marsden (*pro hac vice*)                   Wilmington, DE 19801
Kyle E.  Witherspoon (*pro hac vice*)                  Telephone: (302) 425-7171
DORSEY & WHITNEY LLP                                   Facsimile:  (302) 425-7177
Kearns Building                                        mallard.robert@dorsey.com
136 South Main Street, Suite 1000                      glorioso.alessandra@dorsey.com
Salt Lake City, UT 84101-1685
Telephone:  (801) 933-7360
Facsimile:  (801) 933-7373                             ***Attorneys for Defendants***
E-mail:  marsden.steve@dorsey.com
         witherspoon.kyle@dorsey.com

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PAUL SCHWARTZ, individually as a   :
shareholder of Perseon Corporation (f/k/a   :
BSD Medical Corporation), and on behalf   :
of Perseon Corporation (f/k/a BSD Medical :
Corporation),
                           :
      Plaintiff,               :
                           :
   v.                   :
                           :        C.A. No. 15-344-LPS
PERSEON CORPORATION (f/k/a BSD   :
MEDICAL CORPORATION); TIMOTHY   :
C. MCQUAY; GERHARD W.           :
SENNEWALD; MICHAEL NOBEL;      :
DOUGLAS P. BOYD; STEVEN G.      :
STEWART; DAMIEN E. DUPUY;       :
HAROLD R. WOLCOTT; WILLIAM S.   :
BARTH, DENNIS P. GAUGER; SAM    :
MARAVICH, JR.; and CLINTON E.    :
CARNELL, JR.,               :
                           :
      Defendants.         :

## ORDER

At Wilmington this **29th** day of **March, 2016**:

For the reasons stated in the Memorandum Order issued this same date,

IT IS HEREBY ORDERED that:

1.    The Individual Defendants' motion to dismiss the Complaint (D.I. 7) is

GRANTED.

2.    Plaintiff's request for leave to file an amended Complaint is GRANTED.  If

Plaintiff wishes to file an amended Complaint, he shall do so within thirty (30) days of the date

of this Order.

_____
UNITED STATES DISTRICT JUDGE